## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## PECOS DIVISION

DAVID FLASH,
     Plaintiff,

v.
JEFF DAVIS COUNTY, TEXAS;
CURTIS EVANS, individually and in his
official capacity as County Judge;
VICTOR LOPEZ, individually and in his
official capacity as Sheriff;
GLEN EISEN, individually and in his
official capacity as County Attorney;
MARY ANN LUEDECKE, individually and in her
official capacity as Justice of the Peace;
ADRIANA RUILOBA, individually and in her
official capacity as Chief Deputy;
JOSEPH GIESBRECHT, individually and in his
official capacity as Deputy Sheriff;
KING MERRITT, individually and in his
official capacity as Deputy Sheriff; and
LISA DENNISON, individually,
     Defendants.

Civil Action No. 4:26-cv-00004
JURY TRIAL

### ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiff David Flash, by and through his attorneys Lamar Treadwell, Smith and Vinson Law Firm, PLLC (Jarrod Smith and Brad Vinson), and Elise Smith brings this civil action under 42 U.S.C. § 1983, 28 U.S.C. §§ 1331 and 1343, and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and Texas penal statutes and would respectfully show the Court as follows:

### A. This is a First Amendment free speech case

David Flash is a journalist, news reporter, blogger, and publisher. At no time did his conduct or reporting pose a serious threat to the public. The doctrine of

prior restraint prohibits the government from blocking the publication or broadcast of material before it is released to the public. Over a period of years beginning in September 2023 and continuing to the present, the elected policymaking officials of Jeff Davis County, being County Judge, Curtis Evans, Sheriff Victor Lopez, and joined by County Attorney, Glen Eisen, Justice of the Peace, Mary Ann Luedecke individually and in concert with each other acted under color of law to chill and suppress by intimidation, seizure, arrest, that also constituted prior restraints to Flash's exercise of his constitutional rights. At all times, Flash was engaged in constitutionally protected activity relating to his right to gather information, to investigate and disseminate information about government actions and public affairs.

The First Amendment to the United States Constitution ensures that the press operates without undue government interference. This freedom recognizes the media's function in informing the public and fostering open debate, which are fundamental to a self-governing society. It supports the public's right to know, allowing journalists to investigate and disseminate information about government actions and public affairs. This access allows the press to report on the administration of justice and the conduct of public officials, serving as a powerful check on potential abuses of power. The requirement for open meetings extends to many legislative and administrative bodies, ensuring that decisions affecting the citizenry are made in public view. The press serves as a watchdog: New York *Times v. Sullivan,* 376 U.S. 274 (1964) - protecting criticism of official conduct (prior restraint), *Mills v. Alabama,* 384 U.S. 214 (1966) - press serves as "powerful antidote to any abuses of power by governmental officials"; *New York Times v.*

*United States,* 403 U.S. 713 (1971) – the duty of the press is to expose government deception, *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555 (1980) that the First Amendment protects communication "on matters relating to the functioning of government" logically extends to other government proceedings beyond criminal trials. *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469 (1975) reinforced the principle that "public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media." The Court emphasized that "the freedom of the press to publish that information is of critical importance to our type of government in which the citizenry is final judge of the proper conduct of public business."

The named County officials acted pursuant to their ad hoc policy to directly cause Flash to suffer an injury that would chill a person of ordinary firmness from continuing to engage in his First Amendment freedom of the press activities, and in doing so violated Flash's Fourth and Fifth Amendment rights to be free from unlawful detention and arrest, and to not be deprived of life, liberty, or property, without due process of law when exercising his constitutionally protected conduct, as applied through the Fourteenth Amendment.

Flash engaged in constitutionally protected activity by photographing public meetings and publishing news critical of government officials. The Defendants took adverse actions against him to intimidate him by making him the subject of investigations, harassment by arrest and detention, and by publishing defamatory remarks to intimidate him, to restrain his reporting, and to retaliate against him for his exercise of free speech. There is a direct causal connection between Flash's

protected activity and the adverse intimidating actions *that would chill a person of ordinary firmness from continuing to report and photograph public proceedings. See, Keenan v. Tejeda,* 290 F.3d 252, 258 (5th Cir. 2002) ("…purported acts of retaliation, if proven, were such as would chill speech of a person of ordinary firmness and   former deputy constables sufficiently averred that they were deprived of constitutional free speech rights, even though they were not completely silenced…").

Flash's June 27, 2025, arrest occurred more than eight years after the Fifth Circuit clearly established the First Amendment right to record government officials performing their duties in public. County Attorney Eisen admitted in a recorded meeting that Defendants' actions were "motivated by our coverage"— direct evidence of retaliatory motive. No person in Jeff Davis County has ever been arrested for photographing a public commissioner's court meeting other than Flash.

Flash has a right to exercise free speech in his personal and business activities, including his right to photograph and record public government meetings and to publish news critical of government officials. *See Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) ("First Amendment principles . . . encompass a range of conduct related to the gathering and dissemination of information"). This right was clearly established in the Fifth Circuit eight years before Flash's arrest.

Flash has a Fifth Amendment liberty interest, enforceable through the Fourteenth Amendment, to report on matters of public concern free from arbitrary government restraint. The term "liberty" in the Due Process Clauses "denotes not merely freedom from bodily restraint but also the right of the individual to

contract, to engage in any of the common occupations of life, to acquire useful knowledge…and generally to enjoy those privileges long recognized…as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

The term "liberty" in the Due Process Clauses of the Fifth and Fourteenth Amendments encompasses First Amendment freedoms. In this context, "liberty" means the liberty guaranteed to a citizen to be secure against state actors from arbitrary or unreasonable restraint by the government to report on matters of public concern without government restraints or retaliation as applied through the Fourteenth Amendment to the States. Public meetings are limited public forums where content-based restrictions face heightened scrutiny; government cannot exclude or retaliate against journalists based on viewpoint; conspiracy liability applies when officials coordinate to violate press rights. This liberty "extends to the full range of conduct which the individual is free to pursue." *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954). Liberty also includes "freedom from bodily restraint and punishment" and the right to be free from "unjustified intrusions on personal security." *Ingraham v. Wright*, 430 U.S. 651, 673-74 (1977). Flash's liberty interest includes his right to pursue his occupation as a journalist, to access public meetings, and to be free from arrest and prosecution designed to punish him for his reporting. Flash is a bona fide member of the class of persons constituting the Free Press.

### B. Jurisdiction and Venue

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Plaintiff's claims arise under 42

U.S.C. § 1983 and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, including claims for false imprisonment, assault and battery, and defamation.

3. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in Jeff Davis County, Texas, which is located within the Western District of Texas, Pecos Division.

## C. Parties and Service

4. **Plaintiff, David Flash,** is an individual and citizen of the State of Texas. Flash is an independent journalist and the publisher of the Big Bend Times, a digital news outlet with more than 107,000 Facebook followers that serves as the largest media outlet in Texas's Trans-Pecos region. Flash holds a Master of Science in Digital Audience Strategy from Arizona State University's Walter Cronkite School of Journalism and Mass Communication and a Bachelor of Arts in History from The University of Texas at Austin. Flash may be served through counsel.

5. **Defendant, Jeff Davis County, Texas**, is a political subdivision of the State of Texas. Jeff Davis County may be served through the County Judge at the Jeff Davis County Courthouse, 100 Court Avenue, Fort Davis, Texas 79734.

6. **Defendant, Adriana Ruiloba**, is an individual who may be served at the Jeff Davis County Sheriff's Office, 100 Court Avenue, Fort Davis, Texas 79734.

7. **Defendant, Curtis Evans**, is an individual who may be served at the Jeff Davis County Courthouse, 100 Court Avenue, Fort Davis, Texas 79734.

8.  **Defendant, Victor Lopez,** is an individual who may be served at the Jeff Davis County Sheriff's Office, 100 Court Avenue, Fort Davis, Texas 79734.

9.  **Defendant, Mary Ann Luedecke,** is an individual who may be served at the Jeff Davis County Justice of the Peace Office, 100 Court Avenue, Fort Davis, Texas 79734.

10. **Defendant, Glen Eisen,** is an individual who may be served at the Jeff Davis County Attorney's Office, 100 Court Avenue, Fort Davis, Texas 79734.

11. **Defendant, Joseph Giesbrecht,** is an individual who may be served at the Jeff Davis County Sheriff's Office, 100 Court Avenue, Fort Davis, Texas 79734.

12. **Defendant, King Merritt**, is an individual who may be served at the Jeff Davis County Sheriff's Office, 100 Court Avenue, Fort Davis, Texas 79734.

13. **Defendant, Lisa Dennison,** is an individual who resides in Alpine, Texas, and may be served wherever she may be found.

### D. Summary of Claims

14. From September 2023 to the present, the elected policymaking officials of Jeff Davis County being County Judge, Curtis Evans, Sheriff, Victor Lopez, and joined by County Attorney, Glen Eisen, Justice of the Peace, Mary Ann Luedecke—reached a meeting of the minds to achieve an unlawful objective: the suppression of Flash's journalism through prior restraint, harassment, and retaliation for exercising free speech.

15. These elected officials are final policymakers for Jeff Davis County.

16. Chief Deputy, Adriana Ruiloba, Deputy Giesbrecht, Deputy King Merritt, and former County Attorney employee Lisa Dennison were county employees or

former employees who knew of the objectives of the conspiracy against Flash and committed specific acts in furtherance of the conspiracy.

17. The existence and purpose of the conspiracy are not a matter of inference because in December 2024, County Attorney Glen Eisen admitted in a recorded public Commissioner's Court meeting that the County's legal actions against Flash were **"motivated by our coverage,"** such that Flash's Big Bend Times operated as a "megaphone," and that Flash **"brought it on himself"** [government restraints and retaliations] through his journalism.

18. Between September 2023 and April 2024, County officials initiated at least seven separate investigations into Flash but not a single one resulted in criminal charges.

19. The County spent more than $13,000 in taxpayer funds hiring outside law firms to block the release of public records lawfully requested by Flash in furtherance of the conspiracy to restrain Flash's exercise of his liberty to request public records for his investigative journalism.

20. When Flash exercised his constitutional right to sue for the release of public information, the County spent more than $27,000 in taxpayer funds on outside lawyers to defend its unlawful refusal to release the records.

21. The conspiracy reached a climax on June 27, 2025, only seventeen days after the 394th District Court struck down County Judge Evans's unconstitutional order that banned Flash from being on county property to exercise all of his constitutional rights, ruling that Judge Evans's ban was "without legal authority" and "violates Flash's constitutional rights."

22. Undeterred, Evans directed Chief Deputy Ruiloba to arrest Flash while Flash was photographing a public commissioner's court meeting.

23. Sheriff Lopez was present throughout the arrest and approved it as a bystander supervisor and policy maker because the unlawful arrest was an act in furtherance of the conspiracy.

24. While being handcuffed, Flash was injured from the excessive use of force that led to his being unlawfully detained for approximately thirty minutes during which time Flash was unlawfully charged with disorderly conduct under Texas Penal Code § 42.01.

25. The arrest for disorderly conduct was unlawful because Flash was not put on notice that he had committed any of the prohibited acts listed in § 42.01, but more importantly, this criminal charge was dismissed because this statute was unconstitutional when it is used to target the content of the communication rather than the conduct of the speaker as held in *Owens v. State*, No. PD-0075-24, 2025 WL 1587690, at *1 (Tex. Crim. App. June 4, 2025), reh'g denied (July 30, 2025) that cites a long history of United States Supreme Court cases, for the proposition that, "The First Amendment generally prohibits the government from prohibiting speech or expressive conduct. *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992). … including citing the following First Amendment bedrock principles:

> Offensiveness does not deprive communications of constitutional protection. *Hill v. Colorado*, 530 U.S. 703, 715, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). The First Amendment's protections belong even to

those whose motives others may find misinformed or offensive. *303 Creative LLC v. Elenis,* 600 U.S. 570, 595, 143 S.Ct. 2298, 216 L.Ed.2d 1131 (2023).

*Id.* at *2.

26. Dismissal of all charges occurred because they were based on Flash's exercise of his First Amendment rights meaning there was never any probable cause, and all Defendants committed acts in furtherance of the overall objective of the conspiracy to restrain or retaliate against Flash's exercise of these First and Fifth Amendment rights.

27. Each conspirator committed unlawful acts in furtherance of the conspiracy's objective as follows:

  a. **Defendant Evans** issued the unconstitutional ban to prevent Flash from accessing public property, directed Flash's arrest, and upon information and belief, publicly defamed Flash by making attributions to others to cause the publication of various statements that were either slanderous or libelous per quod (implicated by circumstances in which it is given) or were slanderous or libelous per se (by itself) that were inherently harmful to Flash's personal and business reputation including to a newspaper that Flash was "crazy" and "not suitable for public settings," endorsed an anonymous smear website that exploited the 2011 shooting death of Flash's younger brother, and authorized release of body camera footage to that website that called Flash a fraud, a provocateur, a narcissist, his reporting and cleaning business were "scams," a con man, a liar, a fake journalist.

  b. **Defendant Lopez** was present during the unlawful arrest and failed to intervene despite having command authority, failed to discipline any

subordinate, consented to the release of footage to the smear website, and presided over a Sheriff's Office that failed to train deputies on the First Amendment rights of journalists—rights clearly established since 2017.

c. **Defendant Eisen** admitted the County's actions were "motivated by our coverage," refused to discipline his employee for a felonious disclosure of confidential information, and coordinated the harassment campaign.

d. **Defendant Luedecke** attempted to illegally detain Flash by shouting "You're detained!" despite having no authority to detain citizens, secretly sent a law enforcement alert labeling Flash a "First Amendment auditor" to invite hostility from officers, issued multiple false warrant notices that blocked Flash's driver's license renewal, and filed the baseless criminal charges that were ultimately dismissed.

e. **Defendant Ruiloba** arrested Flash without probable cause, dug her fingernails into Flash's forearm leaving documented abrasions, and applied handcuffs so tightly they caused wrist injuries.

f. **Defendant Merritt** filed bogus criminal reports and enforced the extrajudicial ban by threatening Flash near his own home.

g. **Defendant Giesbrecht** participated in excessive force and failed to intervene.

h. **Defendant Dennison** disclosed confidential law enforcement information on three separate occasions—constituting a third-degree felony under Texas Penal Code § 39.06. First, on October 8, 2023, Dennison

revealed to Flash that she had accessed body camera footage of him through her job. Second, on or about February 2, 2024, Dennison used her login credentials to access Flash's sealed DPS records and disclosed his non-disclosed mugshots to a public Facebook forum to damage his reputation. Third, Dennison submitted a defamatory written statement to county officials—authored on county time—describing Flash as mentally unstable, speculating he was carrying a concealed weapon in disguise, and comparing him to "a spoiled toddler."

28. **Municipal liability attaches under Monell.** Jeff Davis County is liable for the violations of Flash's First Amendment rights (through the Fourteenth Amendment), and his Fifth Amendment liberty interest (through the Fourteenth Amendment), and Fourth Amendment rights (false arrest, excessive force) because final policymakers personally committed and directed the violations, ratified them with full knowledge of their unconstitutional basis, failed to train and supervise subordinates on clearly established constitutional rights, and fostered a culture of deliberate indifference to the constitutional rights of journalists and critics.

29. County Judge Evans—a final policymaker—personally issued the unconstitutional ban and directed Flash's arrest.

30. Sheriff Lopez—a final policymaker for law enforcement—was personally present during the arrest, knew it was unlawful, had command authority to stop it, and did nothing.

31. Lopez later ratified the violation by refusing to discipline Ruiloba, never responded to Flash's formal complaint, and consented to release body camera footage to a smear website.

32. The need for training was obvious: the right to record government officials has been clearly established in the Fifth Circuit since *Turner v. Driver* in 2017— eight years before this arrest—yet three different deputies all violated the same right.

33. The County's culture of deliberate indifference is demonstrated by seven investigations that produced zero charges, more than $13,000 spent blocking public records, and Eisen's refusal to discipline or investigate his employee's felony, multiple officials recusing themselves from Flash-related matters due to conflicts yet suffering no consequences, and more than $27,000 spent defending officials rather than holding them accountable.

34. **This is also a defamation case.** Defendants defamed Flash by publishing false statements that damaged both his personal and business reputation. Defendant Evans publicly told The Big Bend Sentinel that Flash was "crazy" and "not suitable for public settings"—statements that impute mental illness and unfitness for his profession as a journalist.

35. Defendant Dennison submitted a "burn book" statement to county officials describing Flash as mentally unstable and speculating he was carrying a concealed weapon, comparing him to "a spoiled toddler."

36. These statements constitute defamation per quod under Texas law. Flash seeks damages for harm to his reputation as a journalist and to the Big Bend Times, his business.

37. The policy makers accusing and charging Flash with crimes committed defamation per se because they published defamatory statements about Flash that they knew were false which caused harm to Flash because they were intended to

injure Flash's personal and business reputation exposing him to public hatred, ridicule, or financial injury also intending to impeach his honesty, integrity, virtue, or reputation that caused Flash financial injury.

38. The statements made by the policy makers were made with malice.

39. Flash seeks compensatory and punitive damages, declaratory and injunctive relief under 42 U.S.C. § 1983 and for attorneys' fees under § 1988 for violations of his rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

### E. Factual Background

### i. Flash's Journalism and the Big Bend Times

40. David Flash founded the Big Bend Times as an independent digital news outlet serving the Trans-Pecos region of West Texas. The Big Bend Times has grown to become the most widely read local news source in the region, with more than 107,000 Facebook followers.

41. Flash's journalism focuses on local government accountability, community events, and public affairs in Jeff Davis County and surrounding areas.

42. Flash's reporting regularly covers commissioners court meetings, county budgets, law enforcement activities, and matters of public concern.

43. Beginning in September 2023, the Big Bend Times published investigative stories examining the conduct of Jeff Davis County officials, including Justice of the Peace Mary Ann Luedecke, County Attorney Glen Eisen, County Judge Curtis Evans, and members of the Sheriff's Office.

44. These stories documented potential misuse of county resources, questionable law enforcement practices, and transparency failures.

45. Flash's First Amendment right to gather news and report on government activities is fundamental to our democratic system.

46. As the Fifth Circuit has recognized, "[f]ilming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy." *Turner v. Driver*, 848 F.3d at 689.

### ii. The Conspiracy Begins: September–December 2023

47. On October 8, 2023, Defendant Dennison publicly confronted Flash inside a local meat shop and followed him into an adjacent bakery where Dennison screamed at Flash that he was "under investigation" and that she had viewed body-worn camera footage of him through her job at the County Attorney's Office.

48. On February 2, 2024, an anonymous participant posted Flash's sealed mugshots to the "Alpine, What The F*$& Happened!?" Facebook community page. These mugshots—photographs from January 7, 2009, and May 24, 2015—were subject to judicial orders of non-disclosure under Texas Government Code Chapter 411 and accessible only to law enforcement agencies. The post characterized Flash as untrustworthy and "not a trusted media source," using the sealed criminal records to damage his reputation and discourage the public from crediting his journalism.

49. Flash could not identify the source of the leak until March 2025, when discovery materials produced by the Office of the Attorney General revealed that Defendant Dennison's login credentials were used to access Flash's Department of Public Safety file containing the same mugshots in identical format.

50. Dennison resides in Alpine, Texas, where the Facebook page operates. The unauthorized disclosure of non-disclosed criminal records with intent to harm Flash's reputation constitutes a second violation of Texas Penal Code § 39.06 (Misuse of Official Information), a third-degree felony, and violated Flash's constitutional right to privacy and his clearly established right to be free from government retaliation for exercising First Amendment freedoms.

51. Dennison's disclosure of confidential law enforcement information violated Texas Penal Code § 39.06 (Misuse of Official Information), a third-degree felony.

52. On October 10, 2023, Defendant Eisen admitted that Dennison, his supervised employee, had breached the County office's confidentiality policies, but despite this admission, Eisen took no disciplinary action against Dennison and declined to investigate the felony misuse of official information.

53. Dennison later submitted a written statement to county officials describing Flash as mentally unstable, speculating he might be carrying a gun in disguise, and comparing him to "a spoiled toddler."

54. On October 10, 2023, Defendant Merritt filed a report (Case No. 231010-69) accusing Flash of disorderly conduct, criminal trespassing, and evading arrest where Defendant Eisen was listed as the complainant. **No arrest was made, and no charges were ever filed based on this report.**

55. On October 18, 2023, Defendant Luedecke attempted to illegally detain Flash at the Jeff Davis County Courthouse after Flash photographed a sign outside her office. Luedecke—who is not a peace officer and has no authority to detain citizens—shouted "You're detained!" at Flash as he attempted to leave and instructed her assistant to "press the button" to summon law enforcement.

56. On October 20, 2023, Defendant Luedecke secretly sent an alert to regional law enforcement agencies labeling Flash a 'First Amendment auditor'—a derogatory term designed to delegitimize Flash's journalism and invite hostility from law enforcement officers.

57. Discovery materials revealed that Defendant Luedecke's "First Amendment auditor" alert was not limited to a written memorandum. Luedecke and Defendant Eisen also placed phone calls to the District Attorney's office—which serves both Jeff Davis County and Brewster County—warning that a "First Amendment auditor" was "on the loose." In response, county officials discussed playing Disney music during public meetings to prevent Flash from "monetizing" his recordings—a strategy premised on the false assumption that Flash was a "First Amendment auditor" seeking to provoke officers for profit rather than a credentialed journalist covering local government.

58. This coordinated, multi-agency effort to develop counterstrategies against Flash's journalism demonstrates the scope of the conspiracy and the Defendants' retaliatory intent.

59. On October 22, 2023, Defendant Luedecke published a second law enforcement report falsely accusing Flash of committing the crime of evading arrest and **no charges were ever filed based on this report.**

60. In December 2023, Flash discovered through a public information request that Jeff Davis County had conducted an extensive secret investigation against him, generating more than 300 pages of documents.

61. **Because this massive investigation resulted in no charges being filed, no arrests, and no court proceedings were initiated, this** shows the

use of law enforcement was to intimidate Flash and chill his exercise of his First Amendment rights.

62. In December 2023, Defendant Luedecke issued a false warrant notice to Flash at his actual home address hundreds of miles from Fort Davis—demonstrating she had accessed his personal records for purposes unrelated to any legitimate law enforcement function.

63. When confronted, Luedecke first claimed it was "a mistake," then changed her story to claim officials were "practicing" with new software. When asked why she would use Flash's real name and actual home address rather than a fictitious "John Doe" for a training exercise, Luedecke had no explanation.

64. A collection notice from the county's contracted collection firm followed.

65. Flash documented Luedecke's contradictory explanations in a contemporaneous news article.

66. This false warrant notice was issued before any criminal charges were filed against Flash—revealing it as pure harassment designed to intimidate him.

67. Defendant Luedecke subsequently initiated a false "failure to appear" notice and caused the Texas Department of Public Safety to block Flash's driver's license renewal.

68. Despite being informed there was no factual basis for these actions—and despite a clear paper trail showing Flash had complied with all requirements—Luedecke refused to rescind the notices.

69. Luedecke also refused to recuse herself from Flash's traffic citation case despite her obvious conflict of interest as both a target of Flash's journalism, a

complainant in pending criminal charges against Flash, and the judicial officer presiding over his case.

70. The traffic citation was ultimately dismissed, but not before Luedecke weaponized her judicial office to further harass Flash.

71. In total, between September 2023 and April 2024, Jeff Davis County officials initiated at least seven separate investigations into Flash but again, **none resulted in any criminal charges** implicating a conspiratorial purpose of intimidation and chilling of First Amendment rights to restrain reporting on government officials' actions to the public.

72. These investigations occurred under former Sheriff Bill Kitts, whose term expired in early 2025. Despite claiming to Flash that he was consulting with the Texas Rangers about Justice of the Peace Luedecke's unlawful detention attempt, public records reveal no such consultation occurred. Instead, Kitts's office directed Deputy Merritt to investigate Flash for 'evading arrest'—turning the victim of Luedecke's misconduct into the target of a baseless investigation. This pattern of targeting Flash rather than addressing official misconduct continued under Sheriff Lopez.

73. In furtherance of the conspiracy, Defendant Eisen authored a memorandum to the Commissioners Court proposing an ordinance that would criminalize photographing any county employee without their consent—and would allow county officials to grant consent to "media outlets they like" while depriving consent from journalists they disfavor. Though Eisen did not name Flash specifically, the memorandum was clearly designed to target Flash's journalism

and constitutes direct evidence of viewpoint-based discrimination and an attempted prior restraint on protected First Amendment activity.

74. The County spent more than $13,000 in taxpayer funds hiring outside law firms to block the release of public records related to these fruitless investigations.

### iii. Judge Evans's Unconstitutional Ban: April 2024

75. On April 23, 2024, Defendant Evans ordered Flash physically removed from the Jeff Davis County Courthouse while Flash was attempting to cover a public meeting, and as Flash was escorted out, Deputy Walker told him to "get a lawyer and sue."

76. **On April 25, 2024, Defendant Evans issued a written order banning Flash from being within 300 feet of any Jeff Davis County building or official.** The order threatened Flash with arrest and jailing in Hudspeth County if he violated the ban.

77. The 300-foot restriction effectively banned Flash from the entire town of Fort Davis—including the library, post office, park, community center, firehouse, and any public gathering where county employees might be present.

78. **The ban was issued without any procedural due process whatsoever, and**

    a. Flash received no prior notice of the ban.

    b. Flash was afforded no opportunity to be heard.

    c. No neutral decisionmaker reviewed the evidence.

    d. No findings of fact were made. No legal standards were applied.

e. Evans simply issued the ban by fiat, depriving Flash of his liberty interests in freedom of movement, access to public property, freedom from arrest, and the right to pursue his occupation as a journalist.

79. On April 25, 2024, Flash was arrested on a warrant issued by Jeff Davis County while returning from El Paso. A DPS trooper stopped Flash, and Culberson County deputies transported him to the Van Horn jail, where he was detained overnight—approximately 16 hours—before posting a $4,000 cash bond.

80. Flash's 14-year-old dog was with him at the time of the arrest. His other dogs, left at his Jeff Davis County residence, were exposed to predators overnight when a family member attempting to help could not secure them properly.

81. On April 28, 2024, Defendant Merritt stopped Flash near his own home and warned him he would be arrested if he approached the courthouse—enforcing Defendant Evans's extrajudicial ban without legal authority.

82. In July 2024, Defendant Luedecke issued multiple additional false warrant notices to Flash, causing his driver's license renewal to be blocked.

83. These notices were issued without any scheduled court dates and were designed solely to harass Flash.

84. Flash's attorney filed a habeas motion challenging Defendant Evans's ban as a violation of Flash's rights under the First, Fifth, and Fourteenth Amendments.

85. **On June 10, 2025, the court struck down Defendant Evans's ban, ruling that the order was "without legal authority" and "violates Flash's constitutional rights."**

86. The terroristic threat charge was dropped. Only the harassment charge filed by Defendant Luedecke remained pending at that time.

### iv. The June 27, 2025, Arrest:
### Retaliation 17 Days After the Ban Was Struck Down

87. **On June 27, 2025—exactly seventeen days after the court struck down Defendant Evans's unconstitutional ban—Flash was arrested while photographing a public Commissioner's Court budget meeting.**

88. Flash arrived at the Commissioners Court meeting to document the proceedings as a journalist.

89. He set up a streaming camera in a corner of the room and moved around taking photographs.

90. There were no written rules posted prohibiting recording or photography. When asked, Flash complied with a request to move his camera to the back of the room.

91. No rules regarding photography or recording were posted on the County's website. Flash received no verbal warning before his arrest.

92. Defendant Lopez approached Flash and complained about his photography, claiming it was interfering with his ability to listen to the meeting.

93. Video of the incident shows Flash was not disrupting the meeting in any way.

94. Defendant Ruiloba then confronted Flash, telling him to "back off" and "don't come in my personal space."

95. Flash left the room and continued recording from outside. Flash stated that he would return to photograph Ruiloba.

96. When Flash re-entered the room and pointed his camera toward Ruiloba, she immediately detained him without warning, and Ruiloba then grabbed Flash, handcuffed him, and forcibly removed him from the room.

97. Video and audio recordings captured Flash saying "Stop" and "I'm not resisting" as Defendants Ruiloba and Giesbrecht used physical force against him.

98. Despite Flash's lack of resistance, Ruiloba dug her fingernails into Flash's left forearm, leaving visible abrasions.

99. Flash's camera was knocked over during the arrest.

100. Body camera footage confirms that Flash was detained at the direction of Defendant Evans.

101. Defendant Lopez was present throughout the incident and failed to intervene despite knowing the arrest was unlawful—it occurred seventeen days after a court ruled that Evans's ban against Flash was unconstitutional and violated Flash's constitutional rights.

102. As Sheriff, Lopez had command authority over Ruiloba and Giesbrecht and could have stopped the arrest at any time.

103. Flash was questioned for approximately 30 minutes while handcuffed.

104. Flash was issued a citation for disorderly conduct under Texas Penal Code § 42.01. **The citation did not specify which subsection of § 42.01 was allegedly violated.** This failure to identify a specific offense is evidence that no probable cause existed—the charge was based on the content of Flash's speech, not his conduct, and was designed to intimidate him and chill his exercise of First Amendment rights.

### v. Flash's Documented Physical Injuries

105. On June 27, 2025, the same day as his arrest, Flash sought medical treatment at Vital Care Urgent Care in Odessa, Texas. Medical records document the following injuries:

(a) Visible abrasions on Flash's left forearm caused by Ruiloba digging her fingernails into his skin;

(b) Bruising and tenderness on Flash's right upper arm;

(c) Wrist abrasions from overly tight handcuff restraints;

(d) Pain in Flash's upper back and chest; and

(e) Elevated heart rate.

106. Flash was prescribed medication for muscle spasms and pain. He was advised to apply ice, monitor for infection, and return for follow-up care.

### vi. Dismissal of All Criminal Charges

107. On July 24, 2025, the disorderly conduct charge arising from the June 27, 2025, arrest was dropped due to insufficient evidence—confirming that no probable cause ever existed for Flash's arrest.

108. **On August 10, 2025, all remaining criminal charges against Flash were dismissed.** This included the harassment charge originally filed by Defendant Luedecke in April 2024 and a traffic citation, which was dismissed *with prejudice.*

109. The dismissal of all charges—particularly the dismissal with prejudice of the traffic citation—demonstrates that the County's criminal prosecutions of Flash were baseless and pretextual.

### vii. Post-Arrest Defamation, Ratification, and Continued Retaliation

110. Following Flash's June 27, 2025, arrest, the Defendants ratified the unlawful conduct and continued their conspiracy of retaliation. **On June 29, 2025, Defendant Evans defamed Flash in an interview with The Big Bend Sentinel, a third-party newspaper** because Evans publicly stated that Flash was "crazy" and "not suitable for public settings."

111. These statements are defamatory per se or per quod because they impute mental illness and unfitness for Flash's profession as a journalist.

112. Evans also threatened to pursue additional criminal charges against Flash under a two-year statute of limitations.

113. On June 30, 2025, Defendant Evans publicly endorsed an anonymous smear website (BigBendTimes.org, which is not affiliated with Flash's Big Bend Times) in online comments to the smear website that exploited the 2011 shooting death of Flash's younger brother.

114. Flash filed a public information request seeking records of all persons who had requested body camera footage of him.

115. The County's response identified only Flash and Rob D'Amico, editor of the Big Bend Sentinel, as requesters.

116. Flash contacted D'Amico, who confirmed he had not provided the footage to the anonymous smear website BigBendTimes.org.

117. Flash then emailed Defendant Eisen, copying D'Amico, asking how the smear site obtained footage that neither he nor D'Amico had disclosed. The County's response was evasive.

118. In fact, Defendants Evans and Lopez had granted the smear website operators an in-person exclusive interview about Flash and personally handed

over body camera footage outside the public information request process—then actively concealed this fact from Flash when he inquired.

119. This fraudulent concealment was not revealed until September 2025, when emails obtained through subsequent public records requests showed Defendant Evans had authorized release of the footage "with the consent of Sheriff Lopez."

120. The County's deliberate concealment of its coordination with the smear website constitutes fraudulent concealment that tolls any applicable statute of limitations until Flash discovered the truth in September 2025.

121. In September 2025, emails obtained through public records requests revealed the extent of the conspiracy by documenting that County Attorney Eisen confirmed in a September 2, 2025, email that Evans, "with the consent of Sheriff Lopez," had authorized the release of body camera footage to the smear website.

122. The County initially denied releasing the footage before the email exposed the truth.

123. Defendant Ruiloba remained on duty following the June 27, 2025, arrest.

124. She received no discipline despite Flash filing a formal complaint, and the County never responded to Flash's complaint.

125. Jeff Davis County has spent more than $27,000 in taxpayer funds on outside lawyers to defend against Flash's tort claims, demonstrating the County's commitment to protecting officials who violated Flash's constitutional rights rather than holding them accountable.

126.  Multiple officials recused themselves from matters involving Flash due to conflicts of interest, including Defendants Eisen, Luedecke, and Evans, demonstrating their awareness that their conduct was improper.

127. Flash's arrest was catalogued by the U.S. Press Freedom Tracker, a project of the Freedom of the Press Foundation, which documents press freedom violations nationwide.

128. Defendants actively concealed material facts from Flash that prevented him from discovering the full scope of the conspiracy until 2025.

129. The contents of Dennison's "burn book" statement were concealed in official county records until produced in OAG discovery in March 2025, and Dennison's identity as the source of the sealed mugshot leak remained hidden until her login credentials were revealed in that same discovery production.

130. Evans and Lopez's coordination with the anonymous smear website—including their in-person meeting and direct handover of body camera footage—was actively concealed when Flash inquired and not revealed until September 2025 when subsequent public records requests uncovered emails showing Evans had authorized the release "with the consent of Sheriff Lopez."

131. When Flash filed a public information request asking who had requested his body camera footage, the County falsely stated that only Flash and one other journalist had made such requests, deliberately concealing the County's direct disclosure to the smear website outside official channels.

132. Under Texas law, fraudulent concealment tolls the statute of limitations until the plaintiff discovers, or through reasonable diligence should have discovered the facts giving rise to the cause of action.

133. Flash could not have discovered these concealed facts earlier through reasonable diligence because Defendants actively lied and withheld information in response to his inquiries.

134. The facts alleged above by all Defendants, individually, or in furtherance of their agreement were acts committed in furtherance of the conspiracy to hinder, chill, or intimidate Flash from exercising his First Amendment rights when their acts constitute multiple violations of Texas Penal Code § 39.03, Official Oppression, because they were public servants acting under color of law or of their office, or employment who intentionally subjected Flash to mistreatment or arrest, detention, search, seizure, dispossession, assessment, or lien that they knew was unlawful, and also misused government property in doing so.

### F. Plaintiff's Damages

135. As a direct and proximate result of Defendants' conduct, Flash has suffered and continues to suffer significant damages, including but not limited to:

a. Physical injuries requiring medical treatment, including abrasions, bruising, and pain;

b. Medical expenses;

c. Loss of liberty through unlawful detention and arrest;

d. Cash bonds totaling $4,800 ($4,000 for the April 2024 charges and $800 for the traffic citation appeal);

e. Criminal defense costs;

f. Displacement from his Jeff Davis County residence since April 2024, with associated costs;

g. Lost income and business opportunities;

h. Damage to his personal and business reputation from defamatory statements published in third-party media;

i. Emotional distress, humiliation, and mental anguish; and

j. The chilling effect on his ability to exercise his First Amendment rights.

### G. Claims for Relief

### Count I
### First Amendment Retaliation – 42 U.S.C. § 1983
*(Against Defendants Ruiloba, Evans, Luedecke, Eisen, and Merritt)*

136. Plaintiff incorporates by reference all preceding paragraphs.

137. At all relevant times, all Defendants committed acts in furtherance of the conspiracy to unlawfully restrain Flash in the exercise of his First Amendment rights by conduct that violated their oaths of office that constituted Official Oppression.

138. Flash engaged in constitutionally protected activity by photographing and recording public meetings and by publishing news critical of government officials through the Big Bend Times.

139. The right to record government officials conducting public business has been clearly established in the Fifth Circuit since *Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017).

140. Each Defendant took adverse actions against Flash in retaliation for his protected activity.

141. Defendant Ruiloba arrested Flash, used excessive force, and initiated malicious prosecution.

142. Defendant Evans issued the unconstitutional ban, directed Flash's arrest, defamed Flash, endorsed the smear website, and authorized release of body camera footage to that website.

143. Defendant Luedecke attempted illegal detention, sent the secret law enforcement alert, issued false warrant notices, and filed baseless criminal charges. Defendant Eisen admitted the County's actions were "motivated by our coverage," refused to discipline his employee, and coordinated the harassment campaign. Defendant Merritt filed bogus criminal reports and enforced the extrajudicial ban.

144. Flash can satisfy the *Nieves v. Bartlett* exception as clarified by *Gonzalez v. Trevino*, 602 U.S. 653 (2024), because: (a) no other person photographing or recording a public meeting has been arrested for disorderly conduct in Jeff Davis County; (b) the Texas Open Meetings Act explicitly protects the right to record public meetings; (c) the arrest occurred exactly 17 days after a court struck down an unconstitutional ban against Flash; and (d) all charges were dismissed.

145. No Defendant is entitled to qualified immunity because the right to record government officials and to publish news critical of government officials has been clearly established for decades.

146. The First Amendment right to record government officials performing their duties in public has been clearly established in the Fifth Circuit since 2017. *Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017).

147. Flash's June 27, 2025, arrest occurred more than eight years after this right was clearly established, defeating any claim of qualified immunity. Moreover, even assuming arguable probable cause existed for Flash's arrest, his

First Amendment retaliation claim may proceed because he can demonstrate through objective evidence that he was arrested when otherwise similarly situated individuals not engaged in protected speech were not. *Gonzalez v. Trevino*, 602 U.S. 653 (2024).

148. No person in Jeff Davis County has ever been arrested for photographing a public Commissioner's Court meeting.

149. As a direct and proximate result of Defendants' conduct, Flash has suffered damages as set forth above.

## Count II
### Fourth Amendment False Arrest
### 42 U.S.C. § 1983
*(Against Defendants Ruiloba, Evans, and Lopez)*

150. Plaintiff incorporates by reference all preceding paragraphs.

151. The Fourth Amendment prohibits unreasonable seizures, including arrests without probable cause.

152. On June 27, 2025, Defendant Ruiloba arrested Flash without probable cause when Flash was photographing a public Commissioner's Court meeting— activity protected by the First Amendment and the Texas Open Meetings Act.

153. The disorderly conduct citation issued to Flash failed to specify which statutory subsection was allegedly violated, demonstrating the complete absence of any factual basis for arrest.

154. Seventeen days before the arrest, a state district court struck down Judge Evans's ban as "without legal authority" and in violation of Flash's "constitutional rights"—putting all Defendants on explicit notice that excluding Flash from county proceedings was unconstitutional.

155. Despite this judicial declaration, Defendants arrested Flash for doing precisely what the court had ruled he had a constitutional right to do.

156. All charges against Flash were dismissed.

157. As a direct and proximate result of Defendants' false arrest, Flash has suffered damages as set forth above.

## Count III
## Fourth Amendment Excessive Force – 42 U.S.C. § 1983
### *(Against Defendants Ruiloba and Giesbrecht)*

158. Plaintiff incorporates by reference all preceding paragraphs.

159. The Fourth Amendment prohibits the use of excessive force in effectuating an arrest.

160. The force used against Flash was objectively unreasonable under the totality of circumstances.

161. The alleged offense was a minor misdemeanor that was later dismissed.

162. Flash posed no threat to the safety of officers or others—he was peacefully photographing a public meeting.

163. Flash did not resist arrest or attempt to flee.

164. To the contrary, Flash verbally stated, "I'm not resisting" and "stop, you're hurting me."

165. Despite Flash's verbal protests of pain and non-resistance, the deputies continued to apply force, causing documented injuries including fingernail abrasions, wrist injuries from excessively tight handcuffs, and bruising.

166. Under *Graham v. Connor*, 490 U.S. 386 (1989), courts evaluate excessive force by examining: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to officers or others; and (3) whether he is actively

resisting arrest or attempting to evade arrest by flight. All three factors favor Flash.

167. It is clearly established in the Fifth Circuit that force used against a non-resisting, non-fleeing arrestee violates the Fourth Amendment. *Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020).

168. As a direct and proximate result of Defendants' excessive force, Flash has suffered damages as set forth above.

### Count IV
### Bystander Liability / Failure to Intervene – 42 U.S.C. § 1983

*(Against Defendants Lopez and Giesbrecht)*

169. Plaintiff incorporates by reference all preceding paragraphs.

170. An officer may be held liable under § 1983 for failing to intervene to prevent a constitutional violation when the officer: (1) knew that a fellow officer was violating an individual's constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).

171. Defendant Lopez was the Sheriff present at the scene with command authority.

172. Lopez knew that Flash's arrest was unlawful—it occurred seventeen days after a court ruled Evans's ban unconstitutional.

173. Lopez had a reasonable opportunity to intervene. Lopez chose not to act, instead watching as Ruiloba arrested Flash and used excessive force.

174. In Texas, the county sheriff is the county's final policymaker in the area of law enforcement.

175. Sheriff Lopez was physically present in the commissioner's courtroom throughout Flash's arrest. Lopez possessed command authority over Chief Deputy Ruiloba and the other arresting deputies.

176. Lopez observed the constitutional violations as they occurred in real time. Lopez had both the authority and the opportunity to intervene and prevent the unlawful arrest. Lopez chose not to act.

177. Defendant Giesbrecht was a deputy present during the arrest who participated in restraining Flash.

178. Giesbrecht knew the arrest was unlawful, had a reasonable opportunity to intervene, and chose not to act.

179. An officer is liable as a bystander under Section 1983 when he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. *Whitley v. Hanna*, 726 F.3d 631 (5th Cir. 2013).

180. Sheriff Lopez, possessing command authority over the deputies who arrested Flash, was physically present throughout the arrest, observed the battery and the constitutional violations as they occurred, had both the authority and the opportunity to intervene, and chose not to act.

181. As a direct and proximate result of Defendants' failure to intervene, Flash has suffered damages as set forth above.

### Count V
### Malicious Prosecution – 42 U.S.C. § 1983
*(Against Defendants Ruiloba, Luedecke, Evans, and Eisen)*

182. Plaintiff incorporates by reference all preceding paragraphs.

183. Each Defendant caused criminal proceedings against Flash. Defendant Ruiloba initiated the disorderly conduct citation.

184. Defendant Luedecke filed the terroristic threat and harassment charges. Defendant Evans directed the arrest. Defendant Eisen coordinated the campaign and admitted it was "motivated by our coverage."

185. All criminal proceedings terminated in Flash's favor because the disorderly conduct charge was dropped, the terroristic threat charge was dropped, the harassment charge was dismissed, and the traffic citation was dismissed with prejudice because there never was any probable cause for any officer to believe there was an objectively articulable reason to believe Flash had committed these crimes.

186. The disorderly conduct citation failed to specify any subsection because Flash's conduct was always objectively reasonable, and it was the content of his speech that was being targeted to restrain and chill his constitutionally protected activity.

187. Seven investigations produced no charges, and all charges were ultimately dismissed.

188. To demonstrate favorable termination for purposes of a Fourth Amendment malicious prosecution claim under Section 1983, a plaintiff need only show that his prosecution ended without a conviction. *Thompson v. Clark*, 596 U.S. 36 (2022). All criminal charges against Flash were dismissed.

189. Defendants acted with malice. Eisen admitted the County's actions were "motivated by our coverage." The 17-day gap between the court striking down Evans's ban and Flash's arrest demonstrates retaliatory intent.

190. As a direct and proximate result of Defendants' malicious prosecution, Flash has suffered damages as set forth above.

### Count VI
### Civil Rights Conspiracy – 42 U.S.C. § 1983
*(Against All Individual Defendants)*

191. Plaintiff incorporates by reference all preceding paragraphs.

192. To establish a conspiracy claim under § 1983, a plaintiff must show: (1) an agreement between two or more persons; (2) to deprive the plaintiff of constitutional rights; and (3) an actual deprivation of those rights.

193. Defendants Evans, Lopez, Eisen, and Luedecke—all elected officials and final policymakers—reached a meeting of the minds to achieve the unlawful objective of suppressing Flash's journalism through prior restraint and retaliation for exercising free speech.

194. Defendants Ruiloba, Giesbrecht, Merritt, and Dennison acted under their direction to commit specific acts in furtherance of the conspiracy.

195. A conspiracy under Section 1983 may be proven through circumstantial evidence demonstrating a "meeting of the minds," including coordinated conduct, mutual failure to discipline co-conspirators, and a pattern of harassment targeting the same individual. *Imani v. City of Baton Rouge*, 614 F.Supp.3d 306 (M.D. La. 2022).

196. Here, the Defendants coordinated a two-year campaign of retaliation. Their mutual failure to discipline any participant, their coordinated release of body camera footage to a third-party website to further harm Flash, and County Attorney Eisen's admission that the Defendants' actions were "motivated by our

coverage" establish the requisite agreement to deprive Flash of his constitutional rights.

197. The evidence of the agreement includes: (a) Eisen's admission that the County's actions were "motivated by our coverage"; (b) Evans and Lopez's joint authorization of footage release to the smear website; (c) Luedecke's secret law enforcement alert distributed to multiple agencies; (d) Evans directing the arrest that Ruiloba executed in Lopez's presence; (e) the mutual failure to discipline any conspirator; and (f) the two-year pattern of coordinated harassment; (g) Dennison's use of her official credentials to access Flash's sealed DPS records and leak them to a public forum in February 2024—during the height of the County's investigation campaign against Flash—demonstrates her active participation in the conspiracy to damage Flash's reputation and suppress his journalism; (h) Evans and Lopez's secret in-person meeting with the operators of the anonymous smear website, during which they provided an exclusive interview about Flash and handed over body camera footage outside official public information channels, then lied to Flash about it when he inquired; (i) Luedecke and Eisen's phone calls to the District Attorney's office warning of a "First Amendment auditor on the loose" and coordinating strategies to counter Flash's journalism, including discussing playing Disney music to prevent monetization; (j) Eisen's memorandum to Commissioners Court proposing an ordinance that would criminalize photographing county employees without consent and allow officials to grant or deny consent based on whether they "like" the media outlet—a transparent attempt to create a legal mechanism for viewpoint discrimination against Flash.

198. Evans and Lopez's coordination with the private operators of BigBendTimes.org, including an in-person meeting, exclusive interview about Flash, and direct transfer of body camera footage outside official channels, demonstrates the conspiracy extended beyond county employees to include private actors.

199. The conspiracy included persons outside Jeff Davis County's employment. Upon information and belief, Defendants Evans and Lopez coordinated with private third parties—the operators of the anonymous smear website BigBendTimes.org—to further the conspiracy's objectives. Evans and Lopez met in person with these private actors, provided an exclusive interview targeting Flash, and personally delivered body camera footage outside official public information channels.

200. This coordination with non-county actors removes the conspiracy from the intracorporate conspiracy doctrine. The private operators of BigBendTimes.org knowingly agreed to participate in the retaliatory scheme and acted in concert with Evans and Lopez to publish targeted content designed to suppress Flash's journalism, thereby sharing a common objective and meeting of the minds with county officials

201. Dennison's disclosure of Flash's sealed mugshots to a public Facebook forum and her submission of the defamatory "burn book" statement were acts undertaken in coordination with the other conspirators to further their shared objective of suppressing Flash's journalism. These acts demonstrate willful participation in the conspiracy's unlawful objectives.

202. Flash was systematically deprived of his constitutional rights by government officials and employees acting under color of law.

203. He was subjected to an unconstitutional ban, false arrest, excessive force, malicious prosecution, and defamation—all in violation of his First, Fourth, Fifth, and Fourteenth Amendment rights.

204. As a direct and proximate result of Defendants' conspiracy, Flash has suffered damages as set forth above.

**Count VII**
**Municipal Liability – 42 U.S.C. § 1983**
*(Against Defendant Jeff Davis County)*

205. Plaintiff incorporates by reference all preceding paragraphs.

206. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may be held liable under § 1983 when a constitutional violation is caused by official policy, custom, or the acts of a final policymaker.

207. Jeff Davis County is liable for the violations of Flash's First Amendment rights (through the Fourteenth Amendment), Fifth Amendment liberty interest (through the Fourteenth Amendment), and Fourth Amendment rights (false arrest and excessive force) under the following theories:

208. **Final Policymaker.** County Judge Curtis Evans is a final policymaker for Jeff Davis County. *See Baker v. Llano County*, 746 F. Supp. 3d 429 (W.D. Tex. 2024).

209. Evans personally issued the unconstitutional ban that a court later struck down as "without legal authority" and violative of Flash's "constitutional rights." Evans personally directed Flash's June 27, 2025, arrest, as confirmed by body camera footage.

210. Sheriff Victor Lopez is a final policymaker for law enforcement. Lopez was personally present during the arrest, knew it was unlawful, had command authority to stop it, and chose not to intervene. A single unconstitutional act by a final policymaker is sufficient to establish municipal liability. *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008).

211. Sheriff Lopez's deliberate decision to permit the unlawful arrest of a journalist exercising clearly established constitutional rights constitutes official county policy for which Jeff Davis County is directly liable.

212. A single unconstitutional act by a final policymaker establishes municipal liability when that act constitutes official policy.

213. Texas county judges possess final policymaking authority over courthouse access and operations. *Familias Unidas v. Briscoe*, 619 F.2d 391 (5th Cir. 1980).

214. The Fifth Circuit recently confirmed that Texas county judges are not arms of the state and are not entitled to Eleventh Amendment sovereign immunity on official-capacity claims; that judicial immunity does not protect conduct while presiding over Commissioner's Court; and that qualified immunity is unavailable when a county judge acts without discretionary authority in ordering a person detained at a Commissioner's Court meeting. *Diaz v. Cantu*, 123 F.4th 736 (5th Cir. 2024).

215. Here, Judge Evans—acting as final policymaker—personally issued the unconstitutional ban, personally directed Flash's arrest, and did so without any discretionary authority.

216. **Ratification.** A municipality may be held liable when a final policymaker ratifies a subordinate's unconstitutional conduct. *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017).

217. Sheriff Lopez ratified Ruiloba's unconstitutional conduct by: (a) being present during the arrest and failing to intervene despite having command authority; (b) consenting to Judge Evans's release of body camera footage to the smear website; (c) refusing to discipline Ruiloba despite Flash's formal complaint; and (d) never responding to Flash's complaint.

218. Lopez's authorization of body camera footage release to a third-party website designed to harm Flash demonstrates knowing approval of not just the arrest but its retaliatory purpose—conduct going beyond routine defense of officers to affirmative participation in the ongoing campaign against Flash's journalism.

219. The County's failure to discipline any official despite clear constitutional violations, including the Commissioners Court ratifying its officials and employees committing Official Oppression and by its decision to spend more than $27,000 defending them instead, constitutes ratification.

220. **Failure to Train and Supervise.** A municipality may be held liable for failure to train when the failure amounts to deliberate indifference to constitutional rights. *City of Canton v. Harris*, 489 U.S. 378 (1989).

221. The need for training was obvious: the right to record government officials has been clearly established in the Fifth Circuit since *Turner v. Driver* in 2017—eight years before Flash's arrest.

222. Despite this, three different deputies—Ruiloba, Giesbrecht, and Merritt—all violated the same clearly established right.

223. Recording of public government proceedings—including commissioners court meetings—is a recurrent situation that sheriff's deputies are certain to face, making the need for *Turner* training obvious.

224. The Jeff Davis County Sheriff's Office failed to train its deputies on the First Amendment rights of journalists and members of the public to record government activities—a systemic failure that persisted across administrations. Sheriff Lopez, as the current final policymaker for law enforcement, continued this failure and took no corrective action despite the clearly established law.

225. This failure evidenced by repeated acts of official oppression was the moving force behind the constitutional violations because had deputies been properly trained, they would not have arrested Flash for photographing a public meeting.

226. **Culture of Deliberate Indifference.** Jeff Davis County maintained a persistent and widespread pattern of retaliating against Flash and that constituted a culture of deliberate indifference to his constitutional rights including through repeated acts of official oppression.

227. This pattern includes:

(a) seven separate investigations that produced zero criminal charges, demonstrating that the investigative process was used as a harassment tool rather than for legitimate law enforcement;

(b) more than $13,000 in taxpayer funds spent hiring outside law firms to block the release of public records—records that would have exposed the harassment campaign;

(c) County Attorney Eisen admitting that Dennison breached confidentiality by disclosing information about Flash, yet refusing to discipline her or investigate the felony;

(d) Luedecke issuing multiple false warrant notices that blocked Flash's driver's license renewal with no court dates scheduled;

(e) multiple officials—Eisen, Luedecke, and Evans—recusing themselves from Flash-related matters due to conflicts of interest, demonstrating consciousness of impropriety, yet suffering no consequences;

(f) the County never responding to Flash's formal complaint about Ruiloba;

(g) Ruiloba remaining as Chief Deputy with no discipline;

(h) more than $27,000 spent on outside lawyers to defend officials rather than hold them accountable;

(i) A county employee using official credentials to access and publicly disclose a journalist's sealed criminal records in violation of Texas Government Code Chapter 411 and Texas Penal Code § 39.06, with no investigation, discipline, or consequences;

(j) Final policymakers Evans and Lopez personally meeting with operators of an anonymous smear website to provide footage and an exclusive interview targeting a journalist, then fraudulently concealing this coordination when Flash inquired through official channels;

(k) Defendant Luedecke issuing false warrant notices, false failure-to-appear notices, and blocking Flash's driver's license renewal—then lying about the reasons when confronted;

(l) The County Attorney drafting a proposed ordinance designed to criminalize Flash's journalism while permitting photography by media outlets the County "likes"—direct evidence of viewpoint discrimination as official policy.

This pattern of conduct was so common and well-settled as to constitute the de facto policy of Jeff Davis County.

228. As a direct and proximate result of Jeff Davis County's policies, customs, failure to train, and culture of deliberate indifference, Flash has suffered damages as set forth above.

## Count VIII
## Defamation – Texas State Law
### *(Against Defendant Evans)*

229. Plaintiff incorporates by reference all preceding paragraphs.

230. On June 29, 2025, Defendant Evans made statements to The Big Bend Sentinel, a third-party newspaper, that Flash was "crazy" and "not suitable for public settings."

231. The statements were false because there is no evidence that Flash is mentally ill or "crazy." Flash is a credentialed journalist with a master's degree from Arizona State University's Cronkite School of Journalism.

232. The statements were published to third parties.

233. Evans made the statements to a newspaper reporter, knowing they would be disseminated to the public.

234. The statements are defamatory under Texas law because they impute mental illness and unfitness for Flash's profession as a journalist.

235. Accusations of mental instability affecting a person's fitness for public settings constitute defamation per se or per quod under Texas law because they impute unfitness for professional duties.

236. Evans also speculated to government officials that Flash carries a concealed weapon - an affirmative statement of dangerous criminal propensity.

237. Evans acted with actual malice because Evans knew Flash was a working journalist, knew a court had just struck down Evans's ban as unconstitutional, and made the statements to continue the campaign of retaliation to injure Flash's reputation and cause his financial harm. Evans had no factual basis to believe Flash was mentally ill and either knew the statements were false or consciously disregarded their likely falsity.

238. As a direct and proximate result of Evans's defamation, Flash has suffered damages to his personal and business reputation as set forth above.

### Count IX
### Defamation – Texas State Law
*(Against Defendant Dennison)*

239. Plaintiff incorporates by reference all preceding paragraphs.

240. Defendant Dennison submitted a written statement to county officials describing Flash as mentally unstable, speculating he might be carrying a gun in disguise, and comparing him to "a spoiled toddler."

241. The statements were false because Flash is not mentally unstable, and Flash was not carrying a gun in disguise.

242. The statements were published by Dennison when she submitted the statement to county officials, which became part of official public records.

243. The statements are defamatory per se under Texas law because they impute mental illness and criminal propensity.

244. Written statements to government officials characterizing a journalist as "mentally unstable" and affirmatively stating as a fact that Flash unlawfully carries a concealed weapon constitute defamation per se because they impute mental illness affecting professional fitness and imply dangerous criminal propensity.

245. Dennison acted with actual malice. As a County Attorney's office employee, Dennison knew Flash was a working journalist, not a threat. Her own statement admits she was "speculating" about Flash carrying a weapon—demonstrating no factual basis. Her access to Flash's sealed DPS records showed only minor offenses from years earlier, yet she implied ongoing criminal propensity. A reasonable person in Dennison's position would have entertained serious doubts about these statements' truth, and Dennison either knew they were false or consciously disregarded their likely falsity.

246. Flash did not discover, and could not have discovered through reasonable diligence, the contents of Dennison's written statement until on or about March 22, 2025, when the Office of the Attorney General first produced it through litigation discovery.

247. The statement was buried in non-public internal county records, was never disclosed in response to Flash's multiple public information requests and was produced only after Flash initiated litigation to compel disclosure. Despite exercising reasonable diligence—filing public information requests, monitoring public statements, and pursuing litigation when the County refused to produce

records—Flash could not have discovered the statement earlier because it was shielded within internal county files inaccessible to the public.

248. Because Flash first learned of the statement's contents in March 2025, his claim is timely.

249. Dennison also published or caused to be published Flash's sealed mugshots to the "Alpine, What The F*$& Happened!?" Facebook page on February 2, 2024, accompanied by text characterizing Flash as untrustworthy and attacking his credibility as a journalist. The publication of sealed criminal records—which Flash had a legal right to deny under Texas Government Code § 411.0755—falsely implied ongoing criminal propensity and untrustworthiness, constituting defamation per se under Texas law.

250. Flash did not discover that Dennison was the source of the leak until March 2025, when OAG discovery revealed her login credentials were used to access his DPS file containing the identical mugshots.

251. Under the discovery rule, Flash's claim accrued upon discovery of Dennison's identity as the source.

252. As a direct and proximate result of Dennison's defamation, Flash has suffered damages as set forth above.

## Count X
## False Imprisonment – Texas State Law
### *(Against Defendant Ruiloba)*

253. Plaintiff incorporates by reference all preceding paragraphs.

254. Defendant Ruiloba willfully detained Flash on June 27, 2025, without his consent and without legal authority because Flash was handcuffed and detained for approximately 30 minutes without probable cause for his detention.

255. The disorderly conduct charge was dismissed.

256. Under Texas law, liability for false imprisonment extends to anyone who participates in, directs, or requests unlawful detention—including non-peace officers who instigate detention by peace officers.

257. As a direct and proximate result of Defendants' false imprisonment, Flash has suffered damages as set forth above.

### Count XI
### Assault and Battery – Texas State Law
#### (Against Defendants Ruiloba and Giesbrecht)

258. Plaintiff incorporates by reference all preceding paragraphs.

259. Defendant Ruiloba intentionally caused harmful and offensive contact with Flash by grabbing him without warning, digging her fingernails into his forearm causing visible abrasions, and applying handcuffs tightly enough to cause wrist injuries. Defendant Giesbrecht participated in restraining Flash and using force against him.

260. Video and audio captured Flash saying "Stop" and "I'm not resisting." The force used was not justified because Flash was not committing any crime and was not resisting arrest.

261. The deputies were made aware of Flash's pain and discomfort through his verbal protests. Despite this knowledge, the deputies continued to apply force and did not loosen the handcuffs.

262. The intentional application of force causing injury to a person who is verbally protesting pain and non-resistance and tightening or maintaining tight handcuffs after being told of discomfort, demonstrates intent to cause offensive contact and constitutes assault and battery under Texas law.

263. As a direct and proximate result of Defendants' assault and battery, Flash has suffered damages as set forth above.

### Count XII
### Abuse of Process (Texas State Law)
*(Against Defendants Evans, Luedecke, Eisen, and Ruiloba)*

264. Plaintiff incorporates by reference all preceding paragraphs.

265. Defendants instituted criminal proceedings against Flash not for legitimate law enforcement purposes but to retaliate against him for his journalism. The improper purpose is demonstrated by: (a) Eisen's admission that the County's actions were "motivated by our coverage"; (b) seven investigations producing zero charges; (c) the 17-day gap between the court striking down Evans's ban and Flash's arrest; (d) the dismissal of all charges; and (e) the use of warrant notices and failure-to-appear notices as harassment tools with no underlying court proceedings.

266. Defendants committed a willful act in the use of legal process not proper in the regular conduct of the proceeding, with an ulterior motive to suppress Flash's journalism.

267. As a direct and proximate result of Defendants' abuse of process, Flash has suffered damages as set forth above.

### Count XIII
### Punitive Damages

268. Plaintiff incorporates by reference all preceding paragraphs.

269. Defendants' conduct warrants an award of punitive damages. Defendants intentionally subjected Flash to an arrest they knew was unlawful and based on intentionally and repeatedly committing the offense of official oppression.

270. A court declared Evans's ban unconstitutional on June 10, 2025. Seventeen days later, on June 27, 2025, Defendants arrested Flash for photographing a public meeting—the very conduct the court had ruled Flash had a constitutional right to engage in. Two days after the arrest, on June 29, 2025, Evans publicly called Flash 'crazy' and threatened to pursue additional criminal charges.

271. Defendants cannot claim they believed their conduct was lawful when a court had just told them it was not.

272. This conduct satisfies the elements of official oppression under Texas Penal Code § 39.03—intentionally subjecting another to arrest or detention the official knows is unlawful—demonstrating the willful and malicious nature of Defendants' actions.

273. Defendants' knowing violation of Flash's clearly established constitutional rights, seventeen days after being told by a court that their conduct was unconstitutional, justifies an award of punitive damages.

## PRAYER

WHEREFORE, Plaintiff David Flash respectfully requests that this Court:

    a.  Enter judgment in favor of Plaintiff and against Defendants;

    b.  Award Plaintiff compensatory damages in an amount to be determined at trial;

    c.  Award Plaintiff punitive damages against the individual Defendants in an amount to be determined at trial;

    d.  Issue injunctive relief prohibiting Defendants from continuing to retaliate against Plaintiff for exercising his First Amendment rights;

e. Award Plaintiff his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

f. Award Plaintiff pre-judgment and post-judgment interest; and

g. Grant such other and further relief as the Court deems just and proper.

h. As a direct and proximate result of Defendants' actions, Flash has suffered damages as set forth above.

## JURY TRIAL DEMAND

274. Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Lamar Treadwell*
**Lamar D. Treadwell**, Lead Trial Counsel
TBN: 20205000
1308 E. Common St., Suite 205
New Braunfels, Texas 78132
Office: (505) 660-0602
E-Fax: (505) 213-0094
Lamar@treadwelltriallaw.com

**SMITH AND VINSON LAW FIRM, PLLC**

*/s/ Jarrod Smith*
**Jarrod L. Smith**
TBN: 24094095
jarrod@smithandvinson.com

*/s/ Brad Vinson*
**Brad Vinson**
TBN: 24110021
brad@smithandvinson.com

*/s/ Elise Smith*
**Elise Smith**
MBN: 0505942
elise@smithandvinson.com
1411 West Avenue, #124
Austin, Texas 78701
PH: (512) 368-9044
***ATTORNEYS FOR PLAINTIFF***