**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**PECOS DIVISION**

| | | |
|---|---|---|
| **DAVID FLASH;** | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **v.** | § | **PE:26-CV-00004-DC-DF** |
| | § | |
| **JEFF DAVIS COUNTY, et al.;** | § | |
| *Defendants.* | § | |
| | § | |

## <u>U.S. MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

Before the Court are Defendant Adriana Ruiloba and Joseph Giesbrecht's Motions to Dismiss. (Docs. 15, 20). After due consideration, the undersigned recommends that the Motions be granted in part and denied in part.

### BACKGROUND

Plaintiff David Flash brings this action against Defendant Jeff Davis County ("County") and multiple County officials, alleging violations of his constitutional rights. (Doc. 1). Flash is an independent journalist who covers regional events and public affairs in West Texas. *Id.* at 14. In September 2023, Flash's news outlet, the Big Bend Times, published investigative news stories centered around the conduct of multiple County officials. *Id.* The stories accused the officials of misusing county resources and questionable law enforcement practices. *Id.*

Flash faced backlash after the stories were published. *Id.* at 15. Defendant Lisa Dennison, an employee for the County Attorney's Office, confronted him and told him he was under investigation. *Id.* A few months later, an anonymous poster released Flash's mugshots—which were private under a Texas Government Code Chapter 411

non-disclosure order—and characterized him as "not a trusted media source." *Id.* He later discovered Dennison had been the one who had obtained his mugshots. *Id.*

Defendant Glen Eisen, Dennison's supervisor, was apparently aware that Dennison had misappropriated Flash's mugshots but did not take disciplinary action. *Id.* at 16. As Flash was beginning to face backlash in Fall 2023, Defendant King Merritt filed a police report detailing an incident with Flash at the County Attorney's Office between Eisen and Flash. *Id.* at 16; (Doc. 11 at 16). Eisen had asked Merritt to arrest Flash for "causing problems at the Jeff Davis County Attorney's Office." (Doc. 11 at 16). Merritt attempted to detain Flash, but Flash left before he could do so and no further action was taken. *Id.* at 16–17.

On October 20, 2023, Flash returned to the County Courthouse. (Doc. 1 at 16–17). Defendant Mary Ann Luedecke, a justice of the peace for the County, attempted to detain him after he photographed a sign outside her office. *Id.* Two days later, Luedecke sent out an alert to regional law enforcement agencies that labeled Flash as a "First Amendment auditor." *Id.* at 17. Luedecke and Eisen also called the District Attorney's Office to warn them that a "First Amendment auditor" was "on the loose." *Id.*

Although no charges had been filed against Flash by this point, Luedecke issued a mock-warrant notice to law enforcement against him at his home address. *Id.* at 18. Luedecke claimed this was part of a training exercise for officials practicing with new software. *Id.* Luedecke also filed a "failure to appear" notice against Flash that resulted in Flash's driver's license renewal being blocked. *Id.* Flash was the target of seven

separate criminal investigations during this time, none of which resulted in criminal charges. *Id.* at 19.

At this point, Flash and Defendants did not have any affinity with each other and Defendants began strategizing how they could keep Flash out of their affairs. *Id.* They discussed playing Disney music during public meetings to prevent Flash—through copyright restrictions—from monetizing his recordings. *Id.* at 17. Eisen authored a memorandum to the County Commissioners Court proposing an ordinance that would criminalize photographing any county employee without their consent but allow employees to grant consent to favorable media outlets. *Id.* at 19–20.

On April 23, 2024, Flash returned once more to the County Courthouse to record a public county commissioners court meeting. *Id.* at 20. This time, Defendant Curtis Evans—a county judge—ordered Flash physically removed for covering the meeting. *Id.* As he was being escorted out, one of the County deputies told him to "get a lawyer and sue." *Id.* The next day, Evans issued a written order that banned Flash from being within 300 feet of any County building or official, under penalty of arrest and jail time. *Id.* Flash did not receive notice of the ban or the opportunity to be heard, and it was unclear what legal authority, if any, Evans had been acting under in issuing the ban. *Id.* Criminal charges had also been filed against Flash for harassment and terrorism. *Id.* at 22.

Two days later, Flash was arrested on a warrant issued by the County and placed in the Van Horn Jail for sixteen hours before posting bond. *Id.* at 21. After he returned to his home in Fort Davis, he was stopped by Merritt near his house and told that he

would be arrested if he approached the County Courthouse, pursuant to Judge Evans's trespass order. *Id.* Flash filed a habeas motion challenging the order as a violation of his First, Fifth, and Fourteenth Amendment rights. *Id.* On June 10, 2025, a court struck down the ban, finding it violated Flash's constitutional rights and was issued without legal authority. *Id.* at 21.

With the order now lifted, Flash returned to the County Courthouse on June 27 to photograph a budget meeting. *Id.* at 22. There were no written rules that prohibited recording or photography, but Flash was asked to move his camera to the back of the room—a request he complied with. *Id.* Defendant Victor Lopez, a county sheriff, then approached Flash and told him his photography was interfering with his ability to listen to the meeting. *Id.* Defendant Adriana Ruiloba, a county deputy, also approached Flash and told him to back off and not come in her personal space. *Id.* Flash left the room and continued recording the meeting from outside. *Id.*

Upon reentering the room to photograph Ruiloba, Flash was grabbed, handcuffed, and forcibly removed by Ruiloba and Joseph Giesbrecht, a fellow a police officer. *Id.* at 23. Flash was nonresistant throughout the duration of his removal, and he made this clear to the officers. *Id.* ("Flash sa[id] 'Stop' and 'I'm not resisting' as Defendants Ruiloba and Giesbrecht used physical force against him."). Flash was questioned for 30 minutes and cited for disorderly conduct under Texas Penal Code § 42.01. *Id.* The citation did not identify which of the eleven subsections Flash had violated. *Id.* The same day he was arrested, Flash went to an urgent care center for injuries stemming from Ruiloba and Giesbrecht's force. *Id.* at 24. Flash's medical records

4

documented bruising and wrist abrasions on his arms, pain in his upper back and chest, and an elevated heart rate. *Id.*

After his arrest, Defendants made various statements to the media about Flash and his arrest. Evans called him "crazy" and "not suitable for public settings" and brought up the possibility of additional criminal charges. *Id.* at 25. Evans also endorsed an anonymous anti-David Flash website called BigBendTimes.org (unaffiliated with Flash's news outlet, Big Bend Times). *Id.* Evans and Lopez both conducted an in-person interview with BigBendTimes.org and released body cam footage of Flash's arrest to the website. *Id.* at 25–26. All criminal charges against Flash were eventually dropped. *Id.* at 24. His disorderly conduct charge was dropped due to insufficient evidence. *Id.* The harassment charge filed by Defendant Luedecke was dismissed on August 10, along with an outstanding traffic citation against Flash. *Id.*

On January 18, 2026, Flash filed this action, alleging that the County and many of its officials, including Ruiloba and Giesbrecht, violated his constitutional rights. (Doc. 1). Ruiloba and Giesbrecht both filed Motions to Dismiss. (Docs. 15, 20). Both Motions were fully briefed and are ripe for adjudication. (Docs. 29, 32, 43, 44).

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a 12(b)(6) motion to dismiss, plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is appropriate if a complaint offers merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (quoting *Ashcroft*, 556 U.S. at 678), *cert. denied*, 572 U.S. 1087 (2014). When reviewing a 12(b)(6) motion, the court accepts all facts as true and construes them in the light most favorable to plaintiff. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).

## DISCUSSION

Flash brings claims against Ruiloba for First Amendment retaliation, Fourth Amendment false arrest, Fourth Amendment excessive force, Fourth Amendment malicious prosecution, civil rights conspiracy, false imprisonment, assault and battery, as well as abuse of process. He brings claims against Giesbrecht for Fourth Amendment excessive force, bystander liability, civil rights conspiracy, and assault and battery. Both Defendants assert qualified immunity and move to dismiss Flash's claims on various grounds.

### I.   Entitlement to Qualified Immunity

Ruiloba and Giesbrecht both invoke qualified immunity. Qualified immunity is a defense to individual capacity liability for "government officials performing discretionary functions . . . insofar as their conduct does not violate clearly established constitutional rights." *Diaz v. Cantu*, 123 F.4th 736, 747 (5th Cir. 2024) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If a defendant successfully raises qualified

immunity, "[t]he plaintiff 'must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm . . . alleged and that defeat a qualified immunity defense with equal specificity." *Id.* (quoting *Lincoln v. Barnes*, 855 F.3d 297, 300–01 (5th Cir. 2017)).

Qualified immunity works under a burden shifting framework. *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 318 (5th Cir. 2019). The defendant official bears the initial burden to establish their entitlement to the defense. *Castelan v. Villarreal*, No. 5:23-CV-1394-JKP-RBF, 2025 WL 424538, at *20 (W.D. Tex. Feb. 6, 2025) ("[M]ere invocation [of qualified immunity] is not enough."); *Barker v. Norman*, 651 F.2d 1107, 1120 (5th Cir. 1981) ("The immunities of state officials that we have recognized for purposes of [§] 1983 are the equivalents of those we have recognized at common law, and the burden is on the official claiming immunity to demonstrate his entitlement." (internal citations omitted) (quoting *Dennis v. Sparks*, 449 U.S. 24, 29 (1980))).

To satisfy this burden, the defendant official must demonstrate their conduct was within the scope of their discretionary authority. *Cherry Knoll*, 922 F.3d at 318; *Sweetin v. Texas City*, 48 F.4th 387, 392 (5th Cir. 2022) ("To even get into the qualified-immunity framework, the government official must 'satisfy his burden of establishing that the challenged conduct was within the scope of his discretionary authority.'" (quoting *Cherry Knoll*, 922 F.3d at 318)). An official acts pursuant to discretionary authority when they perform non-ministerial acts within the scope of their official responsibilities. *Cherry Knoll*, 922 F.3d at 318. Non-ministerial acts are those that involve personal deliberation and judgment, while ministerial acts are those that require obedience or the

7

performance of a duty to which the actor had no choice but to perform. *Anders v. Rumfield*, No. 25-40387, 2026 WL 625638, at *2 (5th Cir. Mar. 5, 2026).

Even if the defendant demonstrates their actions were non-ministerial, they must also show they were within the scope of their official responsibilities. *Diaz*, 123 F.4th at 748–49; *see Barker*, 651 F.2d at 1121 n.18 ("It should be clear from our prior case law that an official's actions may be so far removed from the ordinary course of his duties, so outside even his discretionary authority to act, that the official cannot establish his entitlement to claim immunity in the first instance . . . ."). To determine whether an official was acting within the scope of their official duties, courts look primarily at state law. *Anders*, 2026 WL 625638, at *2 (citing *Sweetin*, 48 F.4th at 392).

Here, both Ruiloba and Giesbrecht met their burden of establishing entitlement to qualified immunity. They both point to specific state law providing them with discretionary authority to make arrests and use reasonable amounts of force while doing so. (Docs. 15 at 13; 20 at 9). Because all of Flash's allegations against Ruiloba and Giesbrecht concern the discharge of this discretionary authority, they have met their burden. The burden is now on Flash to overcome their qualified immunity.

## II.  First Amendment Retaliation Against Ruiloba

First, Ruiloba moves to dismiss Flash's First Amendment retaliation claim. Because Ruiloba and Giesbrecht have established their entitlement to qualified immunity, Flash must: (1) state a claim for a constitutional deprivation (2) involving a violation of clearly established law. *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019).

The undersigned will first analyze whether Flash states a claim before proceeding to whether it implicates clearly established law.

To state a First Amendment retaliation claim, a plaintiff must plead: (1) they were engaged in constitutionally protected activity; (2) the defendant's action caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse actions were substantially motivated against their exercise of constitutionally protected activity. *Rincon v. City of Laredo*, No. 24-40168, 2025 WL 603883, at *5 (5th Cir. Feb. 25, 2025); *Batyukova v. Doege*, 994 F.3d 717, 730 (5th Cir. 2021). When the retaliatory action is an arrest, the plaintiff must also typically show the arrest was made without probable cause. *See, e.g., Nieves v. Bartlett*, 587 U.S. 391 (2019).[1]

As to the first element, Flash was engaged in a constitutionally protected activity — photographing the police. (Doc. 1 at 29). Flash pleads that Ruiloba's retaliation occurred after he photographed her during a public meeting. *Id.* at 23. The Fifth Circuit has held that "a First Amendment right to record the police does exist . . . ." *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (quoting *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011)).

Flash pled the second and third elements of his claim as well. As to the second element, a "retaliatory arrest is sufficiently chilling" to a person of ordinary firmness. *Nieves*, 587 U.S. at 397. The Fifth Circuit also requires a subjective showing "that *the*

---

1. This element is not at issue here because, for the reasons described later in regard to Flash's Fourth Amendment false arrest claim, he has adequately pled the absence of probable cause.

9

*plaintiffs'* exercise of free speech has been curtailed." *Villarreal v. City of Laredo*, 44 F.4th 363, 373–74 (5th Cir. 2022) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)), *vacated on reh'g en banc on other grounds*, 94 F.4th 374, 398 (5th Cir. 2024). Here curtailment can be inferred from the lack of any allegations that Flash returned to the County Courthouse or photographed the police after the retaliatory conduct occurred. (Doc. 1); *see Keenan*, 290 F.3d at 260 (finding curtailment requirement satisfied by plaintiff backing off from exposing unlawful practices in constable's office).

Third, close timing between the plaintiff engaging in the protected activity and facing the retaliatory action can be a sufficient basis for inferring retaliatory motive. *Lewis v. Panola County*, No. 22-60123, 2022 WL 17496048, at *2 (5th Cir. Dec. 8, 2022); *Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013). Here, Flash indicates he was arrested immediately after trying to photograph Ruiloba, demonstrating temporal proximity. (Doc. 1 at 23). Accordingly, Flash sufficiently pled all the elements of his First Amendment retaliation claim.

Flash makes out a clearly established violation as well. Qualified immunity shields government officials "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Harlow*, 457 U.S. at 818). Clearly established law must not be defined at a high level of generality; the "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Even so, there need not be a "case directly on point." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam);

10

*Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) ("It is not necessary, of course, that 'the very action in question has previously been held unlawful.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))).

The Fifth Circuit recognized in 2017 that the "First Amendment right to record police does exist" and is "clearly established henceforth . . . ." *Turner*, 848 F.3d at 687–88. Accordingly, Flash has made out the violation of a clearly established right and overcomes Ruiloba's qualified immunity as to this claim. Ruiloba's Motion should therefore be denied as to Flash's claim for First Amendment retaliation.

## III.   Fourth Amendment

Flash brings Fourth Amendment claims against Ruiloba for false arrest, excessive force, and malicious prosecution and against Giesbrecht for excessive force and bystander liability. Both Defendants move to dismiss all claims under qualified immunity and for failure to state a claim. Because Ruiloba and Giesbrecht have established their entitlement to qualified immunity, Flash must: (1) state a claim for a constitutional deprivation (2) involving a violation of clearly established law. *Benfield*, 945 F.3d at 337. The undersigned will first analyze whether Flash sufficiently pled his claims before proceeding to whether they involve violations of clearly established law.

### A. False Arrest Against Ruiloba

To state a claim for Fourth Amendment false arrest, a plaintiff must show that the defendant could not have reasonably believed they had probable cause to arrest the plaintiff for any crime. *Green v. Thomas*, 129 F.4th 877, 886 (5th Cir. 2025). "Probable cause is established by facts and circumstances within the officer's knowledge that are

11

sufficient to warrant a prudent person, or one of reasonable caution, in believing . . . that the suspect has committed . . . an offense." *Id.* at 886–87 (internal quotations omitted) (quoting *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019)). Accepting Flash's allegations as true, no reasonable officer in Ruiloba's shoes could have thought there was probable cause to arrest Flash.

Flash alleges he was arrested after photographing a County Commissioners Court meeting that was open to the public. (Doc. 1 at 22). Flash briefly left the meeting but was arrested upon returning to photograph Defendant Ruiloba. *Id.* at 23. He pleads that there were no rules prohibiting recording or photography; he complied with a request to move his camera when asked; and that he was not disrupting the meeting in any way. *Id.* at 22.

Flash was arrested and cited for disorderly conduct under Texas Penal Code § 42.01. (Doc. 1 at 23). Texas Penal Code § 42.01 proscribes a laundry list of conduct; Flash was not notified how his conduct fell under the statute. *Id.* Under § 42.01, a person commits an offense if he:

> (1) uses abusive, indecent, profane, or vulgar language in a public place, and the language by its very utterance tends to incite an immediate breach of the peace;
> (2) makes an offensive gesture or display in a public place, and the gesture or display tends to incite an immediate breach of the peace;
> (3) creates, by chemical means, a noxious and unreasonable odor in a public place;
> (4) abuses or threatens a person in a public place in an obviously offensive manner;
> (5) makes unreasonable noise in a public place other than a sport shooting range, as defined by Section 250.001, Local Government Code, or in or near a private residence that he has no right to occupy;
> (6) fights with another in a public place;

12

(7) discharges a firearm in a public place other than a public road or a sport shooting range, as defined by Section 250.001, Local Government Code;

(8) displays a firearm or other deadly weapon in a public place in a manner calculated to alarm;

(9) discharges a firearm on or across a public road;

(10) exposes his anus or genitals in a public place and is reckless about whether another may be present who will be offended or alarmed by his act; or

(11) for a lewd or unlawful purpose enters on the property of another and looked into a dwelling on the property through any window or other opening in the dwelling.

Nothing from Flash's Complaint indicates probable cause existed to arrest him for any of these acts. (Doc. 1). Taking his allegations as true, he was not threatening or fighting anyone, and he certainly was not exposing his genitals in a public place. Flash has therefore alleged sufficient facts to show a lack of probable cause at this stage.

Flash also makes out a violation of a clearly established right. There is robust authority giving police fair notice that it is unconstitutional to arrest without probable cause for filming or photographing police. *Turner*, 848 F.3d at 695; *Glik*, 655 F.3d at 82. Flash therefore overcomes Ruiloba's qualified immunity and her Motion should be denied as to this claim.

### B. Excessive Force Against Ruiloba and Giesbrecht

To state a claim for excessive force, a plaintiff must plead: (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable. *Rucker v. Marshall*, 119 F.4th 395, 403 (5th Cir. 2024). Although the Fifth Circuit still invokes these elements, it has also said that the third element—whether the force was "objectively reasonable"—is the overarching focus of the analysis and the only thing that really matters. *Alexander v. City*

13

*of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) ("[O]nly one inquiry is required to determine whether an officer used excessive force in violation of the Fourth Amendment." (internal quotations omitted) (quoting *Ikerd v. Blair*, 101 F.3d 430, 434 n.9 (5th Cir. 1996))).

Courts assess reasonableness using the *Graham* factors of: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Bailey v. Ramos*, 125 F.4th 667, 680 (5th Cir. 2025). Beginning with the severity of the crime at issue, Flash was arrested and cited for disorderly conduct—a misdemeanor. (Doc. 1 at 23). Misdemeanors are generally regarded as non-severe and this factor therefore weighs in favor of force being excessive. *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017); *Reyes v. Bridgwater*, 362 F. App'x 403, 407 n.5 (5th Cir. 2010) (finding "severity" factor weighed against a use of force where the alleged crime was a misdemeanor).

Second, Flash has sufficiently pled that he did not pose an immediate threat to the safety of officers or others. He states in his Complaint that all he was doing was "peacefully photographing a public meeting." (Doc. 1 at 32). Third and finally, he states that he "did not resist or attempt to flee" and that he verbally communicated his non-resistance to the officers. *Id.* Therefore, each of the *Graham* factors weigh in favor of force being objectively unreasonable.

Even so, "this [C]ircuit requires a plaintiff to have 'suffered at least some injury'" for there to be a claim for excessive force. *Ikerd*, 101 F.3d at 434 (quoting *Jackson v. R.E.*

14

*Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993)). Defendants argue Flash's injuries are insufficient. (Docs. 15 at 13; 20 at 9). Admittedly, Flash's injuries are not very extensive; he pled that he suffered fingernail and wrist abrasions, bruising, upper back and chest pain, and an elevated heart rate. (Doc. 1 at 32). Although a significant injury is not required for excessive force claims, the injury must be more than *de minimis*. *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005).

The Fifth Circuit has previously found similar injuries to be *de minimis*. In *Tarver*, for example, the Court found injuries stemming from excessive handcuffing — including wrist injuries — were insufficient to support a claim for excessive force. *Id.* The Court reached a similar result in *Freeman v. Gore*, in which it said "minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not rise to a constitutional claim for excessive force." 483 F.3d 404, 417 (5th Cir. 2007). Flash points to *Deville v. Marcantel* to argue wrist injuries from excessively tight handcuffs may support a claim, but that case is distinguishable in that the handcuffs there "caus[ed] long-term nerve damage that was severe enough to require four surgeries." 567 F.3d 156, 167 (5th Cir. 2009). There are no such allegations here.

Although Defendants' argument is persuasive, the Fifth Circuit has recently made clear just how low the bar can go for an excessive force injury when the *Graham* factors weigh against force being necessary. "[A]s long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Alexander*, 52 F.4th at 309. And there are some contexts, such as a custodial

interrogation, where "the use of nearly any amount of force may result in a constitutional violation . . . ." *Ikerd*, 101 F.3d at 434. Consequently, the Fifth Circuit has found generic and unspecific allegations that the plaintiff suffered "injuries to his body" and "to his mouth" as sufficient to survive a motion to dismiss in *Alexander*, 52 F.4th at 309. Though Flash's injuries are far from severe, they are sufficient to support a claim for excessive force at this stage. *Bailey*, 125 F.4th at 680 (finding plaintiff met injury requirement for excessive force claim by providing evidence of "abrasion to his wrist and knee").

Flash has also made out the violation of a clearly established right. "[T]here is a well-developed body of case law in the Fifth Circuit specifically holding that the use of physical force against a restrained, passively resisting, or non-resistant suspect is a constitutional violation." *Callaway v. City of Austin*, No. 15-CV-00103, 2015 WL 4323174, at *13 (W.D. Tex. July 14, 2015) (citing *Williams v. Bramer*, 180 F.3d 699, 704 (5th Cir. 1999)); *Zinter v. Salvaggio*, 610 F. Supp. 919, 955 (W.D. Tex. 2022); *Wenckens v. Collier*, No. PE:25-CV-00005-DC-DF, 2025 WL 4684500, at *7 (W.D. Tex. Nov. 12, 2025), *R. & R. adopted*, 2026 WL 579398 (W.D. Tex. Mar. 2, 2026) (Counts, J.). Flash has therefore sufficiently pled facts that, taken as true, make out a claim for excessive force under the Fourth Amendment against Ruiloba and Giesbrecht as to overcome their qualified immunity. Ruiloba and Giesbrecht's Motions should be denied as to Flash's excessive force claim.

## C.  Bystander Liability Against Giesbrecht

An officer is liable under a theory of bystander liability where they: (1) know that another officer is violating an individual's constitutional rights; (2) have a reasonable opportunity to prevent the harm; and (3) choose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). It is also required that "an officer 'acquiesce[d] in' the alleged constitutional violation." *Ambler v. Nissen*, 116 F.4th 351, 362 (5th Cir. 2024). This requirement is satisfied if the officer "helped with the arrest" in which the excessive force was used, meaning it is satisfied here given Giesbrecht's involvement in Flash's arrest. *Id.*; (Doc. 1 at 23).

Flash alleges that Giesbrecht failed to intervene to prevent the false arrest and Ruiloba's excessive force. Bystander liability "generally arises in the context of another officer's use of force" and it is not immediately apparent whether it can apply for the failure to intervene to prevent a false arrest. *Vela v. Lewis*, No. 4:23-CV-03376, 2024 WL 990058, at *6 (S.D. Tex. Mar. 6, 2024). The undersigned would recognize a bystander liability claim predicated on a false arrest, as the Fifth Circuit has noted that "other constitutional violations may also support a theory of bystander liability" and not just excessive force. *Whitley*, 726 F.3d at 646 n.11. Regardless, Flash does not plead this theory sufficiently. There is nothing in Flash's Complaint indicating that Giesbrecht had any opportunity to prevent the arrest other than Flash's blanket legal conclusion, devoid of any factual support. (Doc. 1 at 34) ("Giesbrecht knew the arrest was unlawful, had a reasonable opportunity to intervene, and chose not to act."). Merely stating the officer was at the scene and then reciting the elements of bystander liability is

17

insufficient to state a claim. *Terwilliger v. Reyna*, 4 F.4th 270, 285 (5th Cir. 2011). Flash also points to Giesbrecht being present with Defendant Victor Lopez, who was the ranking officer. (Doc. 32 at 12). But all this suggests is that Lopez had an opportunity to prevent the arrest; it is irrelevant as to Giesbrecht.

Even if Flash's pleading were sufficient, he fails to make out a clearly established violation to the extent he predicates his bystander liability claim on false arrest. Every case Flash cites arose in the excessive force context; Flash does not point to a single case involving bystander liability predicated on false arrest. (Doc. 32). Flash points to a general "failure-to-intervene" duty being clearly established, but this is far too general. *Id.* at 13. The clearly established inquiry cannot be satisfied with "a broad general proposition." *Brosseau*, 543 U.S. at 198.

"[T]he Fifth Circuit has not specified which constitutional violations, beyond excessive force, may underlie a bystander liability claim." *Corral v. El Paso County*, No. EP-22-CV-00160-DCG, 2025 WL 2427616, at *8 (W.D. Tex. Aug. 15, 2025); *Frakes v. Masden*, No. H-14-1753, 2015 WL 7583051, at *9 (S.D. Tex. Nov. 25, 2015). Without more on-point authority relating to bystander liability for false arrest, Flash cannot make out a clearly established violation as to overcome Giesbrecht's qualified immunity. Accordingly, the Court will analyze Flash's bystander liability claim solely from the standpoint of whether it can be predicated on Giesbrecht failing to intervene to prevent Ruiloba's alleged excessive force.

Flash does state a claim for bystander liability in this respect. The bar to state such a claim at this stage is low when the plaintiff has already made out a claim for

18

excessive force. *See Cardona v. Taylor*, F. App'x 198, 202–03 (5th Cir. 2020). Because the undersigned determined Flash "sufficiently stated a claim for relief regarding" the officer's use of excessive force, and "because he alleges that other officers, . . . were present . . . but failed to intervene," the undersigned concludes "that he has stated a claim for relief on this ground as well." *Id.*

The law on Flash's bystander liability claim against Giesbrecht is also clearly established. It is "clearly established in the Fifth Circuit that an officer could be liable as a bystander in a case involving excessive force if he knew a constitutional violation was taking place and had a reasonable opportunity to prevent the harm." *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017). This extends to cases involving the failure to intervene to prevent harm to a nonresistant subject. *Wenckens*, 2025 WL 4684500, at *9; *Callaway*, 2015 WL 4323174, at *14. Accordingly, Flash makes out the violation of a clearly established right for his bystander liability claim against Giesbrecht to the extent it is predicated on excessive force. Giesbrecht's Motion should therefore be denied as to Flash's bystander liability claim predicated on excessive force.

### D. Malicious Prosecution Against Ruiloba

To state a malicious prosecution claim, the plaintiff must plead the threshold element of there being an unlawful seizure as well as: "(1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for

19

such proceeding; (5) malice; and (6) damages." *Davis v. Warren*, 173 F.4th 566, 572 (5th Cir. 2026). Authority illuminating the contours of these elements is sparse.

In 2002, the Fifth Circuit conceded that "[i]t would be an understatement to say that this [C]ircuit's caselaw regarding so-called 'Fourth Amendment malicious prosecution' claims under § 1983 is both confused and confusing." *Gordy v. Burns*, 294 F.3d 722, 725 (5th Cir. 2002). One year later, the Fifth Circuit held that a freestanding constitutional claim for malicious prosecution was not cognizable under § 1983. *See, e.g., Castellano v. Fragozo*, 352 F.3d 939, 953–54 (5th Cir. 2003). Then in 2022, the Supreme Court formally recognized the claim as cognizable under the Fourth Amendment in *Thompson v. Clark*, 596 U.S. 36 (2022). Fourth Amendment malicious prosecution is now officially back from the grave and many uncertainties remain.[2] *See Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023).

The Fifth Circuit has said "the elements of the state-law tort of malicious prosecution and the elements of the constitutional tort of 'Fourth Amendment malicious prosecution' are coextensive[,]" meaning they are equivalent. *Id.* (quoting *Gordy*, 294 F.3d at 725). But it has also said "a Fourth Amendment malicious prosecution claim is essentially a federal constitutional claim, and federal courts are bound neither by state courts' interpretation of those elements nor (we think) by procedural requirements like the burden-shifting framework" imposed by state courts. *Gordy*, 294 F.3d at 727. The undersigned takes this to mean that while the elements of state and federal malicious

---

2. Even before this, the Fifth Circuit had gone back and forth on recognizing malicious prosecution. *See Brummett v. Camble*, 946 F.2d 1178, 1180 n.2 (5th Cir. 1991). The Fifth Circuit is not alone, as "[m]ysteriously, other circuit courts seem also to have flip-flopped on the constitutional tort status of malicious prosecution." *Id.*

prosecution claims are the same, state courts' interpretation of these elements is not authoritative.

Consequently, there is not much out there establishing the dimensions of a federal malicious prosecution claim in this Circuit. "In the typical case, an officer maliciously causes a criminal proceeding to be brought by providing false or misleading information to a prosecuting attorney or grand jury." *Gordy*, 294 F.3d at 728. This is not the typical case. Flash's malicious prosecution claim against Ruiloba is premised on the same facts as his false arrest claim—that Ruiloba arrested him. (Doc. 24 at 11). Flash was arrested and given a citation for the arrest, but he was not seized pursuant to the prosecution itself. (Doc. 1 at 23–24). This is fatal to Flash's malicious prosecution claim,[3] as the prosecution itself must be the source of an unconstitutional seizure. *See Thompson*, 596 U.S. at 43 n.2 ("[T]he plaintiff also has to prove that *the malicious prosecution* resulted in a seizure of the plaintiff." (citing *Manuel v. Joliet*, 580 U.S. 357, 365–66 (2017))).

Flash was arrested and therefore seized here. (Doc. 24 at 11). But a seizure incident to a warrantless arrest before the initiation of criminal charges and a seizure made after the initiation of criminal charges—a pre-trial detention, for example—are distinct under the Fourth Amendment. *See Thompson*, 596 U.S. at 43 n.2. In *Manuel*, for

---

3. Although Ruiloba does not point to this deficiency in arguing Flash failed to state a claim, "no plaintiff is exempt from [their] obligation to 'allege sufficient facts to state all the elements of [their] claim.'" *Puente v. Ridge*, 324 F. App'x 423, 428 (5th Cir. 2009) (quoting *Mitchell v. Crescent River Ports Pilots Ass'n*, 265 F. App'x 363, 370 (5th Cir. 2008)). Moreover, the "court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 111 (1991); *See Bernacchi v. First Chi. Ins. Co.*, 52 F.4th 324, 328 (7th Cir. 2022). Under the governing law applicable here, Flash cannot state a claim for relief.

example, the Supreme Court distinguished a plaintiff's Fourth Amendment claims "for his (pre-legal-process) arrest" and "his (post-legal-process) pretrial detention." 580 U.S. at 365–66.

The former, a pre-legal-process arrest, would not support a claim for malicious prosecution because the prosecution itself has yet to begin when the seizure occurs. *Thompson*, 596 U.S. at 42 (defining "a Fourth Amendment claim under § 1983 for malicious prosecution" as "a claim for unreasonable seizure *pursuant to legal process*" (emphasis added)); *see Winfrey v. Rogers*, 901 F.3d 483, (5th Cir. 2018) (construing plaintiff's claim as being for "malicious prosecution, because [plaintiff] was arrested through the wrongful institution of legal process: an arrest pursuant to a warrant"). The First Circuit has been explicit on this point, holding that if "a person is arrested without a warrant and before the issuance of any legal process, that arrest does not form part of a Fourth Amendment seizure upon which a section 1983 claim malicious prosecution claim may be premised." *Harrington v. City of Nashua*, 610 F.3d 24, 32 (1st Cir. 2010). The Tenth Circuit has as well, holding that "[t]he Fourth Amendment in the context of a malicious prosecution claim deals with *judicial determinations* of probable cause, either at the warrant application stage or during a *Gerstein* hearing following a warrantless arrest." *Wilkins v. DeReyes*, 528 F.3d 790, 802 (10th Cir. 2008); *see Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1994) (holding that plaintiff's arrest "cannot serve as the predicate deprivation of liberty because it occurred prior to his arraignment and without a warrant, and therefore was not 'pursuant to legal process'").

Here, Flash was seized pursuant to a pre-legal-process arrest. (Doc. 1 at 23). There was no warrant and Flash was not seized after his arrest. (Doc. 1). The order of events—Flash being arrested, cited, and then released without any limitations on his liberty from the citation, does not demonstrate that "the malicious prosecution resulted in a seizure of the plaintiff." *Thompson*, 596 U.S. at 43 n.2; *Johnson v. Crook*, No. W-11-CA-00212, 2012 WL 12871138, at *3 (W.D. Tex. Mar. 21, 2012) ("[T]o the extent that the malicious prosecution claim is based on the allegedly unconstitutional arrests, it is both redundant and misleading, as it is not truly a claim for malicious prosecution.").

Furthermore, there is no indication that the criminal charges themselves restrained Flash's liberty after his arrest. In *Britton v. Maloney*, for example, the First Circuit found that there was no seizure because "[a]bsent any evidence that [the plaintiff] was arrested, detained, restricted in travel, or otherwise subject to a deprivation of his liberty before the charges against him were dismissed, the fact that he was given a date to appear in court is insufficient to establish a seizure within the meaning of the Fourth Amendment." 196 F.3d 24, 28–29 (1st Cir. 1999). Similarly, nothing in Flash's Complaint indicates that there were any restrictions on his liberty after he was cited for disorderly conduct and released. (Doc. 1). Accordingly, Ruiloba's Motion should be granted as to Flash's malicious prosecution claim.

## IV.    42 U.S.C. § 1983 Conspiracy

Next, Ruiloba and Giesbrecht move to dismiss Flash's civil rights conspiracy claim. Flash alleges that each individual Defendant, including Ruiloba and Giesbrecht, conspired to suppress his newsgathering and journalism through retaliation and prior

23

restraint. (Doc. 1 at 36). The undersigned finds Flash adequately pled the existence of a conspiracy to suppress his First Amendment rights involving Ruiloba and Giesbrecht.

Conspiracy claims brought through § 1983 for deprivations of constitutional rights "are unique" in that the plaintiff must not only allege facts that (1) establish the existence of a conspiracy involving state action, but also (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019). A § 1983 conspiracy cannot exist in a vacuum; there must be a surviving constitutional claim for it to be actionable. *Id.* They thus "act as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act" that caused the constitutional deprivation. *Bevill v. Fletcher*, 26 F.4th 270, 283 (5th Cir. 2022).

Here, Flash has pled facts demonstrating Defendant Evans, a member of the conspiracy, deprived Flash of his rights under the First Amendment. (Doc. 48). Thus, all that is left to consider is whether Flash sufficiently pled the existence of a connected conspiracy involving state action. *See Morales v. Carrillo*, 625 F. Supp. 3d 587, 598 (W.D. Tex. 2022). To survive a motion to dismiss, a plaintiff's allegations must "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bevill*, 26 F.4th at 284 (quoting *Twombly*, 550 U.S. at 557).

Ruiloba and Giesbrecht argue Flash's claim fails because he did not plead the specifics of the agreement such as "when and where" it was made and "who was present . . . ." (Doc. 15 at 16–17; 20 at 11–12). Such specificity is unnecessary at this stage. The sufficiency of "a complaint's conspiracy claim does not turn on whether the

24

plaintiff includes a 'conclusory allegation of agreement[.]' It turns on whether the specific facts alleged raise a 'suggestion' of such an agreement." *Rudd v. City of Norton Shores*, 977 F.3d 503, 520 (6th Cir. 2020) (internal citation omitted) (quoting *Twombly*, 550 U.S. at 557). Thus, "a plaintiff's § 1983 conspiracy claim need not satisfy 'a probability requirement at the pleading stage; plausibility simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *Bevill*, 26 F.4th at 284 (cleaned up) (quoting *Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013)).

The existence of an agreement is often "shown by circumstantial evidence, because 'conspirators rarely formulate their plans in ways susceptible of proof by direct evidence.'" *Morales*, 625 F. Supp. at 599 (quoting *Thomas v. New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982)). "Conspiracy" often "conjures images of under-the-table handshakes and back-alley meetings under the cover of night[,]" but that is not how people conspire. *Bevill v. City of Quitman*, No. 4:19-CV-406, 2025 WL 2306849, at *22 (E.D. Tex. Aug. 11, 2025). "They do so over time, in text messages, over lunch meetings, and during phone calls." *Id.* Consequently, "there is rarely a smoking gun" or a "room where [the conspiracy] happened." *Id.* "[T]he determination of whether a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the behavior of the alleged conspirators." *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 374 (M.D. La. 2022) (quoting *Mack v. Newton*, 737 F.2d 1343, 1350 (5th Cir. 1984)).

Flash's allegations need only "suggest a commitment to a common end" or that the "conspirators had a unity of purpose or a common design and understanding . . . ."

25

*Id.* (quoting *Mack*, 737 F.2d at 1350). Flash has pled that the individual Defendants conspired and agreed to use their state authority to suppress his journalism through retaliation and prior restraint. (Doc. 1 at 36). There is a demonstrated commitment to a common end here—suppressing Flash's First Amendment rights using state authority— and enough facts to raise the suggestion of a preceding agreement.

Flash alleges a "coordinated, multi-agency effort to develop counterstrategies against Flash's journalism . . . ." *Id.* at 37. Seldomly do such sensational claims have support to back them up, but Flash provides facts to push this over the line from speculative to plausible. After Flash began reporting on the individual Defendants, he was the target of seven separate criminal investigations, none of which resulted in any formal charges. *Id.* at 19. County officials discussed playing copyright restricted music over public meetings to prevent Flash from monetizing his recordings; they also floated the idea of a policy by which journalists could be refused reporting access based on favorability of coverage. *Id.* at 37. Then—in an extrajudicial proceeding—Flash was banned from coming within 300 feet of any County building or employee. *Id.* at 20. After that ban was struck down, Flash was arrested for the same conduct which had led to the ban—attempting to record and cover a County Commissioners Court meeting that was open to the public. *Id.* at 22.

Throughout the conspiracy's duration, many of the parties alleged to have been involved made statements expressing their animus toward Flash and his journalism. Defendant Evans called him "crazy" and "not suitable for public settings." (Doc. 1 at 25). Defendant Dennison called him a "spoiled toddler" and speculated that he could be

26

carrying a concealed weapon. *Id.* at 12. Defendant Eisen described Flash's Big Bend Times as a "megaphone" and said that Flash "brought it on himself" through his journalism. *Id.* at 8. Critically, Eisen also stated that the County's actions against Flash were "motivated by our coverage[,]" suggesting a collective response motivated by his First Amendment activity. *Id.* at 35.

Flash also pled links between the individual Defendants. Defendants Ruiloba and Giesbrecht arrested Flash under Defendant Evans's directions and with Lopez present. *Id.* at 9. Immediately prior to the arrest, Lopez had expressed disapproval toward Flash's photojournalism, telling Flash "it was interfering with his ability to listen to the meeting." *Id.* at 22. Later, Defendants Evans and Lopez jointly provided body camera footage to and participated in an interview with the anonymous anti-Flash smear website. *Id.* at 25–26; *see Quitman*, 2025 WL 2306849, at *18 (considering joint interviews as evidence of conspiratorial relationship).

Although none of these acts in isolation would be sufficient, a reasonable fact finder could look at the totality of the allegations here and find they demonstrate a "commitment to a common end" and not purely independent conduct. *Imani*, 614 F. Supp. at 374 (quoting *Mack*, 737 F.2d at 1350). Multiple coordinated strategies were deployed with the end goal of silencing Flash's journalism. Whether those strategies were undertaken pursuant to a common scheme or agreement is still an open question, but Flash has at least provided enough to meet the "minimum standard" necessary to survive a motion to dismiss. *Bevill*, 26 F.4th at 284; *Morales*, 625 F. Supp. at 605 ("[T]he Court expresses no opinion on the merits of Plaintiff's conspiracy claim; it simply finds

that the inference of conspiracy is not so tenuous that the Court" must dismiss it. (citation and internal quotations omitted)).

Flash has also provided enough to demonstrate Ruiloba and Giesbrecht's individual connection to the conspiracy. Ruiloba and Giesbrecht argue that because they did not join the County Sheriff's Department until 2025, they could not have been part of a conspiracy that is said to have begun in September 2023. (Docs. 15 at 15; 20 at 11). Flash pled that the conspiracy began in September 2023 with a meeting of the minds between Defendants Curtis Evans, Victor Lopez, Glen Eisen, and Mary Ann Luedecke. (Doc. 1 at 7). This does not mean that the conspiracy is limited to those individuals; "a changing cast of characters does nothing to lessen the fact of one conspiracy." *Ashley*, 555 F.2d at 467. And it has long been true that "it is not necessary for each conspirator to have entered into the unlawful agreement at its inception." *United States v. Ashley*, 555 F.2d 462, 467 (5th Cir. 1977). Thus, Ruiloba and Giesbrecht joining the party late would not absolve them of liability.

Ruiloba and Giesbrecht also argue Flash alleges only parallel conduct that could just as well be independent action, citing *Twombly*. (Docs. 15 at 15–16; 20 at 11–12); 550 U.S. at 547. But *Twombly* is distinguishable in that it involved a conspiracy between several companies to violate the Sherman Act where the plaintiffs alleged only "identical, independent action." 550 U.S. at 549. Flash, by contrast, alleges actual cooperation between Ruiloba, Giesbrecht, and the alleged co-conspirators in furtherance of the conspiracy's aims. *Rudd*, 977 F.3d at 519 ("[S]pecific allegations of

28

coordinated action . . . can suffice to state a conspiracy claim.").[4] Ruiloba and Giesbrecht took an act in furtherance of the conspiracy in arresting Flash for newsgathering at the direction of Defendant Evans, an alleged co-conspirator. (Doc. 1 at 9). They did so in the presence of their supervisor—Defendant Lopez—another alleged co-conspirator and someone who has ties to the anonymous anti-Flash smear website. *Id.* at 34, 37.

Perhaps with further factual development, it will quickly become apparent that these actions were taken independent of a conspiratorial agreement. But [e]ven if the evidence will later show that [the plaintiff's] version of events is the 'least plausible of the bunch,' we must accept that version at the pleading stage." *Rudd*, 977 F.3d at 520. Flash's allegations, viewed within the larger context of the strategies developed and acts taken by County officials against him, at least meet the "minimum standard" of "'rais[ing] a reasonable expectation that discovery will reveal evidence of illegal agreement'" involving Ruiloba, Giesbrecht, and the other alleged co-conspirators. *Bevill*, 26 F.4th at 284 (quoting *Jabary*, 547 F. App'x at 611). For these reasons, Ruiloba and Giesbrecht's Motions should be dismissed as to Flash's conspiracy claim.[5]

---

4. Irrespective of the fact there is coordinated action here, the Court in *Twombly* recognized that mere parallel conduct, in some circumstances, can support a claim for conspiracy. 550 U.S. at 556 n.4. The Court pointed to "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties . . . ." *Id.* (quoting 6 Philip Areeda & Hovenkamp, Antitrust Law ¶ 1425 at 167–185 (2 ed. 2003)).

5. Because the law is clearly established on Flash's underlying First Amendment retaliation claim against Evans, it would also be clearly established on his affiliated conspiracy claim. "[W]hen a defendant faces conspiracy claims under § 1983, the qualified immunity analysis that applies to the underlying § 1983 claims resolves the qualified immunity analysis for the conspiracy." *Morales*, 625 F. Supp. at 607 (citing *Bevill*, 26 F.4th at 283).

### V.    State Law Claims

Ruiloba and Giesbrecht both move to dismiss Flash's state law claims against them, pointing to Section 101.106(e) of the Texas Tort Claims Act ("TTCA"). (Docs. 15 at 17; 20 at 13). They argue Flash would have had to elect to sue either them or the County, but not both. (Docs. 15 at 17; 20 at 13). Regardless of the validity of this argument, subsection (e) explicitly states that government employees "shall immediately be dismissed on the filing of a motion by the governmental unit." § 101.106(e). Therefore, this right is properly raised in the County's Motion to Dismiss, but not Ruiloba or Giesbrecht's. *Ibarra v. Harris County*, 243 F. App'x 830, 837 (5th Cir. 2007) (affirming lower court denying dismissal under subsection (e) because county "never filed a motion to dismiss" and "the defendant officers have no automatic right to dismissal"). Ruiloba and Giesbrecht's Motions should therefore be denied as to Flash's state law claims.

### VI.    Official Capacity Claims

Finally, Ruiloba and Giesbrecht move to dismiss all of Flash's claims against them in their official capacity. Official capacity actions against government officials are duplicative when their employing governmental entity is also a defendant, because official-capacity actions are "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Courts dismiss official-capacity claims on this basis, even when the plaintiff seeks injunctive relief from specific defendants. *San Antonio Firefights' Ass'n, Loc. 624 v. City of San Antonio*, No. SA-18-CV-745-XR, 2018 WL 11148671, at *2 (W.D. Tex. Oct. 4, 2018) ("[T]he underlying claims

30

against the official-capacity defendants and the City are the same, regardless of whether Plaintiff intends to ask for injunctive relief specific to the Mayor or City Attorney."); *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001). Flash's claims against Ruiloba and Giesbrecht in their official capacity should therefore be dismissed, as the County is a defendant here.

## CONCLUSION AND RECOMMENDATION

After due consideration, the undersigned **RECOMMENDS** that Ruiloba and Giesbrecht's Motions be **GRANTED IN PART** and **DENIED IN PART**. (Docs. 15, 20). Ruiloba's Motion should be granted as to Flash's malicious prosecution and official capacity claims. These claims should be **DISMISSED WITHOUT PREJUDICE**. The Motion should be denied as to Flash's retaliation, excessive force, false arrest, civil rights conspiracy, and state law claims.

Giesbrecht's Motion should be granted as to Flash's bystander liability claim predicated on false arrest and official capacity claims. These claims should be **DISMISSED WITHOUT PREJUDICE**. His Motion should be denied as to Flash's excessive force, civil rights conspiracy, state law claims, and bystander liability claim predicated on excessive force.

SIGNED this 17th day of June, 2026.


DAVID B. FANNIN
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND RIGHT TO APPEAL/OBJECT**

In the event that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation **by certified mail, return receipt requested**. Pursuant to 28 U.S.C. § 636(b), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Court need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the Magistrate Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a de novo determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).