**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION**

| | | |
|---|---|---|
| **DAVID FLASH;** | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **v.** | § | **PE:26-CV-00004-DC-DF** |
| | § | |
| **JEFF DAVIS COUNTY, et al.;** | § | |
| *Defendants.* | § | |
| | § | |

## <u>U.S. MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

Before the Court is Defendant Victor Lopez's Motion to Dismiss. (Doc. 16). After

due consideration, the undersigned recommends that Lopez's Motion be granted in

part and denied in part.

### BACKGROUND

Plaintiff David Flash brings this action against Defendant Jeff Davis County

("County") and multiple County officials, alleging violations of his constitutional rights.

(Doc. 1). Flash is an independent journalist who covers regional events and public

affairs in West Texas. *Id.* at 14. In September 2023, Flash's news outlet, the Big Bend

Times, published investigative news stories centered around the conduct of multiple

County officials. *Id.* The stories accused the officials of misusing county resources and

questionable law enforcement practices. *Id.*

Flash faced backlash after the stories were published. *Id.* at 15. Defendant Lisa

Dennison, an employee for the County Attorney's Office, confronted him and told him

he was under investigation. *Id.* A few months later, an anonymous poster released

Flash's mugshots—which were private under a Texas Government Code Chapter 411

non-disclosure order—and characterized him as "not a trusted media source." *Id.* He later discovered Dennison had been the one who had obtained his mugshots. *Id.*

Defendant Glen Eisen, Dennison's supervisor, was apparently aware that Dennison had misappropriated Flash's mugshots but did not take disciplinary action. *Id.* at 16. As Flash was beginning to face backlash in Fall 2023, Defendant King Merritt filed a police report detailing an incident with Flash at the County Attorney's Office between Eisen and Flash. *Id.* at 16; (Doc. 11 at 16). Eisen had asked Merritt to arrest Flash for "causing problems at the Jeff Davis County Attorney's Office." (Doc. 11 at 16). Merritt attempted to detain Flash, but Flash left before he could do so and no further action was taken. *Id.* at 16–17.

On October 20, 2023, Flash returned to the County Courthouse. (Doc. 1 at 16–17). Defendant Mary Ann Luedecke, a justice of the peace for the County, attempted to detain him after he photographed a sign outside her office. *Id.* Two days later, Luedecke sent out an alert to regional law enforcement agencies that labeled Flash as a "First Amendment auditor." *Id.* at 17. Luedecke and Eisen also called the District Attorney's Office to warn them that a "First Amendment auditor" was "on the loose." *Id.*

Although no charges had been filed against Flash by this point, Luedecke issued a mock-warrant notice to law enforcement against him at his home address. *Id.* at 18. Luedecke claimed this was part of a training exercise for officials practicing with new software. *Id.* Luedecke also filed a "failure to appear" notice against Flash that resulted in Flash's driver's license renewal being blocked. *Id.* Flash was the target of seven

separate criminal investigations during this time, none of which resulted in criminal charges. *Id.* at 19.

At this point, Flash and Defendants did not have any affinity with each other and Defendants began strategizing how they could keep Flash out of their affairs. *Id.* They discussed playing Disney music during public meetings to prevent Flash—through copyright restrictions—from monetizing his recordings. *Id.* at 17. Eisen authored a memorandum to the County Commissioners Court proposing an ordinance that would criminalize photographing any county employee without their consent but allow employees to grant consent to favorable media outlets. *Id.* at 19–20.

On April 23, 2024, Flash returned once more to the County Courthouse to record a public county commissioners court meeting. *Id.* at 20. This time, Defendant Curtis Evans—a county judge—ordered Flash physically removed for covering the meeting. *Id.* As he was being escorted out, one of the County deputies told him to "get a lawyer and sue." *Id.* The next day, Evans issued a written order that banned Flash from being within 300 feet of any County building or official, under penalty of arrest and jail time. *Id.* Flash did not receive notice of the ban or the opportunity to be heard, and it was unclear what legal authority, if any, Evans had been acting under in issuing the ban. *Id.* Criminal charges had also been filed against Flash for harassment and terrorism. *Id.* at 22.

Two days later, Flash was arrested on a warrant issued by the County and placed in the Van Horn Jail for sixteen hours before posting bond. *Id.* at 21. After he returned to his home in Fort Davis, he was stopped by Merritt near his house and told that he

3

would be arrested if he approached the County Courthouse, pursuant to Judge Evans's trespass order. *Id.* Flash filed a habeas motion challenging the order as a violation of his First, Fifth, and Fourteenth Amendment rights. *Id.* On June 10, 2025, a court struck down the ban, finding it violated Flash's constitutional rights and was issued without legal authority. *Id.* at 21.

With the order now lifted, Flash returned to the County Courthouse on June 27 to photograph a budget meeting. *Id.* at 22. There were no written rules that prohibited recording or photography, but Flash was asked to move his camera to the back of the room—a request he complied with. *Id.* Defendant Victor Lopez, a county sheriff, then approached Flash and told him his photography was interfering with his ability to listen to the meeting. *Id.* Defendant Adriana Ruiloba, a county deputy, also approached Flash and told him to back off and not come in her personal space. *Id.* Flash left the room and continued recording the meeting from outside. *Id.*

Upon reentering the room to photograph Ruiloba, Flash was grabbed, handcuffed, and forcibly removed by Ruiloba and Joseph Giesbrecht, a fellow a police officer. *Id.* at 23. Flash was nonresistant throughout the duration of his removal, and he made this clear to the officers. *Id.* ("Flash sa[id] 'Stop' and 'I'm not resisting' as Defendants Ruiloba and Giesbrecht used physical force against him."). Flash was questioned for 30 minutes and cited for disorderly conduct under Texas Penal Code § 42.01. *Id.* The citation did not identify which of the eleven subsections Flash had violated. *Id.* The same day he was arrested, Flash went to an urgent care center for injuries stemming from Ruiloba and Giesbrecht's force. *Id.* at 24. Flash's medical records

documented bruising and wrist abrasions on his arms, pain in his upper back and chest, and an elevated heart rate. *Id.*

After his arrest, Defendants made various statements to the media about Flash and his arrest. Evans called him "crazy" and "not suitable for public settings" and brought up the possibility of additional criminal charges. *Id.* at 25. Evans also endorsed an anonymous anti-David Flash website called BigBendTimes.org (unaffiliated with Flash's news outlet, Big Bend Times). *Id.* Evans and Lopez both conducted an in-person interview with BigBendTimes.org and released body cam footage of Flash's arrest to the website. *Id.* at 25–26. All criminal charges against Flash were eventually dropped. *Id.* at 24. His disorderly conduct charge was dropped due to insufficient evidence. *Id.* The harassment charge filed by Defendant Luedecke was dismissed on August 10, along with an outstanding traffic citation against Flash. *Id.*

On January 18, 2026, Flash filed this action, alleging that the County and many of its officials, including Lopez, violated his constitutional rights. (Doc. 1). Evans filed a Motion to Dismiss. (Doc. 16). This matter was fully briefed and is ripe for adjudication. (Docs. 28, 47).

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a 12(b)(6) motion to dismiss, plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is appropriate if a complaint offers merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (quoting *Ashcroft*, 556 U.S. at 678), *cert. denied*, 572 U.S. 1087 (2014). When reviewing a 12(b)(6) motion, the court accepts all facts as true and construes them in the light most favorable to plaintiff. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).

## DISCUSSION

Flash brings Fourth Amendment false arrest, bystander liability, and civil rights conspiracy claims against Lopez. Lopez asserts qualified immunity and moves to dismiss on various grounds.

### I.    Entitlement to Qualified Immunity

Lopez invokes qualified immunity. Qualified immunity is a defense to individual capacity liability for "government officials performing discretionary functions . . . insofar as their conduct does not violate clearly established constitutional rights." *Diaz v. Cantu*, 123 F.4th 736, 747 (5th Cir. 2024) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If a defendant successfully raises qualified immunity, "[t]he plaintiff 'must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm . . . alleged and that defeat a qualified immunity defense with equal specificity." *Id.* (quoting *Lincoln v. Barnes*, 855 F.3d 297, 300–01 (5th Cir. 2017)).

6

Qualified immunity works under a burden shifting framework. *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 318 (5th Cir. 2019). The defendant official bears the initial burden to establish their entitlement to the defense. *Castelan v. Villarreal*, No. 5:23-CV-1394-JKP-RBF, 2025 WL 424538, at *20 (W.D. Tex. Feb. 6, 2025) ("[M]ere invocation [of qualified immunity] is not enough."); *Barker v. Norman*, 651 F.2d 1107, 1120 (5th Cir. 1981) ("The immunities of state officials that we have recognized for purposes of [§] 1983 are the equivalents of those we have recognized at common law, and the burden is on the official claiming immunity to demonstrate his entitlement." (internal citations omitted) (quoting *Dennis v. Sparks*, 449 U.S. 24, 29 (1980))).

To satisfy this burden, the defendant official must demonstrate their conduct was within the scope of their discretionary authority. *Cherry Knoll*, 922 F.3d at 318; *Sweetin v. Texas City*, 48 F.4th 387, 392 (5th Cir. 2022) ("To even get into the qualified-immunity framework, the government official must 'satisfy his burden of establishing that the challenged conduct was within the scope of his discretionary authority.'" (quoting *Cherry Knoll*, 922 F.3d at 318)). An official acts pursuant to discretionary authority when they perform non-ministerial acts within the scope of their official responsibilities. *Cherry Knoll*, 922 F.3d at 318. Non-ministerial acts are those that involve personal deliberation and judgment, while ministerial acts are those that require obedience or the performance of a duty to which the actor had no choice but to perform. *Anders v. Rumfield*, No. 25-40387, 2026 WL 625638, at *2 (5th Cir. Mar. 5, 2026).

Even if the defendant demonstrates their actions were non-ministerial, they must also show they were within the scope of their official responsibilities. *Diaz*, 123 F.4th at

7

748–49; *see Barker*, 651 F.2d at 1121 n.18 ("It should be clear from our prior case law that an official's actions may be so far removed from the ordinary course of his duties, so outside even his discretionary authority to act, that the official cannot establish his entitlement to claim immunity in the first instance . . . ."). To determine whether an official was acting within the scope of their official duties, courts look primarily at state law. *Anders*, 2026 WL 625638, at *2 (citing *Sweetin*, 48 F.4th at 392).

Here, Lopez—perhaps accidentally—meets his burden of establishing his entitlement to qualified immunity. He points to the Supreme Court's recognition that police officers have the discretionary authority to detain and use reasonable amounts of force. (Doc. 16 at 5). Because all of Flash's allegations concern Lopez's discharge of that authority, Lopez has met his initial burden. The burden now shifts to Flash to overcome qualified immunity.

## II.    Fourth Amendment False Arrest and Bystander Liability

Flash brings Fourth Amendment claims against Lopez for false arrest and bystander liability for failing to act during the alleged false arrest and excessive use of force. Lopez moves to dismiss Flash's Fourth Amendment claims under qualified immunity and for failure to state a claim. Because Lopez has established his entitlement to qualified immunity, Flash must: (1) state a claim for a constitutional deprivation (2) involving a violation of clearly established law. *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019).  The undersigned finds that Flash does not state a false arrest claim but states a claim for bystander liability against Lopez and overcomes his qualified immunity to the extent the claim is predicated on excessive force.

8

Paradoxically, Flash asserts Lopez falsely arrested him but is also liable for bystander liability by "choos[ing] not to act" as he was being arrested. (Doc. 1 at 24). These allegations contradict each other. Either Lopez affirmatively participated in arresting Flash and may be liable for false arrest, or he failed to intervene to prevent Flash's unconstitutional arrest and can be targeted under a theory of bystander liability.

Flash argues Lopez that can be held liable for false arrest because Lopez "exercised command authority over Defendant Ruiloba" and "Ruiloba proceeded with the arrest with Lopez's approval." (Doc. 28 at 5). This would indicate that Lopez commanded Ruiloba to arrest Flash, or that Ruiloba arrested Flash after receiving Lopez's approval. But that is not what Flash alleges in his Complaint. Flash alleges Lopez "had command authority"—but did not exercise it—and "could have stopped the arrest at any time[,]" but failed to do so. (Doc. 1 at 23, 33) ("Lopez chose not to act, instead watching as Ruiloba arrested Flash . . . ."). Flash therefore failed to plead sufficient personal involvement from Lopez to state a claim against him for false arrest. *See Morales v. Carrillo*, No. EP-19-CV-00217-PRM-ATB, 2020 WL 3684864, at *18 (dismissing claim against officer "because there is no allegation that [the officer] was personally involved in the decision to arrest or to effect the arrest of [plaintiff]"); *Ramos v. Erwin*, 723 F. Supp. 3d 529, 539 (S.D. Tex. 2024).

Even though Flash fails to state a claim against Lopez for false arrest, he may still hold him liable under a bystander liability theory for failing to intervene. To state a bystander liability claim, Flash must show: (1) the officer knew that a fellow officer was violating an individual's constitutional rights; (2) had a reasonable opportunity to

9

prevent the harm; and (3) chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). For bystander liability, it is also required that "an officer 'acquiesce[d] in' the alleged constitutional violation." *Ambler v. Nissen*, 116 F.4th 351, 362 (5th Cir. 2024). This requirement is not at issue here, given that Flash alleges the arrest and force proceeded with Lopez's tacit approval. *Id.*; (Doc. 1 at 34).

Bystander liability "generally arises in the context of another officer's use of force," and it is not immediately apparent whether it can apply for the failure to intervene to prevent a false arrest. *Vela v. Lewis*, No. 4:23-CV-03376, 2024 WL 990058, at *6 (S.D. Tex. Mar. 6, 2024). The undersigned would recognize a bystander liability claim predicated on a false arrest, as the Fifth Circuit has noted that "other constitutional violations may also support a theory of bystander liability" and not just excessive force. *Whitley*, 726 F.3d at 646 n.11.

But even assuming Flash states a claim in this respect, he fails to make out a clearly established violation to the extent he predicates his bystander liability claim on false arrest. Flash does not point to a single case involving bystander liability predicated on a false arrest; every case he cites arose in the excessive force context. (Doc. 28). The clearly established inquiry cannot be satisfied with "a broad general proposition." *Brosseau*, 543 U.S. at 198. "[T]he Fifth Circuit has not specified which constitutional violations, beyond excessive force, may underlie a bystander liability claim." *Corral v. El Paso County*, No. EP-22-CV-00160-DCG, 2025 WL 2427616, at *8 (W.D. Tex. Aug. 15, 2025); *Frakes v. Masden*, No. H-14-1753, 2015 WL 7583051, at *9 (S.D. Tex. Nov. 25, 2015). Without more on-point authority, Flash cannot make out a clearly

10

established violation as to overcome Lopez's qualified immunity. Accordingly, the Court will analyze Flash's bystander liability theory solely from the standpoint of whether it can be predicated on the alleged excessive force.

Flash does state a claim against Lopez in this respect. The bar to state such a claim at this stage is low when the plaintiff has already made out a claim for excessive force. *See Cardona v. Taylor*, F. App'x 198, 202–03 (5th Cir. 2020). Because the undersigned determined Flash "sufficiently stated a claim for relief regarding" Defendants Ruiloba and Giesbrecht's use of excessive force,[1] and "because he alleges that other officers, . . . were present . . . but failed to intervene," the undersigned concludes "that he has stated a claim for relief on this ground as well." *Id.*

The law on Flash's bystander liability claim against Lopez is also clearly established. It is "clearly established in the Fifth Circuit that an officer could be liable as a bystander in a case involving excessive force if he knew a constitutional violation was taking place and had a reasonable opportunity to prevent the harm." *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017). This extends to cases involving the failure to intervene to prevent harm to a nonresistant subject. *Wenckens*, 2025 WL 4684500, at *9; *Callaway*, 2015 WL 4323174, at *14. Accordingly, Flash makes out the violation of a clearly established right with respect to his bystander liability claim against Lopez. Lopez's motion to dismiss as to Flash's bystander liability claim for excessive force should therefore be denied.

---

1. The undersigned reached this conclusion in a separate Report and Recommendation. (Doc. 49).

11

III.    42 U.S.C. § 1983 Conspiracy

Next, Lopez moves to dismiss Flash's civil rights conspiracy claim. Flash alleges that each individual Defendant, including Lopez, conspired to suppress his journalism through retaliation and prior restraint. (Doc. 1 at 36). The undersigned finds Flash adequately pled his conspiracy claim against Lopez.

Conspiracy claims brought through § 1983 for deprivations of constitutional rights "are unique" in that the plaintiff must not only allege facts that (1) establish the existence of a conspiracy involving state action, but also (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019). A § 1983 conspiracy cannot exist in a vacuum; there must be a surviving constitutional claim for it to be actionable. *Id.* They thus "act as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act" that caused the constitutional deprivation. *Bevill v. Fletcher*, 26 F.4th 270, 283 (5th Cir. 2022).

Here, Flash has pled facts demonstrating Defendant Evans, a member of the conspiracy, deprived Flash of his rights under the First Amendment. (Doc. 48). Thus, all that is left to consider is whether Flash sufficiently pled the existence of a connected conspiracy involving state action. *See Morales v. Carrillo*, 625 F. Supp. 3d 587, 598 (W.D. Tex. 2022). To survive a motion to dismiss, a plaintiff's allegations must "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bevill*, 26 F.4th at 284 (quoting *Twombly*, 550 U.S. at 557).

12

Lopez also argues Flash's claim fails because he did not plead the specifics of the agreement such as "when and where" it was made and "who was present . . . ." (Doc. 16 at 11). Such specificity is unnecessary at this stage. The sufficiency of "a complaint's conspiracy claim does not turn on whether the plaintiff includes a 'conclusory allegation of agreement[.]' It turns on whether the specific facts alleged raise a 'suggestion' of such an agreement." *Rudd v. City of Norton Shores*, 977 F.3d 503, 520 (6th Cir. 2020) (internal citation omitted) (quoting *Twombly*, 550 U.S. at 557). Thus, "a plaintiff's § 1983 conspiracy claim need not satisfy 'a probability requirement at the pleading stage; plausibility simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *Bevill*, 26 F.4th at 284 (cleaned up) (quoting *Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013)).

The existence of an agreement is often "shown by circumstantial evidence, because 'conspirators rarely formulate their plans in ways susceptible of proof by direct evidence.'" *Morales*, 625 F. Supp. at 599 (quoting *Thomas v. New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982)). "Conspiracy" often "conjures images of under-the-table handshakes and back-alley meetings under the cover of night[,]" but that is not how people conspire. *Bevill v. City of Quitman*, No. 4:19-CV-406, 2025 WL 2306849, at *22 (E.D. Tex. Aug. 11, 2025). "They do so over time, in text messages, over lunch meetings, and during phone calls." *Id.* Consequently, "there is rarely a smoking gun" or a "room where [the conspiracy] happened." *Id.* "[T]he determination of whether a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the

13

behavior of the alleged conspirators." *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 374 (M.D. La. 2022) (quoting *Mack v. Newton*, 737 F.2d 1343, 1350 (5th Cir. 1984)).

Flash's allegations need only "suggest a commitment to a common end" or that the "conspirators had a unity of purpose or a common design and understanding . . . ." *Id.* (quoting *Mack*, 737 F.2d at 1350). Flash has pled that the individual Defendants conspired and agreed to use their state authority to suppress his journalism through retaliation and prior restraint. (Doc. 1 at 36). There is a demonstrated commitment to a common end here of suppressing Flash's First Amendment rights using state authority and enough facts to raise the suggestion of a preceding agreement.

Flash alleges a "coordinated, multi-agency effort to develop counterstrategies against Flash's journalism . . . ." *Id.* at 37. Seldomly do such sensational claims have support to back them up, but Flash provides facts to push this over the line from speculative to plausible. After Flash began reporting on the individual Defendants, he was the target of seven separate criminal investigations, none of which resulted in any formal charges. *Id.* at 19. County officials discussed playing copyright restricted music over public meetings to prevent Flash from monetizing his recordings; they also floated the idea of a policy by which journalists could be refused reporting access based on favorability of coverage. *Id.* at 37. Then—in an extrajudicial proceeding—Flash was banned from coming within 300 feet of any County building or employee. *Id.* at 20. After that ban was struck down, Flash was arrested for the same conduct which had led to the ban—attempting to record and cover a county commissioners court meeting that was open to the public. *Id.* at 22.

14

Throughout the conspiracy's duration, many of the parties alleged to have been involved made statements expressing their animus toward Flash and his journalism. Defendant Evans called him "crazy" and "not suitable for public settings." (Doc. 1 at 25). Defendant Dennison called him a "spoiled toddler" and speculated that he could be carrying a concealed weapon. *Id.* at 12. Defendant Eisen described Flash's Big Bend Times as a "megaphone" and said that Flash "brought it on himself" through his journalism. *Id.* at 8. Critically, Eisen also stated that the County's actions against Flash were "motivated by our coverage[,]" suggesting a collective response motivated by his First Amendment activity. *Id.* at 35.

Flash also pled links between the individual Defendants. Defendants Ruiloba and Giesbrecht arrested Flash under Defendant Evans's directions and with Defendant Lopez present. *Id.* at 9. Immediately prior to the arrest, Lopez had expressed disapproval toward Flash's photojournalism, telling Flash "it was interfering with his ability to listen to the meeting." *Id.* at 22. Later, Defendants Evans and Lopez jointly provided body camera footage to and participated in an interview with the anonymous anti-Flash smear website. *Id.* at 25–26; *see Quitman*, 2025 WL 2306849, at *18 (considering joint interviews as evidence of conspiratorial relationship).

Although none of these acts in isolation would be sufficient, a reasonable fact finder could look at the totality of the allegations here and find they demonstrate a "commitment to a common end" and not purely independent conduct. *Imani*, 614 F. Supp. at 374 (quoting *Mack*, 737 F.2d at 1350). Multiple coordinated strategies were deployed with the end goal of silencing Flash's journalism. Whether those strategies

were undertaken pursuant to a common scheme or agreement is still an open question, but Flash has at least provided enough to meet the "minimum standard" necessary to survive a motion to dismiss. *Bevill*, 26 F.4th at 284; *Morales*, 625 F. Supp. at 605 ("[T]he Court expresses no opinion on the merits of Plaintiff's conspiracy claim; it simply finds that the inference of conspiracy is not so tenuous that the Court" must dismiss it. (citation and internal quotations omitted)).

Flash has also provided enough to demonstrate Lopez's individual participation. Plaintiffs bringing claims through § 1983 must show that each government-official was personally involved in the constitutional deprivation. *Cope v. Cogdill*, 3 F.4th 198, 207 n.6 (5th Cir. 2021). In the context of conspiracy claims, this showing can involve otherwise lawful acts because "lawful actions can be evidence of a conspiracy." *Morales*, 625 F. Supp. at 603–04.

Flash pled enough to raise a suggestion that Lopez acted as part of a preceding agreement to retaliate against him. *Bevill*, 26 F.4th at 284. Lopez coordinated with Defendant Curtis Evans in releasing body camera footage to the anonymous anti-Flash website BigBendTimes.org. (Doc. 1 at 38). Evans and Lopez also participated in a joint interview with the website in which they criticized Flash and his journalism. *Id.* Lopez was present for Flash's arrest on June 27 and allowed his subordinates to arrest Flash for attempting to take photos and cover the County Commissioners Court meeting. *Id.* at 23.

Flash also alleges that Lopez had relationships and familiarity with the other alleged co-conspirators. Relationships between alleged co-conspirators—though

16

insufficient standing alone—may support the existence of a conspiracy when joined with supporting evidence and parallel conduct. *United States v. Harris*, 932 F.2d 1529, 1523 (5th Cir. 1991) ("[E]vidence of a pre-existing relationship between parties is relevant in determining whether they were engaged in a conspiracy."); *Bevill*, 26 F.4th at 284 (finding "relationships between and among the sheriff, district attorney and judge[,]" combined with other evidence, "'raise[d] a suggestion of a preceding agreement, not merely parallel conduct"); As discussed, Lopez coordinated with Defendant Evans to act against Flash and release body camera footage involving Flash to BigBendTimes.org. (Doc. 1 at 38). Lopez also supervised Defendants Ruiloba and Giesbrecht—the officers who eventually arrested Flash. *Id.* at 23. These acts and allegations are sufficient at this stage to demonstrate Lopez shared the same "commitment to a common end" as the other alleged co-conspirators. *Imani*, 614 F. Supp. at 374 (quoting *Mack*, 737 F.2d at 1350).

Lopez argues that because he was not sworn in as sheriff until January 1, 2025, he could not have been part of a conspiracy that is said to have begun in September 2023. (Doc. 16 at 10). But it has long been true that "it is not necessary for each conspirator to have entered into the unlawful agreement at its inception." *United States v. Ashley*, 555 F.2d 462, 467 (5th Cir. 1977). Therefore, Lopez joining the party late would not absolve him of liability. Accordingly, Lopez's Motion should be denied as to Flash's conspiracy claim.

17

### IV.      Official Capacity Claims

Finally, Lopez moves to dismiss Flash's claims against him in his official capacity. Official capacity actions against government officials are duplicative when their employing governmental entity is also a defendant, because official-capacity actions are "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Courts dismiss official-capacity claims on this basis, even when the plaintiff seeks injunctive relief from specific defendants. *San Antonio Firefights' Ass'n, Loc. 624 v. City of San Antonio*, No. SA-18-CV-745-XR, 2018 WL 11148671, at *2 (W.D. Tex. Oct. 4, 2018) ("[T]he underlying claims against the official-capacity defendants and the City are the same, regardless of whether Plaintiff intends to ask for injunctive relief specific to the Mayor or City Attorney."); *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001). Flash's claims against Lopez in his official capacity should therefore be dismissed, as the County is a defendant here.

### CONCLUSION AND RECOMMENDATION

After due consideration, the undersigned **RECOMMENDS** that Lopez's Motion be **GRANTED IN PART** and **DENIED IN PART**. (Doc. 16). Lopez's Motion should be granted as to dismissing Flash's false arrest and official capacity claims, as well as Flash's bystander liability claim to the extent it is predicated on false arrest. These claims should be **DISMISSED WITHOUT PREJUDICE**. Lopez's Motion should be denied as to Flash's civil rights conspiracy claim and bystander liability claim to the extent it is predicated on excessive force.

SIGNED this 17th day of June, 2026.


DAVID B. FANNIN
UNITED STATES MAGISTRATE JUDGE

19

**INSTRUCTIONS FOR SERVICE AND RIGHT TO APPEAL/OBJECT**

In the event that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation **by certified mail, return receipt requested**. Pursuant to 28 U.S.C. § 636(b), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Court need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the Magistrate Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a de novo determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).