**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**PECOS DIVISION**

| | | |
|---|---|---|
| **DAVID FLASH;** *Plaintiff,* | § | |
| | § | |
| **v.** | § | **PE:26-CV-00004-DC-DF** |
| | § | |
| **JEFF DAVIS COUNTY, et al.;** *Defendants.* | § | |

**U.S. MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Before the Court is Defendant Jeff Davis County's ("County") Motion to Dismiss. (Doc. 13). After due consideration, the undersigned recommends that the County's Motion be granted in part and denied in part.

## BACKGROUND

David Flash is an independent journalist that covers regional events and public affairs in West Texas. (Doc. 1 at 14). Flash brought this action against Jeff Davis County ("County") and multiple County officials for constitutional rights violations. (Doc. 1). Flash's factual allegations are as follows. In September 2023, Flash's news outlet, the Big Bend Times, published investigative news stories centered around the conduct of multiple County officials. *Id.* The stories accused the officials of misusing county resources and questionable law enforcement practices. *Id.*

Flash faced backlash after the stories were published. *Id.* at 15. Defendant Lisa Dennison, an employee for the County Attorney's Office, confronted him and told him he was under investigation. *Id.* A few months later, an anonymous poster released Flash's mugshots—which were private under a Texas Government Code Chapter 411

non-disclosure order—and characterized him as "not a trusted media source." *Id.* He later discovered that Dennison had been the one who had obtained his mugshots. *Id.*

Defendant Glen Eisen, Dennison's supervisor, was apparently aware that Dennison had misappropriated Flash's mugshots but did not take disciplinary action. *Id.* at 16. As Flash was beginning to face backlash in Fall 2023, Defendant King Merritt filed a police report that detailed an incident with Flash at the County Attorney's Office between Eisen and Flash. *Id.* at 16; (Doc. 11 at 16). Eisen had asked Merritt to arrest Flash for "causing problems at the Jeff Davis County Attorney's Office." (Doc. 11 at 16). Merritt attempted to detain Flash, but Flash left before he could do so and no further action was taken. *Id.* at 16–17.

On October 20, 2023, Flash returned to the County Courthouse. (Doc. 1 at 16–17). Defendant Mary Ann Luedecke, a justice of the peace for the County, attempted to detain him after he photographed a sign outside her office. *Id.* Two days later, Luedecke sent out an alert to regional law enforcement agencies that labeled Flash as a "First Amendment auditor." *Id.* at 17. Luedecke and Eisen also called the District Attorney's Office to warn them that a "First Amendment auditor" was "on the loose." *Id.*

Although no charges had been filed against Flash by this point, Luedecke issued a mock-warrant notice to law enforcement against him at his home address. *Id.* at 18. Luedecke claimed this was part of a training exercise for officials practicing with new software. *Id.* Luedecke also filed a "failure to appear" notice against Flash that resulted in Flash's driver's license renewal being blocked. *Id.* Flash was the target of seven

separate criminal investigations during this time, none of which resulted in criminal charges. *Id.* at 19.

At this point, Flash and Defendants did not have any affinity with each other and Defendants began strategizing how they could keep Flash out of their affairs. *Id.* They discussed playing Disney music during public meetings to prevent Flash—through copyright restrictions—from monetizing his recordings. *Id.* at 17. Eisen authored a memorandum to the County Commissioners Court proposing an ordinance that would criminalize photographing any county employee without their consent but allow employees to grant consent to favorable media outlets. *Id.* at 19–20.

On April 23, 2024, Flash returned once more to the County Courthouse to record a public county commissioners meeting. *Id.* at 20. This time, Defendant Curtis Evans—a county judge—ordered Flash physically removed for covering the meeting. *Id.* As he was being escorted out, one of the County deputies told him to "get a lawyer and sue." *Id.* The next day, Evans issued a written order that banned Flash from being within 300 feet of any County building or official, under penalty of arrest and jail time. *Id.* Flash did not receive notice of the ban or the opportunity to be heard, and it was unclear what legal authority, if any, Evans had been acting under in issuing the ban. *Id.* At this point, criminal charges had also been filed against Flash for harassment and terrorism. *Id.* at 22.

Two days later, Flash was arrested on a warrant issued by the County and placed in the Van Horn Jail for sixteen hours before eventually posting bond. *Id.* at 21. After he returned to his home in Fort Davis, he was stopped by Merritt near his house and told

that he would be arrested if he approached the County Courthouse, pursuant to Judge Evans's trespass order. *Id.* Flash filed a habeas motion challenging the order as violative of Flash's rights under the First, Fifth, and Fourteenth Amendments. *Id.* On June 10, 2025, a court struck down the ban, finding it violated Flash's constitutional rights and was issued without legal authority. *Id.* at 21.

With the order now lifted, Flash returned to the County Courthouse on June 27 to photograph a budget meeting. *Id.* at 22. There were no written rules that prohibited recording or photography, but Flash was asked to move his camera to the back of the room, a request that he complied with. *Id.* Defendant Victor Lopez—a county sheriff—then approached Flash and told him Flash's photography was interfering with his ability to listen to the meeting. *Id.* Defendant Adriana Ruiloba—a county deputy—also approached Flash and told him to back off and not come in her personal space. *Id.* Flash left the room and continued recording the meeting from outside. *Id.*

Upon reentering the room to photograph Ruiloba, Flash was grabbed, handcuffed, and forcibly removed by Ruiloba and Joseph Giesbrecht, a fellow a police officer. *Id.* at 23. Flash was nonresistant throughout the duration of his removal, and he made this clear to the officers. *Id.* ("Flash sa[id] 'Stop' and 'I'm not resisting' as Defendants Ruiloba and Giesbrecht used physical force against him."). Flash was questioned for 30 minutes and cited for disorderly conduct under Texas Penal Code § 42.01. *Id.* The citation did not identify which of the eleven subsections Flash had violated. *Id.* The same day he was arrested, Flash went to an urgent care center for injuries stemming from Defendants' force. *Id.* at 24. Flash's medical records

documented bruising and wrist abrasions on his arms, pain in his upper back and chest, and an elevated heart rate. *Id.*

After his arrest, Defendants made various statements to the media about Flash and his arrest. Evans called him "crazy" and "not suitable for public settings" and brought up the possibility of additional criminal charges. *Id.* at 25. Evans also endorsed an anonymous anti-David Flash website called BigBendTimes.org (unaffiliated with Flash's Big Bend Times). *Id.* Evans and Lopez both conducted an in-person interview with BigBendTimes.org and released body cam footage of Flash's arrest to the website. *Id.* at 25–26.

All criminal charges against Flash were eventually dropped. *Id.* at 24. His disorderly conduct charge was dropped on June 27 due to insufficient evidence. *Id.* The harassment charge filed by Defendant Luedecke was dismissed on August 10, along with an outstanding traffic citation against Flash. *Id.*

On January 18, 2026, Flash filed this action, alleging that the County and many of its officials violated his constitutional rights. (Doc. 1). The County filed a Motion to Dismiss. (Doc. 13). This matter was fully briefed and is ripe for adjudication. (Docs. 23, 34).

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a 12(b)(6) motion to dismiss, plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is appropriate if a complaint offers merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013), *cert. denied*, 572 U.S. 1087 (2014) (quoting *Ashcroft*, 556 U.S. at 678). When reviewing a 12(b)(6) motion, the court accepts all facts as true and construes them in the light most favorable to plaintiff. *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993).

"In the context of municipal liability . . . it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 532 (W.D. Tex. 2017) (quoting *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842 (S.D. Tex. 2011)). "Thus, while stating a claim against a municipality requires more than a barebones recitation of the elements of municipal liability, plaintiffs need not 'specifically state what the [municipal] policy is' and can rely on 'minimal factual allegations' at this stage in the litigation." *Id.* (alteration in original) (quoting *Thomas*, 800 F. Supp. 2d at 842–43).

## Discussion

The County moves to dismiss both Flash's municipal liability claims and his state law claims against the individual Defendants. The County argues Flash fails to state a claim for municipal liability and that the Court should consider the Exhibits attached to

its Motion, which allegedly contradict Flash's version of the facts. (Docs. 13-1, 13-2, 13-3, 13-4).

## I. Video Evidence

As a threshold matter, the Court must determine whether to consider the Exhibits ("Video Exhibits") attached to the County's Motion to Dismiss. (Docs. 13-1, 13-2, 13-3, 13-4). The Video Exhibits allegedly depict Flash's arrest on June 27 and the events leading up to it. (Doc. 13 at 4). Both sides make compelling arguments but ultimately the undersigned finds—narrowly—that the Exhibits should not yet be considered.

In ruling on a motion to dismiss, courts are typically limited to the allegations in the complaint. *Ashcroft*, 556 U.S. at 674 But a "limited exception" exists for exhibits attached to a defendant's motion to dismiss if the exhibits are referred to in the plaintiff's complaint and central to their claims. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). The Parties disagree over the centrality of the Video Exhibits to Flash's claims and as to whether they were sufficiently referred to in his Complaint. (Docs. 19, 25).

Undoubtably, the videos appear to be central to this dispute. Body camera footage depicting the events that form the basis of the plaintiff's allegations is central to their claims. *Benfer v. City of Bayton*, 120 F.4th 1272, 1278 n.2 (5th Cir. 2024); *Robles v. Ciarletta*, 797 F. App'x 821, 832 (5th Cir. 2019). In *Benfer*, the Fifth Circuit found that police body camera footage depicting the events that gave rise to the litigation was central to the plaintiff's claims and subject to consideration, stating in a footnote that

"[b]ecause the expert report, which is incorporated into Benfer's complaint, refers to Calvert's dash cam and bodycam footage, we may consider the footage at this stage." 120 F.4th at 1278 n.2. The Court felt no need to conduct any further analysis on this issue, treating it as obvious. And in *Robles*, the Fifth Circuit found that police body camera footage was essential to the plaintiff's false arrest claim because the plaintiff relied "on the video . . . as evidence that [the defendant] lacked probable cause to arrest him." 797 F. App'x at 832.

Similarly here, Flash pled that his excessive force claim was supported by the fact that "[v]ideo and audio captured Flash saying 'Stop' and 'I'm not resisting.'" (Doc. 1 at 48). In regard to his false arrest claim, Flash also stated that "[b]ody camera footage confirms that Flash was detained at the direction of Defendant Evans[,]"and "Evans personally directed Flash's June 27, 2025, arrest, as confirmed by body camera footage." *Id.* at 23, 39. If Flash's Complaint had referred to specific bodycam footage or videos, the result would be the same as in *Benfer* or *Robles*. But his Complaint does not refer to *specific* videos or bodycam footage, it refers to there being bodycam footage and video generally. (Doc. 1). To say that all video evidence of an event becomes incorporated into a complaint—from every conceivable angle and source—because the complaint mentions video or body camera footage existing generally would be an overly broad application of an exception that the Fifth Circuit has described as "limited." *Scanlan*, 343 F.3d at 536.

The archetypal example of this exception is when, in a breach of contract case, a specific contract is overtly mentioned in the complaint and therefore incorporated. *See,*

*e.g.*, *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000). The plaintiff, in drafting their complaint, has a single document in mind—the particular contract at issue. But here, there is no indication Flash was thinking specifically of Defendant Ruiloba's or Lopez's bodycam footage in pointing to there being bodycam footage generally. The undersigned finds this sufficient reason not to consider the Video Exhibits at this stage. And at the end of the day, courts are only permitted to consider evidence under this exception; it is not a command. *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016) (stating courts "may . . . consider" attached material under this exception). There is no error in waiting until the summary judgment stage to consider this material.[1]

The County also argues separately that the Court should take judicial notice of Exhibit 1—a recording of the County Commissioners Court meeting on June 27—as a public record. (Doc. 25 at 5). Courts may take "judicial notice of facts that are '(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 255 (5th Cir. 2021) (quoting FED. R. EVID. 201(b)(1)–(2)).

Given that the County is trying to use the video to dispute Flash's factual allegations, it appears the County is trying to get the Court to take judicial notice of the facts contained on the video rather than the existence of the video itself. *Polnac v. City of*

1. Although he narrowly made it off the hook here, Flash, as the "master of his complaint[,]" could have easily avoided this problem altogether simply by not framing his allegations on what was on video or bodycam footage. *See Bernhard v. Whitney Nat'l Bank*, 523 F.3d 546, 551 (5th Cir. 2008).

*Sulphur Springs*, 555 F. Supp. 3d 309, 324 (E.D. Tex. 2021). This is not a proper use of judicial notice. "If all it takes to get a court to judicially notice evidence on a motion to dismiss without converting the motion to one for summary judgment is to simply file the evidence on the court's docket and pronounce it as a public record, then the law about considering only the four corners of the plaintiffs' pleading would be meaningless." *Lewis v. Touch*, No. 3:25-CV-00201, 2026 WL 926201, at *4 n.5 (S.D. Tex. Mar. 26, 2026), *R. & R. adopted*, 2026 WL 1036190 (S.D. Tex. Apr. 16, 2026). Accordingly, the undersigned declines to consider the County's Video Exhibits or take judicial notice of Exhibit 1.

## II. Municipal Liability

A municipality is not vicariously liable under 42 U.S.C. § 1983 for the unconstitutional acts of its employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To establish municipal liability under § 1983, a plaintiff must show (1) an official policy (2) promulgated by a municipal policymaker (3) was the moving force behind the violation of a constitutional right. *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). An official policy can be a written policy statement, ordinance, regulation, or a widespread practice that is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). In rare circumstances, a single decision may also create municipal liability when the official or entity possessing final policymaking authority performed the act that caused the constitutional deprivation. *St. Maron Props., L.L.C. v. City of Houston*, 78 F.4th 754, 760 (5th Cir. 2023).

Flash asserts four separate bases for the County's municipal liability: (1) Defendant Evans—as a final policymaker—violating his First Amendment rights by issuing the criminal trespass warning and directing his arrest; (2) Defendant Lopez—as a final policymaker for law enforcement—being liable as a bystander for constitutional deprivations, conspiring to violate his First Amendment rights, and ratifying Defendant Ruiloba's unconstitutional acts; (3) the County failing to train its deputies on the First Amendment rights of journalists; and (4) the County maintaining a persistent and widespread custom of retaliating against him through repeated acts of official oppression.

**A. Single Act of Final Policymaker**

Liability can extend to the municipality through their official's acts when their "[unlawful] decisions represent the official policy of the local government unit." *Odonnell v. Harris County*, 892 F.3d 147, 155 (5th Cir. 2018) (quoting *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)), *overruled on other grounds*, *Daves v. Dallas County*, 64 F.4th 616 (5th Cir. 2023). The Fifth Circuit often describes this theory of municipal liability as very narrow. *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010); *La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020) ("Although a policymaker's single decision may be in effect a policy that creates liability for a municipality, the situations to which this exception applies are few . . . ."). But other times, the Court has described it in ways that make it sound exceedingly broad, as to say there is municipal liability any time a final policymaker causes a constitutional deprivation. *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008) ("It is

well-established that a single action by a municipal actor may give rise to municipal liability if that actor is a final policymaker); *Anderson v. City of McComb*, 539 F. App'x 385, 388 n.2 (5th Cir. 2013) ("When the policymakers are the violators, no further proof of municipal policy or custom is required.").

What is clear is that for a municipality to be liable for their official's single act, the act must have given rise to a constitutional deprivation and been made in an area in which the official was responsible for establishing final government policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); *St. Maron Props., L.L.C. v. City of Houston*, 78 F.4th 754, 760 (5th Cir. 2023). For example, a county would be liable if their sheriff—the final policymaker when it comes to law enforcement—deprived someone of their constitutional rights while acting pursuant to their law enforcement and therefore final policymaking authority. *Brown v. Taylor*, 911 F.3d 235, 244 (5th Cir. 2018).

Whether an official possesses final policymaking authority is a question of state law. *St. Maron*, 78 F.4th at 760. Flash alleges that Defendants Evans and Lopez are final policymakers for the County and that the County is liable for the constitutional violations that resulted from Evans's issuance of the criminal trespass order and ordering Flash's arrest, as well as from Lopez's failure to intervene and participation in the civil rights conspiracy to deprive him of his First Amendment rights. (Doc. 1 at 39–40).

*i. Evans*

Flash argues the County is liable for the constitutional deprivations that resulted from Evans's issuance of the criminal trespass order and ordering Flash's arrest. As to

the former, there is nothing here to indicate Evans's issuance of the criminal trespass order was taken pursuant to final policymaking authority. Flash points to *Familias Unidas v. Briscoe* and Tex. Const. art. 5, § 18(b) to argue that Evans, as county judge, had final policymaking authority over courthouse access and operations. (Docs. 1 at 40; 23 at 10–11); 619 F.2d 391 (5th Cir. 1980) ("[A] Texas county judge is charged by the state constitution and statutes with the performance of numerous executive, legislative and administrative chores . . . ."); TEX. CONST. art. 5, § 18(b) ("[T]he County Judge, as presiding officer, shall compose the County Commissioners Court."). Both sources of authority establish the wide-ranging duties of Texas county judges; neither establishes their authority over courthouse access and operations, much less the authority to determine County policy as to who can and cannot access County buildings.

Second, Evans was not acting as a final policymaker for his acts in relation to Flash's arrest. For the reasons discussed below, an arrest plainly relates to law enforcement authority, over which a county sheriff is the final policymaker. *Brown*, 911 F.3d at 244. Accordingly, Flash fails to state a claim for municipal liability under this theory.

*ii. Lopez*

Flash states a municipal liability claim for civil rights conspiracy and bystander liability through Lopez's acts as County sheriff. In Texas, the county sheriffs are counties' final policymakers in the area of law enforcement. *Brown*, 911 F.3d at 244; *Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990). Texas county sheriffs also have a special place in the hierarchy of final policymakers creating municipal liability from a

single unconstitutional act, as there is plentiful authority from the Fifth Circuit finding county liability for county sheriffs' constitutional violations. *See Bolton*, 541 F.3d at 549 n.4 (collecting cases); *id.* ("Texas sheriffs are policymakers as a direct result of state statute; their constitutional violations result in county liability even if contrary to other state law or policy.").

*Turner* controls here. 915 F.2d at 137. *Turner* involved allegations that a county sheriff conspired with a district attorney to subject the plaintiff to trial on false charges. *Id.* at 136. The Fifth Circuit found that:

> If proven . . . the sheriff's participation as a coconspirator, constituting as it would an abuse of his authority as the ultimate repository of law enforcement power in Upton County, would render the county liable as well. Holding the county liable for the actions of its sheriff under these circumstances does not run afoul of *Monell's* admonition against *respondeat superior* liability on the part of the county for the actions of its employees. . . . When the official representing the ultimate repository of law enforcement in the county makes a deliberate decision to abuse that power to the detriment of its citizens, county liability under section 1983 *must attach*, provided that the other prerequisites for finding liability under that section are satisfied.

*Id.* at 136, 138 (emphasis added). *Turner* also makes clear that the County would not only be liable for Lopez's acts, but also those done by his coconspirators. *Id.* at 137–38 (holding that "the county could be held liable not only for the sheriff's participation in the conspiracy" but also "for the actions of his alleged coconspirator," the district attorney). The Fifth Circuit has relied on *Turner* as recently as 2018 to reach a similar result. *Brown*, 911 F.3d at 244. In *Brown*, the Court found that because the plaintiff had stated a due process claim against Tarrant County Sheriff Dee Anderson, "Tarrant

County can be a proper defendant because Anderson is its sheriff." *Id.* (citing *Turner*, 915 F.2d at 136).

The fact that Flash's conspiracy claim against Lopez arises in part from acts that were not strictly related to law enforcement—such as providing the body camera footage to the anonymous smear website—does not insulate the County from liability. (Doc. 1 at 37). In *Bennett v. Pippin*, the Fifth Circuit found that a county could be held liable for a rape committed by their sheriff that had deprived the plaintiff of their substantive due process right to bodily integrity. 74 F.3d 578, 584, 586 (5th Cir. 1996). Although the Court recognized "rape is not a legitimate law enforcement goal[,]" they nonetheless found "the Sheriff's actions were those of the County" because his relationship with the victim grew out of his activity as sheriff and he had used his authority to coerce her into sex. *Id.* Although Lopez providing body camera footage to the website is not strictly a law enforcement goal, he would not have had access to the footage much less the ability to release it to harass Flash but for his law enforcement authority as County sheriff.

Here, the undersigned found Flash stated a claim against Lopez for failing to intervene to prevent the excessive force against Flash and conspiring to retaliate against Flash for engaging in First Amendment activity. (Doc. 50). Both of these claims involve his law enforcement authority. The County can therefore be held liable for these acts, as the actions he took pursuant to his law enforcement authority "were the actions of the county itself." *Turner*, 915 F.3d at 136; *Bennett*, 74 F.3d at 586; *Brown*, 911 F.3d at 244;

*Childers v. San Saba County*, No. A-14-CV-916-LY-ML, 2016 WL 10988779, at *9 (W.D. Tex. Apr. 22, 2016), *R. & R. adopted*, 2016 WL 1088778 (W.D. Tex. May 13, 2016).

Although *Turner*, *Bennett*, and *Brown* are all still good law, the Fifth Circuit appeared to take a narrower view of single-instance county liability through the acts of a county sheriff one year after *Brown* in *Robinson v. Hunt County*, 921 F.3d 440, 448 (5th Cir. 2019). In *Robinson*, the Court found that even though the plaintiff had stated a claim against the sheriff for viewpoint discrimination, Hunt County would nonetheless be subject to liability only if the violation was "directly attributable to the municipality through some sort of official action or imprimatur . . . ." *Id.* (quoting *Piotrowski*, 237 F.3d at 578). The Court ultimately ruled that the plaintiff had sufficiently pled that the sheriff's viewpoint discrimination was attributable to the county because the sheriff's official Facebook account—which had carried out the viewpoint discrimination—was named "Hunt County Sheriff's Office," which "lend[ed] it some official imprimatur" and gave "rise to a reasonable inference" that the account's actions could be identified as acts of the county itself. *Id.*

The Court in *Robinson* also cited *Groden v. City of Dallas* for the principle that a city spokesperson announcing the policy or discussing it can create the reasonable pleading inference that the constitutional deprivation is attributable to the municipality. *Id.* (citing 826 F.3d 280, 286 (5th Cir. 2016)). Here the County Attorney, Defendant Eisen, publicly announced that the County's legal actions against Flash were "motivated by [the County's] coverage" and that Flash "brought it on himself." (Doc. 1 at 8). To the extent the Fifth Circuit now requires more "imprimatur" than was needed in *Turner*,

*Bennett*, and *Brown*, these statements from a County official at least create the pleading inference that Lopez's constitutional deprivations are attributable to the County. *Groden*, 826 F.3d at 286. The County's Motion should therefore be denied as to Flash's municipal liability claim brought through Lopez's acts as a final policymaker.

**B. Failure to Train**

Flash also brings a claim against the County for failure to train its police officers in the First Amendment rights of journalists. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51 (2011). The plaintiff must plead three elements: (1) the municipality failed to train or supervise its officials; (2) there is a casual connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights. *Arnone v. County of Dallas*, 29 F.4th 262, 272 n.78 (5th Cir. 2022) (citing *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018)).

Here, Flash sufficiently pled that (1) the County failed to train its policer officers on the First Amendment rights of journalists and (2) that this failure led to Flash's unconstitutional arrest for photographing a public County meeting and police officers. (Doc. 1 at 41–42). The only remaining issue is whether he pled deliberate indifference sufficiently.

"Deliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Valle*, 613 F.3d at 547.

Flash must show that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* To meet this burden, plaintiffs must usually show a pattern of similar violations involving third parties. *Id.*

Flash argues he has pled a pattern of similar First Amendment violations caused by Defendants Merritt, Ruiloba, and Giesbrecht. (Doc. 23 at 13–14). But Flash's allegations are limited to acts directed towards himself, which standing alone cannot demonstrate the pattern necessary to support a failure to train claim. *Dubash v. City of Houston*, No. 4:23-cv-3556, 2024 WL 4351351, at *10 (S.D. Tex. Aug. 26, 2024) ("Plaintiffs point to no pattern of unconstitutional conduct outside of the incidents that give rise to their alleged injuries, which is insufficient." (citing *Ratliff v. Aransas County*, 948 F.3d 281, 285 (5th Cir. 2020)); *Morales v. Carrillo*, No. 19-cv-217, 2021 WL 664854, at *17 (W.D. Tex. Feb. 19, 2021). Even if a pattern could be developed entirely from acts directed at Flash, three violations would likely be insufficient to support one. *Thompson ex rel. Neveah T. v. Martinez*, 789 F. Supp. 491, 530 (W.D. Tex. 2025) ("[E]ven if the Court assumes that all three incidents were sufficiently similar, that number falls well short of what is required to establish a pattern.").

Accordingly, Flash's failure to train claim must proceed under the single incident exception. *Valle*, 613 F.3d at 547. Under this exception, Flash cannot merely allege a "failure to train in one limited area" but instead "a complete failure to train" the

officials responsible for the harm. *Peña*, 879 F.3d at 624. One of the few cases where this bar has been met, *Brown v. Bryan County*, involved a situation where Bryan County had not given a police officer *any* formal police training. 219 F.3d 450, 455 (5th Cir. 2000). More recently, the Fifth Circuit found this exception satisfied where the plaintiff had alleged "a complete failure to train officers on the First Amendment." *Hershey v. City of Bossier City*, 156 F.4th 555, 563 (5th Cir. 2025) (Dennis, J., concurring) (plurality opinion).

But here, Flash alleges a failure to train in the limited area of "the First Amendment rights of journalists and members of the public to record government activities . . . ." (Doc. 1 at 42). Even taking these allegations as true, it would not amount to the "complete failure to train" necessary to support a failure to train claim under the single incident exception. The County's Motion should therefore be granted as to Flash's failure to train claim.

**C. Ratification**

A municipality may also be liable "when the municipality's policymakers condone or otherwise adopt the creation of a custom by knowingly ratifying the illegal or unconstitutional actions of subordinate, non-policymaking employees." *Santibanes v. City of Tomball*, 654 F. Supp. 2d 593, 611 (S.D. Tex. 2009). "The Fifth Circuit has limited the theory of ratification to 'extreme factual situations.'" *Hargraves v. Trinity County*, No. 9:23-CV-00033, 2025 WL 4225846, at *13 (E.D. Tex. July 2, 2025) (quoting *Peterson*, 588 F.3d at 848). Even if a plaintiff states a claim for excessive force against an officer where the final policymaker was present but did not intervene, there is not necessarily municipal liability through ratification. *Sligh v. City of Conroe*, 87 F.4th 290, 304 (5th Cir.

2023). In *Sligh*, the Fifth Circuit found the decision to sic a dog on a subject without warning supported a claim for excessive force but that "the present circumstances" were not "an extreme factual circumstance sufficient to support a municipal liability claim" via ratification. *Id.* at 300, 304.

Nor does the fact that a plaintiff states a claim involving a violation of clearly established law mean that a claim reaches "extreme" territory. *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017). To be sufficiently extreme, the subordinate must not only violate clearly established law; the violation itself must be an "obvious" violation of clearly established law. *Hargraves*, 2025 WL 4225846, at *14; *World Wide Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009). In *Davidson*, for example, the Fifth Circuit found the plaintiff stated claims for clearly established violations of his First and Fourth Amendment rights but that the unconstitutional conduct of arresting the plaintiff for his speech was "not sufficiently extreme to qualify for a finding of ratification." 848 F.3d at 395; *cf. Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (finding that officers shooting suspect fleeing on foot in the back was an not extreme enough factual situation to support ratification).

Even assuming the allegations against Lopez constitute sufficient approval for ratification, the facts here do not involve the type of "extreme factual situation" necessary to support municipal liability through ratification. Cases that have passed the "extreme" barrier have involved much more egregious facts, such as where police officers mistook a man for a fugitive, surrounded his truck, and "poured their gunfire" into him without waiting for any hostile act or sound. *Grandstaff v. City of Borger*, 767

F.2d 161, 168 (5th Cir. 1985). The undersigned does not think a case premised largely on "fingernail abrasions" and an "[e]levated heart rate" rises to such a level. (Doc. 1 at 24). Accordingly, the County's Motion should be granted as to Flash's municipal liability claim to the extent it is predicated on the theory of ratification.

**D. Custom or Widespread Practice**

Flash also claims the County is liable because there existed a pattern of retaliating against him for exercising his First Amendment rights that amounted to an official County policy or custom of harassment. Flash's allegations are limited to actions the County took against him personally. (Doc. 1 at 42–44). He therefore fails to demonstrate a pattern or practice because there is no indication that County employees "retaliated against, investigated, or arrested anyone else because of their speech." *Villarreal v. City of Laredo*, 44 F.4th 363, 373–74 (5th Cir. 2022), *vacated on reh'g en banc on other grounds*, 94 F.4th 374 (5th Cir. 2024); *Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) (holding that plaintiffs failed to allege a custom of retaliation because they "offered no evidence that similar retaliation had victimized others"); *Miller v. Dunn*, No. 3:20-cv-759-E-BN, 2023 WL 10512247, at *11 (N.D. Tex. Sept. 25, 2023) ("[A]lmost without exception, allegations limited to the events surrounding the plaintiffs cannot constitute an allegation of a *de facto* policy." (internal quotations and citation omitted)), *R. & R. adopted*, 2024 WL 1317793 (N.D. Tex. Mar. 27, 2024).

**III. State Law Claims Against Individual Defendants**

The County moves to dismiss all state law claims against the individual Defendants under Section 101.106(e) of the Texas Tort Claims Act ("TTCA"), arguing

that Flash would have to have elected to sue either the County or the individual Defendants, but not both. (Doc. 13 at 13). In his Response, Flash correctly notes that this would have only been the case had Flash sued both the County and the individual Defendants under the TTCA. (Doc. 23 at 16); *Chavez v. Alvarado*, 550 F. Supp. 439, 451 (S.D. Tex. 2021); *cf. Tex. Dep't of Aging and Disability Servs. v. Cannon*, 453 S.W.3d 411, 416 (Tex. 2015) ("[S]ubsection 101.106(e) does not contemplate or require dismissal of section 1983 claims against individual government employees, or any other claim not brought under the Tort Claims Act . . . ."). The County does not respond to this argument in their Reply. (Doc. 34). Because Flash only brought a claim against the County under § 1983, Section 101.106(e) is inapplicable and Flash's state law claims against the individual Defendants should proceed.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that the County's Motion be **GRANTED IN PART** and **DENIED IN PART**. The Motion should be granted as to Flash's municipal liability claim to the extent it is premised on Evans's acts as a final policymaker, failure to train, ratification, and a *de facto* policy of retaliating against Flash. The Motion should be denied as to Flash's municipal liability claim to the extent it is premised on Lopez's acts as a final policymaker for the County and as to Flash's state law claims.

SIGNED this 17th day of June, 2026.

DAVID B. FANNIN
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND RIGHT TO APPEAL/OBJECT

In the event that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation **by certified mail, return receipt requested**. Pursuant to 28 U.S.C. § 636(b), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Court need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the Magistrate Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a de novo determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).