**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**PECOS DIVISION**

| | | |
|---|---|---|
| **DAVID FLASH;** *Plaintiff,* | § § | |
| **v.** | § § | **PE:26-CV-00004-DC-DF** |
| **JEFF DAVIS COUNTY, et al.;** *Defendants.* | § § § | |

**U.S. MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Before the Court is Defendant King Merritt's Motion to Dismiss. (Doc. 11). After due consideration, the undersigned recommends that the Motion be granted in part and denied in part.

## BACKGROUND

Plaintiff David Flash brings this action against Defendant Jeff Davis County ("County") and multiple County officials, alleging violations of his constitutional rights. (Doc. 1). Flash is an independent journalist who covers regional events and public affairs in West Texas. *Id.* at 14. In September 2023, Flash's news outlet, the Big Bend Times, published investigative news stories centered around the conduct of multiple County officials. *Id.* The stories accused the officials of misusing county resources and questionable law enforcement practices. *Id.*

Flash faced backlash after the stories were published. *Id.* at 15. Defendant Lisa Dennison, an employee for the County Attorney's Office, confronted him and told him he was under investigation. *Id.* A few months later, an anonymous poster released Flash's mugshots—which were private under a Texas Government Code Chapter 411

non-disclosure order—and characterized him as "not a trusted media source." *Id.* He later discovered Dennison had been the one who had obtained his mugshots. *Id.*

Defendant Glen Eisen, Dennison's supervisor, was apparently aware that Dennison had misappropriated Flash's mugshots but did not take disciplinary action. *Id.* at 16. As Flash was beginning to face backlash in Fall 2023, Defendant King Merritt filed a police report detailing an incident with Flash at the County Attorney's Office between Eisen and Flash. *Id.* at 16; (Doc. 11 at 16). Eisen had asked Merritt to arrest Flash for "causing problems at the Jeff Davis County Attorney's Office." (Doc. 11 at 16). Merritt attempted to detain Flash, but Flash left before he could do so and no further action was taken. *Id.* at 16–17.

On October 20, 2023, Flash returned to the County Courthouse. (Doc. 1 at 16–17). Defendant Mary Ann Luedecke, a justice of the peace for the County, attempted to detain him after he photographed a sign outside her office. *Id.* Two days later, Luedecke sent out an alert to regional law enforcement agencies that labeled Flash as a "First Amendment auditor." *Id.* at 17. Luedecke and Eisen also called the District Attorney's Office to warn them that a "First Amendment auditor" was "on the loose." *Id.*

Although no charges had been filed against Flash by this point, Luedecke issued a mock-warrant notice to law enforcement against him at his home address. *Id.* at 18. Luedecke claimed this was part of a training exercise for officials practicing with new software. *Id.* Luedecke also filed a "failure to appear" notice against Flash that resulted in Flash's driver's license renewal being blocked. *Id.* Flash was the target of seven

separate criminal investigations during this time, none of which resulted in criminal charges. *Id.* at 19.

At this point, Flash and Defendants did not have any affinity with each other and Defendants began strategizing how they could keep Flash out of their affairs. *Id.* They discussed playing Disney music during public meetings to prevent Flash—through copyright restrictions—from monetizing his recordings. *Id.* at 17. Eisen authored a memorandum to the County Commissioners Court proposing an ordinance that would criminalize photographing any county employee without their consent but allow employees to grant consent to favorable media outlets. *Id.* at 19–20.

On April 23, 2024, Flash returned once more to the County Courthouse to record a public county commissioners court meeting. *Id.* at 20. This time, Defendant Curtis Evans—a county judge—ordered Flash physically removed for covering the meeting. *Id.* As he was being escorted out, one of the County deputies told him to "get a lawyer and sue." *Id.* The next day, Evans issued a written order that banned Flash from being within 300 feet of any County building or official, under penalty of arrest and jail time. *Id.* Flash did not receive notice of the ban or the opportunity to be heard, and it was unclear what legal authority, if any, Evans had been acting under in issuing the ban. *Id.* Criminal charges had also been filed against Flash for harassment and terrorism. *Id.* at 22.

Two days later, Flash was arrested on a warrant issued by the County and placed in the Van Horn Jail for sixteen hours before posting bond. *Id.* at 21. After he returned to his home in Fort Davis, he was stopped by Merritt near his house and told that he

would be arrested if he approached the County Courthouse, pursuant to Judge Evans's trespass order. *Id.* Flash filed a habeas motion challenging the order as a violation of his First, Fifth, and Fourteenth Amendment rights. *Id.* On June 10, 2025, a court struck down the ban, finding it violated Flash's constitutional rights and was issued without legal authority. *Id.* at 21.

With the order now lifted, Flash returned to the County Courthouse on June 27 to photograph a budget meeting. *Id.* at 22. There were no written rules that prohibited recording or photography, but Flash was asked to move his camera to the back of the room—a request he complied with. *Id.* Defendant Victor Lopez, a county sheriff, then approached Flash and told him his photography was interfering with his ability to listen to the meeting. *Id.* Defendant Adriana Ruiloba, a county deputy, also approached Flash and told him to back off and not come in her personal space. *Id.* Flash left the room and continued recording the meeting from outside. *Id.*

Upon reentering the room to photograph Ruiloba, Flash was grabbed, handcuffed, and forcibly removed by Ruiloba and Joseph Giesbrecht, a fellow a police officer. *Id.* at 23. Flash was nonresistant throughout the duration of his removal, and he made this clear to the officers. *Id.* ("Flash sa[id] 'Stop' and 'I'm not resisting' as Defendants Ruiloba and Giesbrecht used physical force against him."). Flash was questioned for 30 minutes and cited for disorderly conduct under Texas Penal Code § 42.01. *Id.* The citation did not identify which of the eleven subsections Flash had violated. *Id.* The same day he was arrested, Flash went to an urgent care center for injuries stemming from Ruiloba and Giesbrecht's force. *Id.* at 24. Flash's medical records

documented bruising and wrist abrasions on his arms, pain in his upper back and chest, and an elevated heart rate. *Id.*

After his arrest, Defendants made various statements to the media about Flash and his arrest. Evans called him "crazy" and "not suitable for public settings" and brought up the possibility of additional criminal charges. *Id.* at 25. Evans also endorsed an anonymous anti-David Flash website called BigBendTimes.org (unaffiliated with Flash's news outlet, Big Bend Times). *Id.* Evans and Lopez both conducted an in-person interview with BigBendTimes.org and released body cam footage of Flash's arrest to the website. *Id.* at 25–26. All criminal charges against Flash were eventually dropped. *Id.* at 24. His disorderly conduct charge was dropped due to insufficient evidence. *Id.* The harassment charge filed by Defendant Luedecke was dismissed on August 10, along with an outstanding traffic citation against Flash. *Id.*

On January 18, 2026, Flash filed this action, alleging that the County and many of its officials, including Merritt, violated his constitutional rights. (Doc. 1). Merritt filed a Motion to Dismiss, to which Flash filed a timely Response. (Docs. 11, 12). This matter is ripe for adjudication.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a 12(b)(6) motion to dismiss, plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is appropriate if a complaint offers merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (quoting *Ashcroft*, 556 U.S. at 678), *cert. denied*, 572 U.S. 1087 (2014). When reviewing a 12(b)(6) motion, the court accepts all facts as true and construes them in the light most favorable to plaintiff. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).

## DISCUSSION

Flash brings First Amendment retaliation and civil rights conspiracy claims against Merritt. Merritt asserts qualified immunity and moves to dismiss for failure to state a claim.

### I. Entitlement to Qualified Immunity

Merritt invokes qualified immunity. Qualified immunity is a defense to individual capacity liability for "government officials performing discretionary functions . . . insofar as their conduct does not violate clearly established constitutional rights." *Diaz v. Cantu*, 123 F.4th 736, 747 (5th Cir. 2024) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If a defendant successfully raises qualified immunity, "[t]he plaintiff 'must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm . . . alleged and that defeat a qualified immunity defense with equal specificity." *Id.* (quoting *Lincoln v. Barnes*, 855 F.3d 297, 300–01 (5th Cir. 2017)).

Qualified immunity works under a burden shifting framework. *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 318 (5th Cir. 2019). The defendant official bears the initial burden to establish their entitlement to the defense. *Castelan v. Villarreal*, No. 5:23-CV-1394-JKP-RBF, 2025 WL 424538, at *20 (W.D. Tex. Feb. 6, 2025) ("[M]ere invocation [of qualified immunity] is not enough."); *Barker v. Norman*, 651 F.2d 1107, 1120 (5th Cir. 1981) ("The immunities of state officials that we have recognized for purposes of [§] 1983 are the equivalents of those we have recognized at common law, and the burden is on the official claiming immunity to demonstrate his entitlement." (internal citations omitted) (quoting *Dennis v. Sparks*, 449 U.S. 24, 29 (1980))).

To satisfy this burden, the defendant official must demonstrate their conduct was within the scope of their discretionary authority. *Cherry Knoll*, 922 F.3d at 318; *Sweetin v. Texas City*, 48 F.4th 387, 392 (5th Cir. 2022) ("To even get into the qualified-immunity framework, the government official must 'satisfy his burden of establishing that the challenged conduct was within the scope of his discretionary authority.'" (quoting *Cherry Knoll*, 922 F.3d at 318)). An official acts pursuant to discretionary authority when they perform non-ministerial acts within the scope of their official responsibilities. *Cherry Knoll*, 922 F.3d at 318. Non-ministerial acts are those that involve personal deliberation and judgment, while ministerial acts are those that require obedience or the performance of a duty to which the actor had no choice but to perform. *Anders v. Rumfield*, No. 25-40387, 2026 WL 625638, at *2 (5th Cir. Mar. 5, 2026).

Even if the defendant demonstrates their actions were non-ministerial, they must also show they were within the scope of their official responsibilities. *Diaz*, 123 F.4th at

748–49; *see Barker*, 651 F.2d at 1121 n.18 ("It should be clear from our prior case law that an official's actions may be so far removed from the ordinary course of his duties, so outside even his discretionary authority to act, that the official cannot establish his entitlement to claim immunity in the first instance . . . ."). To determine whether an official was acting within the scope of their official duties, courts look primarily at state law. *Anders*, 2026 WL 625638, at *2 (citing *Sweetin*, 48 F.4th at 392).

Here, Merritt asserts that qualified immunity applies because the challenged conduct arose "from the performance of his duties as a Deputy Sheriff for the Jeff Davis County Sheriff's Department." (Doc. 11 at 11). But qualified "immunity is not automatically available to every 1983 defendant merely by virtue of his status as a government employee." *Williams v. Treen*, 671 F.2d 892, 896 (5th Cir. 1982). Other than saying he was acting as a deputy sheriff for the County, Merritt does not provide anything further as to why the actions Flash challenges fall within his discretionary authority; nor does he cite any state law or policy. Instead, he states that because he "has asserted his qualified immunity defense, . . . the burden is on Plaintiff to plead sufficient facts showing the inapplicability of that defense." (Doc. 11 at 13). Merritt, like his co-Defendants, misunderstands that he is the one who bears the initial burden of demonstrating his actions are entitled to qualified immunity. *Sweetin*, 48 F.4th at 392.

To meet his burden, Merritt would have had to point to specific[1] authority vesting him with discretionary authority to engage in the acts Flash challenges. In each

1. In one recent unpublished opinion, the Fifth Circuit appeared to take a broader approach in finding discretionary authority and said it may also flow from "general job duties . . . ." *Turner v. Oliver*, No. 23-60165, 2025 WL 737339, at *4 (5th Cir. Mar. 7, 2025) (finding prosecutor had to make statements to the

of its recent decisions involving this burden, the Fifth Circuit has held that the lack of specific authority authorizing and narrowly tailored to the defendant's discrete acts made qualified immunity inapplicable. *Diaz*, 123 F.4th at 749 (county judge could not assert qualified immunity because he failed to meet his burden of showing state law gave him authority to issue contempt orders); *Sweetin*, 48 F.4th at 392 (ambulance permit officer could not assert qualified immunity because state law did not give him authority to conduct seizures); *Cherry Knoll*, 922 F.3d at 318–19 (city manager could not assert qualified immunity because he failed to meet his burden of showing state law gave him authority to file plats). Imposing this burden "provides greater protection to the public and is consistent with the common law burden of proof rule with respect to official immunity." *Douthit v. Jones*, 619 F.2d 527, 534 (5th Cir. 1980).

Perhaps if Merritt were to reassert qualified immunity at the summary judgment stage this burden would be easily satisfied. And it is justifiable for Defendants not to have known of a burden that the Fifth Circuit itself has recognized "often gets overlooked . . . ." *Sweetin*, 48 F.4th at 392. But it is not the Court's role to establish a government-official's entitlement to qualified immunity, and it should not treat a burden as satisfied when there has been no attempt to meet it. *Castelan v. Villarreal*, No. 5:23-CV-1394-JKP-RBF, 2025 WL 424538, at *20 (W.D. Tex. Feb. 6, 2025) ("[D]istrict courts err in determining that a defendant official is 'entitled to the protection of qualified immunity at the Rule 12(b)(6) stage' when the defendant official has not

---

public as part of their general job duties and was therefore acting within their discretionary authority). But this opinion is unpublished and is therefore not precedent.

carried his burden . . . ." (quoting *Cherry Knoll*, 922, F.3d at 319)); *Williams v. East Baton Rouge City/Parish*, No. 23-01581-BAJ-EWD, 2024 WL 4241627, at *8 (M.D. La. Sept. 19, 2024) (denying police officer's qualified immunity because "he point[ed] to no state law or policy that might demonstrate the scope of his discretionary authority"). Accordingly, Merritt's Motion should be denied as to qualified immunity.

## II. First Amendment Retaliation

To state a First Amendment retaliation claim, a plaintiff must plead that: (1) they were engaged in constitutionally protected activity; (2) the officer's action caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the officer's adverse actions were substantially motivated against their exercise of constitutionally protected activity. *Rincon v. City of Laredo*, No. 24-40168, 2025 WL 603883, at *5 (5th Cir. Feb. 25, 2025) (citing *Batyukova v. Doege*, 994 F.3d 717, 730 (5th Cir. 2021)).

This right is not without limits. The Fifth Circuit has said that it would be "frivolous" to hold that "the First Amendment, in the interest of securing news or otherwise, confers a license . . . to violate valid criminal laws." *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 184 (5th Cir. 2000) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 691 (1972)); *Buehler v. City of Austin*, No. 1:13-CV-1100-ML, 2024 WL 12776539, at *6 (W.D. Tex. July 24, 2014) ("To the extent that an individual, in exercising his First Amendment right to film police officers as they execute their official duties, violates a valid criminal law, he cannot plausibly argue that his First Amendment right acts as a shield . . . .").

As to the first element, Flash sufficiently pled that he was engaged in the constitutionally protected activity of newsgathering. The Fifth Circuit has recognized that newsgathering is entitled to First Amendment protection. *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017); *In re Express-News Corp.*, 695 F.2d 807, 808 (5th Cir. 1982) ("[N]ews gathering is entitled to [F]irst [A]mendment protection, for 'without some protection for seeking out the news, freedom of the press could be eviscerated.'" (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972))). Flash therefore adequately pleads the first element of his claim.

Second, Flash's allegations are sufficient to establish that a person of ordinary firmness would have been chilled. Flash points to Merritt (1) filing a criminal report against him, (2) investigating him for evading arrest and detention, and (3) stopping Flash near his home to threaten him with arrest for approaching the courthouse. (Doc. 12 at 5). The filing of the criminal report and investigation, by themselves, are insufficient to satisfy this element. *Johnson v. Bowe*, 856 F. App'x 487, 493 (5th Cir. 2021) (finding that "criticism, false public accusations, and an attempted criminal investigation are not substantial enough injuries to 'chill a person of ordinary firmness'").

Merritt detaining Flash and warning him that he would be arrested if he went any further near the courthouse, however, is sufficient. Courts have found that the issuance of a trespass warning and prevention of an individual from accessing particular geographic locations can constitute an injury that would chill an individual of reasonable firmness from exercising their First Amendment rights. *Rios v. Perez*, 777 F.

Supp. 3d 727, 758 (W.D. 2025). This, in conjunction with Merritt stopping Flash on a public street and threatening arrest if he went any further, is sufficient to chill Flash's speech. *See Nieves v. Bartlett*, 587 U.S. 391, 412–13 (2019) (Gorsuch, J., concurring in part and dissenting in part) ("The freedom to speak without risking arrest is 'one of the principal characteristics by which we distinguish a free nation.'" (quoting *Houston v. Hill*, 482 U.S. 451, 463 (1987))).

Although Flash establishes the first two elements of his claim, there is nothing here demonstrating that the motive behind Merritt's actions was retaliatory. At the broadest level, there is no suggestion Merritt even knew of Flash's journalism or newsgathering. (Doc. 1). Flash points to several altercations between Merritt and Flash as being sufficient to infer retaliatory motive; but it is not apparent that Merritt had any idea Flash was engaged in journalism during the events described. (Doc. 12 at 7–8).

First, Flash points to Merritt enforcing Evans's trespass order; but enforcing this order—no matter how flagrantly unconstitutional it was—is not evidence of a retaliatory motive. (Doc. 12 at 8). Although Merritt has not raised the affirmative defense of quasi-judicial immunity for enforcing judicial orders, the rationale behind it is illustrative as to why merely enforcing this order does not demonstrate retaliatory motive:

> [A]n official charged with executing a facially valid court order has no choice but to do so. Government officials should not be required to make the Hobson's choice between disobeying the court order or being haled into court to answer for damages. To hold otherwise would require sheriffs and other court officers enforcing facially valid court

> orders to act as pseudo-appellate courts scrutinizing the orders of judges.

*Mays v. Sudderth*, 97 F.3d 107, 113 (5th Cir. 1996) (internal citations and quotation marks omitted). Police officers are "not expected to predict the future course of constitutional law" and thus are not expected to neglect their duties out of doubt of the authority they are acting under. *Wilson v. Layne*, 526 U.S. 603, 617 (1999). All the facts illustrate is that Merritt's motive was doing his job, even if that job happened to be enforcing an unconstitutional trespass order.

Similarly, Merritt listing Defendant Eisen as the complainant on Merritt's police report is not evidence of retaliatory motive. All this demonstrates is that Eisen was the one who made the complaint that brought Merritt to the County Courthouse. As a police officer, Merritt is tasked with responding to such complaints. In his Motion, Merritt attaches the police report as a document incorporated by reference into Flash's Complaint; Flash does not dispute its inclusion. (Docs. 11 at 16; 12 at 8–9). Flash argues the report supports his claims because it shows Merritt tried to detain Flash for "leaving a public building" and "walking to his car . . . ." (Doc. 12 at 9). That is not what the report describes. The report states that "[a]s Deputy Merritt approached the main door, he observed [Flash] exit out the East Entrance of the courthouse and running towards [the parking lot]." (Doc. 11 at 16). Headlong flight from the police, when corroborated with other facts,—such as the police call here—can support reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 119 (2000) (finding reasonable suspicion existed in part from

"unprovoked flight"). Flash's argument that this was "not a legitimate law enforcement response to someone leaving a public building" is therefore unavailing. (Doc. 12 at 9).

Flash also points to Merritt being directed to investigate Flash after Flash criticized another government official. *Id.* at 7. But if this argument supports a retaliatory motive, it supports the motive of the individual directing Merritt—not Merritt's motive. All this indicates is that Merritt's motive to investigate Flash was that a superior had directed him to do so. Accordingly, Flash fails to plead that Merritt's actions were motivated by his protected activity. Merritt's Motion should therefore be granted as to Flash's First Amendment retaliation claim.

**III. 42 U.S.C. § 1983 Conspiracy**

Next, Merritt moves to dismiss Flash's civil rights conspiracy claim for failure to state a claim. Flash alleges that each individual Defendant, including Merritt, conspired to suppress his journalism through retaliation and prior restraint. (Doc. 1 at 36). The undersigned finds Flash adequately pled the existence of a conspiracy to suppress his First Amendment rights but failed to establish Merritt's connection.

Conspiracy claims brought through § 1983 for deprivations of constitutional rights "are unique" in that the plaintiff must not only allege facts that (1) establish the existence of a conspiracy involving state action, but also (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019). A § 1983 conspiracy cannot exist in a vacuum; there must be a surviving constitutional claim for it to be actionable. *Id.* They thus "act as the legal mechanism through which to impose liability on all of the defendants without regard to

who committed the particular act" that caused the constitutional deprivation. *Bevill v. Fletcher*, 26 F.4th 270, 283 (5th Cir. 2022).

Here, Flash has pled facts demonstrating Defendant Evans, a member of the conspiracy, deprived Flash of his rights under the First Amendment. (Doc. 48). Thus, all that is left to consider is whether Flash sufficiently pled the existence of a connected conspiracy involving state action. *See Morales v. Carrillo*, 625 F. Supp. 3d 587, 598 (W.D. Tex. 2022). To survive a motion to dismiss, a plaintiff's allegations must "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bevill*, 26 F.4th at 284 (quoting *Twombly*, 550 U.S. at 557).

Merritt argues Flash's claim fails because he did not plead the specifics of the agreement such as "when and where" it was made and "who was present . . . ." (Doc. 11 at 10). Such specificity is unnecessary at this stage. The sufficiency of "a complaint's conspiracy claim does not turn on whether the plaintiff includes a 'conclusory allegation of agreement[.]' It turns on whether the specific facts alleged raise a 'suggestion' of such an agreement." *Rudd v. City of Norton Shores*, 977 F.3d 503, 520 (6th Cir. 2020) (internal citation omitted) (quoting *Twombly*, 550 U.S. at 557). Thus, "a plaintiff's § 1983 conspiracy claim need not satisfy 'a probability requirement at the pleading stage; plausibility simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *Bevill*, 26 F.4th at 284 (cleaned up) (quoting *Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013)).

The existence of an agreement is often "shown by circumstantial evidence, because 'conspirators rarely formulate their plans in ways susceptible of proof by direct

evidence.'" *Morales*, 625 F. Supp. at 599 (quoting *Thomas v. New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982)). "Conspiracy" often "conjures images of under-the-table handshakes and back-alley meetings under the cover of night[,]" but that is not how people conspire. *Bevill v. City of Quitman*, No. 4:19-CV-406, 2025 WL 2306849, at *22 (E.D. Tex. Aug. 11, 2025). "They do so over time, in text messages, over lunch meetings, and during phone calls." *Id.* Consequently, "there is rarely a smoking gun" or a "room where [the conspiracy] happened." *Id.* "[T]he determination of whether a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the behavior of the alleged conspirators." *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 374 (M.D. La. 2022) (quoting *Mack v. Newton*, 737 F.2d 1343, 1350 (5th Cir. 1984)).

Flash's allegations need only "suggest a commitment to a common end" or that the "conspirators had a unity of purpose or a common design and understanding . . . ." *Id.* (quoting *Mack*, 737 F.2d at 1350). Flash has pled that the individual Defendants conspired and agreed to use their state authority to suppress his journalism through retaliation and prior restraint. (Doc. 1 at 36). There is a demonstrated commitment to a common end here—suppressing Flash's First Amendment rights using state authority—and enough facts to raise the suggestion of a preceding agreement.

Flash alleges a "coordinated, multi-agency effort to develop counterstrategies against Flash's journalism . . . ." *Id.* at 37. Seldomly do such sensational claims have support to back them up, but Flash provides facts to push this over the line from speculative to plausible. After Flash began reporting on the individual Defendants, he was the target of seven separate criminal investigations, none of which resulted in any

formal charges. *Id.* at 19. County officials discussed playing copyright restricted music over public meetings to prevent Flash from monetizing his recordings; they also floated the idea of a policy by which journalists could be refused reporting access based on favorability of coverage. *Id.* at 37. Then—in an extrajudicial proceeding—Flash was banned from coming within 300 feet of any County building or employee. *Id.* at 20. After that ban was struck down, Flash was arrested for the same conduct which had led to the ban—attempting to record and cover a County Commissioners Court meeting that was open to the public. *Id.* at 22.

Throughout the conspiracy's duration, many of the parties alleged to have been involved made statements expressing their animus toward Flash and his journalism. Defendant Evans called him "crazy" and "not suitable for public settings." (Doc. 1 at 25). Defendant Dennison called him a "spoiled toddler" and speculated that he could be carrying a concealed weapon. *Id.* at 12. Defendant Eisen described Flash's Big Bend Times as a "megaphone" and said that Flash "brought it on himself" through his journalism. *Id.* at 8. Critically, Eisen also stated that the County's actions against Flash were "motivated by our coverage[,]" suggesting a collective response motivated by his First Amendment activity. *Id.* at 35.

Flash also pled links between the individual Defendants. Defendants Ruiloba and Giesbrecht arrested Flash under Defendant Evans's directions and with Defendant Lopez present. *Id.* at 9. Lopez had expressed disapproval toward Flash's photojournalism immediately prior to the arrest, telling Flash "it was interfering with his ability to listen to the meeting." *Id.* at 22. Later, Defendants Evans and Lopez jointly

provided body camera footage to and participated in an interview with the anonymous anti-Flash smear website. *Id.* at 25–26; *see Quitman*, 2025 WL 2306849, at *18 (considering joint interviews as evidence of conspiratorial relationship).

Although none of these acts in isolation would be sufficient, a reasonable fact finder could look at the totality of the allegations here and find they demonstrate a "commitment to a common end" and not purely independent conduct. *Imani*, 614 F. Supp. at 374 (quoting *Mack*, 737 F.2d at 1350). Multiple coordinated strategies were deployed with the end goal of silencing Flash's journalism. Whether those strategies were undertaken pursuant to a common scheme or agreement is still an open question, but Flash has at least provided enough to meet the "minimum standard" necessary to survive a motion to dismiss. *Bevill*, 26 F.4th at 284; *Morales*, 625 F. Supp. at 605 ("[T]he Court expresses no opinion on the merits of Plaintiff's conspiracy claim; it simply finds that the inference of conspiracy is not so tenuous that the Court" must dismiss it. (citation and internal quotations omitted)).

Although Flash sufficiently pled the existence of a conspiracy involving state action, he failed to demonstrate Merritt's connection to it. *See Zorn v. City of Marion*, 774 F. Supp. 1279, 1330 (D. Kan. 2025) (finding plaintiff sufficiently pled conspiracy involving some defendants but dismissing the claim against other defendants who lacked involvement). There is simply nothing here that would allow the inference that Merritt's actions were undertaken pursuant to a larger conspiracy to silence Flash's

journalism.[2] Although conspiracy can be demonstrated by circumstantial evidence, "[u]nreasonable inferences, speculation, and conjecture are . . . inadequate." *Imani*, 614 F. Supp. at 374.

Here, Flash merely points to actions Merritt took against him pursuant to Merritt's normal duties as a police officer, such as enforcing the trespass order and responding to Eisen's complaint about Flash at the County courthouse. (Doc. 12 at 9–11). Normal police actions can certainly be taken in retaliation to an individual's First Amendment rights; but there must be some indication that Merritt took those actions pursuant to a broader agreement. No such facts exist here.

Unlike Defendants and fellow police officers Ruiloba and Giesbrecht, it does not appear that Merritt's actions were taken while Flash was engaged in newsgathering, nor were they taken under the verbal directive of an alleged coconspirator. (Doc. 1 at 16, 21). Perhaps Flash would argue that enforcing Evans's order shows Merritt acted under the direction of a coconspirator and as part of a larger agreement, but we afford officers substantial benefit of the doubt in carrying out written judicial orders out of recognition that it is their job to execute them. *Mays*, 97 F.3d at 113 ("Government officials should not be required to make the Hobson's choice between disobeying the court order or being haled into court to answer for damages."). Although the undersigned concedes that "drawing the line between a conclusory and non-conclusory allegation isn't always

2. In his Response, Flash includes a parenthetical quotation from *Imani* that states "[a] conspiracy under Section 1983 may be proven through circumstantial evidence demonstrating a 'meeting of the minds,' including coordinated conduct, mutual failure to discipline co-conspirators, and a pattern of harassment targeting the same individual." (Doc. 12 at 9–10) (citing 614 F. Supp. at 318). This quote does not appear anywhere in *Imani*. *See, e.g.*, 614 F. Supp. 306. The pin cite Flash provides goes to the headnotes. *Id.* at 318.

a precise task[;]" Merritt's actions here are "merely parallel conduct that could just as well be independent action." *Zorn*, 774 F. Supp. at 1330; *Twombly*, 550 U.S. at 557. Merritt's Motion should therefore be granted as to Flash's civil rights conspiracy claim.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that Merritt's Motion be **GRANTED IN PART** and **DENIED IN PART**. (Doc. 11). The Motion should be granted as to dismissing Flash's First Amendment retaliation and civil rights conspiracy claims against Merritt. These claims should be **DISMISSED WITHOUT PREJUDICE**. The Motion should be denied as to Merritt's assertion of qualified immunity.

SIGNED this 17th day of June, 2026.

DAVID B. FANNIN
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND RIGHT TO APPEAL/OBJECT

In the event that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation **by certified mail, return receipt requested**. Pursuant to 28 U.S.C. § 636(b), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Court need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the Magistrate Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a de novo determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).