IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| **DAVID FLASH;** *Plaintiff,* | § | |
| **v.** | § | **PE:26-CV-00004-DC-DF** |
| **JEFF DAVIS COUNTY, et al.;** *Defendants.* | § | |

**U.S. MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Before the Court is Defendant Mary Ann Luedecke's Motion to Dismiss. (Doc. 14). After due consideration, the undersigned recommends that Luedecke's Motion be granted in part and denied in part.

## BACKGROUND

David Flash is an independent journalist that covers regional events and public affairs in West Texas. (Doc. 1 at 14). Flash brought this action against Jeff Davis County ("County") and multiple County officials for constitutional rights violations. (Doc. 1). Flash's factual allegations are as follows. In September 2023, Flash's news outlet, the Big Bend Times, published investigative news stories centered around the conduct of multiple County officials. *Id.* The stories accused the officials of misusing county resources and questionable law enforcement practices. *Id.*

Flash faced backlash after the stories were published. *Id.* at 15. Defendant Lisa Dennison, an employee for the County Attorney's Office, confronted him and told him he was under investigation. *Id.* A few months later, an anonymous poster released Flash's mugshots—which were private under a Texas Government Code Chapter 411

non-disclosure order—and characterized him as "not a trusted media source." *Id.* He later discovered that Dennison had been the one who had obtained his mugshots. *Id.*

Defendant Glen Eisen, Dennison's supervisor, was apparently aware that Dennison had misappropriated Flash's mugshots but did not take disciplinary action. *Id.* at 16. As Flash was beginning to face backlash in Fall 2023, Defendant King Merritt filed a police report that detailed an incident with Flash at the County Attorney's Office between Eisen and Flash. *Id.* at 16; (Doc. 11 at 16). Eisen had asked Merritt to arrest Flash for "causing problems at the Jeff Davis County Attorney's Office." (Doc. 11 at 16). Merritt attempted to detain Flash, but Flash left before he could do so and no further action was taken. *Id.* at 16–17.

On October 20, 2023, Flash returned to the County Courthouse. (Doc. 1 at 16–17). Defendant Mary Ann Luedecke, a justice of the peace for the County, attempted to detain him after he photographed a sign outside her office. *Id.* Two days later, Luedecke sent out an alert to regional law enforcement agencies that labeled Flash as a "First Amendment auditor." *Id.* at 17. Luedecke and Eisen also called the District Attorney's Office to warn them that a "First Amendment auditor" was "on the loose." *Id.*

Although no charges had been filed against Flash by this point, Luedecke issued a mock-warrant notice to law enforcement against him at his home address. *Id.* at 18. Luedecke claimed this was part of a training exercise for officials practicing with new software. *Id.* Luedecke also filed a "failure to appear" notice against Flash that resulted in Flash's driver's license renewal being blocked. *Id.* Flash was the target of seven

separate criminal investigations during this time, none of which resulted in criminal charges. *Id.* at 19.

At this point, Flash and Defendants did not have any affinity with each other and Defendants began strategizing how they could keep Flash out of their affairs. *Id.* They discussed playing Disney music during public meetings to prevent Flash—through copyright restrictions—from monetizing his recordings. *Id.* at 17. Eisen authored a memorandum to the County Commissioners Court proposing an ordinance that would criminalize photographing any county employee without their consent but allow employees to grant consent to favorable media outlets. *Id.* at 19–20.

On April 23, 2024, Flash returned once more to the County Courthouse to record a public county commissioners meeting. *Id.* at 20. This time, Defendant Curtis Evans—a county judge—ordered Flash physically removed for covering the meeting. *Id.* As he was being escorted out, one of the County deputies told him to "get a lawyer and sue." *Id.* The next day, Evans issued a written order that banned Flash from being within 300 feet of any County building or official, under penalty of arrest and jail time. *Id.* Flash did not receive notice of the ban or the opportunity to be heard, and it was unclear what legal authority, if any, Evans had been acting under in issuing the ban. *Id.* At this point, criminal charges had also been filed against Flash for harassment and terrorism. *Id.* at 22.

Two days later, Flash was arrested on a warrant issued by the County and placed in the Van Horn Jail for sixteen hours before eventually posting bond. *Id.* at 21. After he returned to his home in Fort Davis, he was stopped by Merritt near his house and told

that he would be arrested if he approached the County Courthouse, pursuant to Judge Evans's trespass order. *Id.* Flash filed a habeas motion challenging the order as violative of Flash's rights under the First, Fifth, and Fourteenth Amendments. *Id.* On June 10, 2025, a court struck down the ban, finding it violated Flash's constitutional rights and was issued without legal authority. *Id.* at 21.

With the order now lifted, Flash returned to the County Courthouse on June 27 to photograph a budget meeting. *Id.* at 22. There were no written rules that prohibited recording or photography, but Flash was asked to move his camera to the back of the room, a request that he complied with. *Id.* Defendant Victor Lopez—a county sheriff—then approached Flash and told him Flash's photography was interfering with his ability to listen to the meeting. *Id.* Defendant Adriana Ruiloba—a county deputy—also approached Flash and told him to back off and not come in her personal space. *Id.* Flash left the room and continued recording the meeting from outside. *Id.*

Upon reentering the room to photograph Ruiloba, Flash was grabbed, handcuffed, and forcibly removed by Ruiloba and Joseph Giesbrecht, a fellow a police officer. *Id.* at 23. Flash was nonresistant throughout the duration of his removal, and he made this clear to the officers. *Id.* ("Flash sa[id] 'Stop' and 'I'm not resisting' as Defendants Ruiloba and Giesbrecht used physical force against him."). Flash was questioned for 30 minutes and cited for disorderly conduct under Texas Penal Code § 42.01. *Id.* The citation did not identify which of the eleven subsections Flash had violated. *Id.* The same day he was arrested, Flash went to an urgent care center for injuries stemming from Defendants' force. *Id.* at 24. Flash's medical records

documented bruising and wrist abrasions on his arms, pain in his upper back and chest, and an elevated heart rate. *Id.*

After his arrest, Defendants made various statements to the media about Flash and his arrest. Evans called him "crazy" and "not suitable for public settings" and brought up the possibility of additional criminal charges. *Id.* at 25. Evans also endorsed an anonymous anti-David Flash website called BigBendTimes.org (unaffiliated with Flash's Big Bend Times). *Id.* Evans and Lopez both conducted an in-person interview with BigBendTimes.org and released body cam footage of Flash's arrest to the website. *Id.* at 25–26.

All criminal charges against Flash were eventually dropped. *Id.* at 24. His disorderly conduct charge was dropped on June 27 due to insufficient evidence. *Id.* The harassment charge filed by Defendant Luedecke was dismissed on August 10, along with an outstanding traffic citation against Flash. *Id.*

On January 18, 2026, Flash filed this action, alleging that the County and many of its officials, including Luedecke, violated his constitutional rights. (Doc. 1). Luedecke filed a Motion to Dismiss. (Doc. 14). This matter was fully briefed and is ripe for adjudication. (Docs. 27, 46).

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a 12(b)(6) motion to dismiss, plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is appropriate if a complaint offers merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (quoting *Ashcroft*, 556 U.S. at 678), *cert. denied*, 572 U.S. 1087 (2014). When reviewing a 12(b)(6) motion, the court accepts all facts as true and construes them in the light most favorable to plaintiff. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).

## Discussion

Flash brings First Amendment retaliation, Fourth Amendment malicious prosecution, civil rights conspiracy, and a state law abuse of process claim against Luedecke. Luedecke asserts judicial and qualified immunity and moves to dismiss on various grounds.

### I. Judicial Immunity

Luedecke raises judicial immunity, as she is entitled to do as a justice of the peace. *See, e.g., Jones v. King*, 148 F.4th 296 (5th Cir. 2025). Judicial immunity is an absolute defense that applies to all judicial acts performed during judicial proceedings. *Id.* Immunity applies even in circumstances where the judge is accused of acting maliciously or corruptly. *Id.* The Fifth Circuit, for example, has held that justices of the peace enjoy judicial immunity for issuing arrest warrants, even when it is alleged that

the warrants were falsified. *Kastner v. Lawrence*, 390 F. App'x 311, 315 (5th Cir. 2010); *Brewer v. Blackwell*, 692 F.2d 387, 400 (5th Cir. 1982).

Judicial immunity does not extend to "actions not taken in the judge's judicial capacity" or "actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Diaz v. Cantu*, 123 F.4th 736, 746 (5th Cir. 2024) (quoting *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991)). And an act is not judicial simply because it was or is commonly performed by a judge. *Jones*, 148 F.4th at 300. Courts consider: (1) whether the precise act complained of is a normal judicial function; (2) whether the acts occurred in the courtroom or appropriate adjunct spaces such as the judge's chambers; (3) whether the controversy centered around a case pending before the court; and (4) whether the acts directly arose out of a visit to the judge in his official capacity. *Diaz*, 123 F.4th at 746–47. "The 'touchstone' is whether the judge is 'resolving disputes between the parties' or 'authoritatively adjudicating private rights.'" *Jones*, 148 F.4th at 301 (quoting *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435–36 (1993)).

As to the first factor, the acts Flash complains of appear to primarily be executive functions. *See Davis v. Tarrant County*, 565 F.3d 214, 221 (5th Cir. 2009) ("[C]ourts must draw a 'distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform.'" (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)). Flash complains of Luedecke: (1) attempting to detain him; (2) issuing a law enforcement alert outside the context of pending litigation; (3) issuing warning notices to law enforcement about Flash; and (4) filing criminal charges against him for harassment and terrorism. (Doc. 27 at 3). The first three

acts appear to be clear executive functions, rather than judicial; Luedecke does not argue otherwise. (Docs. 14 at 4–5; 46 at 3).

Luedecke filing criminal charges against Flash presents a more difficult question. In his Response, Flash argues that Luedecke acted as a complaining witness—not a judge—in filing the charges against him. (Doc. 27 at 6). Luedecke does not respond to this argument. (Doc. 46 at 3). At this early stage, the undersigned finds it would be best to wait until there is more clarity as to Luedecke's role in bringing these charges before recognizing this act as a normal judicial function. If Flash means that Luedecke filed the arrest warrant against him for these charges, she would likely be entitled to judicial immunity. *Kastner*, 390 F. App'x at 315. But if Luedecke was indeed acting as a complaining witness, she likely would not have been acting judicially and instead as a private citizen. Thus, the Court should deny Luedecke's Motion as to her assertion of judicial immunity at this stage.

## II. Entitlement to Qualified Immunity

Luedeke also invokes qualified immunity. Qualified immunity is a defense to individual capacity liability for "government officials performing discretionary functions . . . insofar as their conduct does not violate clearly established constitutional rights." *Diaz v. Cantu*, 123 F.4th 736, 747 (5th Cir. 2024) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If a defendant successfully raises qualified immunity, "[t]he plaintiff 'must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm . . . alleged and that defeat a qualified

immunity defense with equal specificity." *Id.* (quoting *Lincoln v. Barnes*, 855 F.3d 297, 300–01 (5th Cir. 2017)).

Qualified immunity works under a burden shifting framework. *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 318 (5th Cir. 2019). The defendant official bears the initial burden to establish their entitlement to the defense. *Castelan v. Villarreal*, No. 5:23-CV-1394-JKP-RBF, 2025 WL 424538, at *20 (W.D. Tex. Feb. 6, 2025) ("[M]ere invocation [of qualified immunity] is not enough."); *Barker v. Norman*, 651 F.2d 1107, 1120 (5th Cir. 1981) ("The immunities of state officials that we have recognized for purposes of [§] 1983 are the equivalents of those we have recognized at common law, and the burden is on the official claiming immunity to demonstrate his entitlement." (internal citations omitted) (quoting *Dennis v. Sparks*, 449 U.S. 24, 29 (1980))).

To satisfy this burden, the defendant official must demonstrate their conduct was within the scope of their discretionary authority. *Cherry Knoll*, 922 F.3d at 318; *Sweetin v. Texas City*, 48 F.4th 387, 392 (5th Cir. 2022) ("To even get into the qualified-immunity framework, the government official must 'satisfy his burden of establishing that the challenged conduct was within the scope of his discretionary authority.'" (quoting *Cherry Knoll*, 922 F.3d at 318)). An official acts pursuant to discretionary authority when they perform non-ministerial acts within the scope of their official responsibilities. *Cherry Knoll*, 922 F.3d at 318. Non-ministerial acts are those that involve personal deliberation and judgment, while ministerial acts are those that require obedience or the performance of a duty to which the actor had no choice but to perform. *Anders v. Rumfield*, No. 25-40387, 2026 WL 625638, at *2 (5th Cir. Mar. 5, 2026).

Even if the defendant demonstrates their actions were non-ministerial, they must also show they were within the scope of their official responsibilities. *Diaz*, 123 F.4th at 748–49; *see Barker*, 651 F.2d at 1121 n.18 ("It should be clear from our prior case law that an official's actions may be so far removed from the ordinary course of his duties, so outside even his discretionary authority to act, that the official cannot establish his entitlement to claim immunity in the first instance . . . ."). To determine whether an official was acting within the scope of their official duties, courts look primarily at state law. *Anders*, 2026 WL 625638, at *2 (citing *Sweetin*, 48 F.4th at 392).

Here, Flash complains of Luedecke: (1) attempting to detain him; (2) issuing a secret law enforcement alert; (3) issuing false warning notices about him; and (4) filing criminal charges against him. (Doc. 27 at 3). Other than asserting she was acting within the scope of her duties as a justice of the peace, Luedecke does not provide any authority demonstrating that the acts Flash complains of were within her discretionary power. (Doc. 14 at 6). But qualified "immunity is not automatically available to every 1983 defendant merely by virtue of his status as a government employee." *Williams v. Treen*, 671 F.2d 892, 896 (5th Cir. 1982). Luedecke, like many of her co-Defendants, misunderstands that she is the one who bears the initial burden of demonstrating her actions are entitled to qualified immunity.

To meet this burden, Luedecke would have had to point to specific[1] authority vesting her with discretionary authority over the conduct Flash has challenged. In each

1. In one recent unpublished opinion, the Fifth Circuit appeared to take a broader approach in finding discretionary authority and said it may also flow from "general job duties . . . ." *Turner v. Oliver*, No. 23-60165, 2025 WL 737339, at *4 (5th Cir. Mar. 7, 2025) (finding prosecutor had to make statements to the

of its recent decisions involving this burden, the Fifth Circuit has held that the lack of specific state authority that authorized and was narrowly tailored to the defendant's discrete acts made qualified immunity inapplicable. *Diaz*, 123 F.4th at 749 (county judge could not assert qualified immunity because he failed to meet his burden of showing state law gave him authority to issue contempt orders); *Sweetin*, 48 F.4th at 392 (ambulance permit officer could not assert qualified immunity because state law did not give him authority to conduct seizures); *Cherry Knoll*, 922 F.3d at 318–19 (city manager could not assert qualified immunity because he failed to meet his burden of showing state law gave him authority to file plats affecting private property without consent of the landowner). Imposing this burden "provides greater protection to the public and is consistent with the common law burden of proof rule with respect to official immunity." *Douthit v. Jones*, 619 F.2d 527, 534 (5th Cir. 1980).

Perhaps this burden would be easily satisfied if Luedecke were to reassert qualified immunity at the summary judgment stage. And it is justifiable for Defendants not to have known of a burden that the Fifth Circuit itself has recognized "often gets overlooked . . . ." *Sweetin*, 48 F.4th at 392. But it is not the Court's role to establish a government-official's entitlement to qualified immunity, and it should not treat a burden as satisfied when there has been no attempt to meet it. *Castelan*, 2025 WL 424538, at *20 ("[D]istrict courts err in determining that a defendant official is 'entitled to the protection of qualified immunity at the Rule 12(b)(6) stage' when the defendant official

public as part of their general job duties and was therefore acting within their discretionary authority). But this opinion is unpublished and therefore not precedent.

has not carried his burden . . . ." (quoting *Cherry Knoll*, 922, F.3d at 319)); *Williams v. East Baton Rouge City/Parish*, No. 23-01581-BAJ-EWD, 2024 WL 4241627, at *8 (M.D. La. Sept. 19, 2024) (denying police officer's qualified immunity because "he point[ed] to no state law or policy that might demonstrate the scope of his discretionary authority"). For these reasons, the Court should deny Luedecke's Motion as to qualified immunity.

## III. Fourth Amendment Malicious Prosecution

Luedecke moves to dismiss Flash's malicious prosecution claim for failure to state a claim. To state a malicious prosecution claim, the plaintiff must plead the threshold element of there being an unlawful seizure in addition to: "(1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) malice; and (6) damages." *Davis v. Warren*, 173 F.4th 566, 572 (5th Cir. 2026).

Legal causation is present if the defendant "misled the prosecutor" or factored into the decision to initiate criminal proceedings. *Soto v. Monge*, 735 F. Supp. 792, 804 (W.D. Tex. 2024); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014) ("If the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution."). To demonstrate favorable termination, "[a] plaintiff need only show that the criminal prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 39 (2022).

Irrespective of Flash pleading the elements for malicious prosecution, the fundamental flaw with his claim is that Luedecke was not acting under color of state law in bringing charges against Flash. *Smith v. City of Gretna Police Dep't*, 175 F. Supp. 2d 870, 875 (E.D. La. 2001) ("The filing of a criminal complaint is insufficient to transform a private individual into a state actor for purposes of § 1983 liability." (citing *Hernandez v. Schwegmann Bros. Giant Supermarkets*, 673 F.2d 771, 772 (5th Cir. 1982)); *see also Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 388 n.5 (5th Cir. 1985) ("[A] private party does not act under color of state law when she merely elicits but does not join in an exercise of official state authority."). Flash acknowledges this in arguing Luedecke's judicial immunity does not apply. (Doc. 27 at 5) ("A judge who files criminal charges is no different from any other citizen who reports alleged misconduct."). This is fatal to Flash's malicious prosecution claim because it is brought through § 1983. *Hernandez v. Causey*, 124 F.4th 325, 334 (5th Cir. 2024) ("To state a claim under § 1983, a plaintiff . . . show that the alleged deprivation was committed by a person acting under color of state law." (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988) (internal quotations omitted)).

Flash also raises the possibility that Luedecke was acting in a prosecutorial capacity in bringing charges against him, but if that is the case she would be entitled to prosecutorial immunity. (Doc. 27 at 5). In *Oliver v. Collins*, the Fifth Circuit held that "[e]ven if [a sheriff] were the person with authority to decide whether or not to pursue criminal charges, [the plaintiff] would have no claim because . . . [t]he decision to file or not file charges falls within the category of acts that will not give rise to section 1983 liability." 904 F.2d 278, 281 (5th Cir. 1990). If she was acting as a citizen, she was not

acting under color of state law; if she was acting as a prosecutor, she is entitled to immunity. Either way, this claim should be dismissed.

**IV. First Amendment Retaliation**

Luedecke also moves to dismiss Flash's First Amendment retaliation claim for failure to state a claim. To state a First Amendment retaliation claim, a plaintiff must plead that: (1) they were engaged in constitutionally protected activity; (2) the defendant's adverse actions were substantially motivated against their exercise of the constitutionally protected activity and (3) caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity. *Rincon v. City of Laredo*, No. 24-40168, 2025 WL 603883, at *5 (5th Cir. Feb. 25, 2025); *Batyukova v. Doege*, 994 F.3d 717, 730 (5th Cir. 2021).

As to the first element, Flash was engaged in a constitutionally protected activity—taking photographs and collecting information for his reporting on government officials. The Fifth Circuit has recognized that news gathering is entitled to First Amendment protection. *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017); *In re Express-News Corp.*, 695 F.2d 807, 808 (5th Cir. 1982) ("[N]ews gathering is entitled to [F]irst [A]mendment protection, for 'without some protection for seeking out the news, freedom of the press could be eviscerated.'" (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972))). Flash pleads that Luedecke's retaliation occurred after he photographed a sign outside of her office and therefore pleads the first element of his claim sufficiently.

Flash likewise demonstrates retaliatory motive. Motive is notoriously difficult to demonstrate—especially without the benefit of discovery—and the Fifth Circuit has said that courts should dismiss on this basis sparingly. *See Haverda v. Hays County*, 723 F.3d 586, 592 (5th Cir. 2017) ("Summary judgment should be used most sparingly in First Amendment cases involving delicate constitutional rights, complex fact situations, disputed testimony, and questionable credibilities." (cleaned up)); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991) ("When state of mind is an essential element of the nonmoving party's claim, it is less fashionable to grant summary judgment because a party's state of mind is inherently a question of fact that turns on credibility."). Regardless, Flash's factual allegations regarding Luedecke's motive are sufficient at this early stage.

Close timing between the plaintiff engaging in the protected activity and facing the retaliatory action can be a sufficient basis for inferring retaliatory motive. *Lewis v. Panola County*, No. 22-60123, 2022 WL 17496048, at *2 (5th Cir. Dec. 8, 2022); *Mooney v. Lafayette Cnty. School Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013). Luedecke's retaliatory conduct occurred immediately after Flash photographed the sign outside her office, demonstrating temporal proximity. (Doc. 1 at 16). Luedecke's motive being Flash's First Amendment activity may also be inferred from her characterizing him negatively as a First Amendment auditor to multiple law enforcement agencies. (Doc. 1 at 17, 37). "[L]awfully conducted First Amendment auditor activities are protected by the First Amendment." *Miller v. Salvaggio*, No. SA-20-CV-00642-JKP, 2021 WL 3474006, at *5 (W.D. Tex. Aug. 6, 2021).

As to the third element, the Fifth Circuit requires the plaintiff to plead both: (1) the defendant's conduct would have chilled a person of ordinary firmness from engaging in the protected activity and (2) "that *the plaintiffs'* exercise of free speech has been curtailed." *Villarreal v. City of Laredo*, 44 F.4th 363, 373–74 (5th Cir. 2022) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)), *vacated on reh'g en banc on other grounds*, 94 F.4th 374, 398 (5th Cir. 2024). This element therefore requires both an objective showing as to how an ordinary person's speech would be chilled and a subjective showing as to the chilling effect the defendant's acts had on the plaintiff. Flash makes the first but not the second.

The threshold issue regarding the objective inquiry is how much of Luedecke's conduct can be considered. Flash argues Luedecke retaliated against him by: (1) attempting illegal detention; (2) sending law enforcement alerts; (3) issuing false arrest warrant notices; and (4) filing baseless criminal charges. (Doc. 1 at 30). As explained previously, Luedecke did not act under the color of state law in pressing criminal charges against Flash as a private citizen. *Brewer*, 692 F.2d at 400; *Hernandez*, 673 F.2d at 772. The Court therefore is left to consider whether Luedecke sending out law enforcement alerts and attempting to illegally detain Flash is sufficient.

To meet the objective component, Flash first points to Luedecke alerting law enforcement that he was a "First Amendment auditor" and "on the loose" as conduct that would chill a person of ordinary firmness. (Doc. 1 at 17). This conduct is insufficient; the Fifth Circuit has recognized that false accusations and criticism would

not chill a person of ordinary firmness. *Johnson v. Bowe*, 856 F. App'x 487, 493 (5th Cir. 2021).

Luedecke's attempt to detain Flash presents a more difficult question. In her Motion, Luedecke largely tries to discredit Flash's accusations. (Doc. 14 at 8–9) ("Plaintiff had been in the Judge's courtroom and she had found him in contempt of court after he ignored multiple warnings and was harassing and attempting to intimidate Judge Luedecke and interfering with court operations."). But at this stage, this Court must accept Flash's version of the facts. *Fernandez-Montes*, 987 F.2d at 284.

According to Flash, Luedecke shouted "You're detained!" after he photographed a sign outside Luedecke's office and instructed her assistant to press a silent alarm to summon law enforcement. (Doc. 1 at 16). A detention can chill a person of ordinary firmness. *Rios v. Perez*, 777 F. Supp. 727, 759 (W.D. Tex. 2025); *Ctr. For Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007) (finding plaintiff's detention "would undoubtedly deter an average law-abiding citizen" from engaging in First Amendment activity).

Although Flash was not ultimately detained, the undersigned finds a person of ordinary firmness could be chilled from First Amendment activity by a judicial officer shouting they are detained and summoning law enforcement to effectuate the detention. Lesser threats have been found to chill speech. *Hill v. City of Houston*, 789 F.2d 1103, 1110 (5th Cir. 1986) (finding ordinance that imposed penalty of a misdemeanor and $200 fine chilled speech), *aff'd*, 482 U.S. 451 (1987); *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (finding selective issuance of parking tickets

totaling $35 could potentially chill speech and support a retaliation claim). Flash therefore pled the objective component of this element sufficiently.

Flash failed to plead the subjective component of this element, however, as there is nothing here indicating that his speech activities were curtailed by Luedecke's retaliatory acts.[2] *Villarreal* is illustrative here. 44 F.4th at 374. In *Villarreal*, the Fifth Circuit held that although a citizen-journalist plaintiff had suffered an injury sufficient to chill a person of ordinary firmness, they had not pled their speech had been curtailed and therefore could not state a First Amendment retaliation claim. *Id.* ("[T]hese allegations do not show that Villarreal curtailed her speech. To the contrary . . . Villarreal has continued reporting since her arrest—consistent with the highest traditions of fearless journalism."). Similarly here, there is no indication that Flash's speech was curtailed by Luedecke's attempted detention. He returned to the County Courthouse multiple times to continue his reporting and newsgathering. (Doc. 1 at 20, 22).

The undersigned does note the folly in this subjective component, which effectively requires plaintiffs to self-censor if they want a First Amendment retaliation claim.[3] *Mendociono Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999)

2. Flash does plead damages of "[t]he chilling effect on his ability to exercise his First Amendment rights." (Doc. 1 at 29). But even if this allegation were particularized at Luedecke, it is a legal conclusion insufficient to demonstrate curtailment. *McLin v. Ard*, 866 F.2d 682, 697 (5th Cir. 2017).

3. When the Fifth Circuit clarified that plaintiffs must make both an objective and subjective showing in *Keenan v. Tejeda*, the Court relied on precedent from the First, Second, and Fourth Circuits. 290 F. 252, 259 (5th Cir. 2002) (citing *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000); *Spear v. Town of West Hartford*, 954 F.2d 63, 67 (2d Cir. 1992); *Sullivan v. Carrick*, 888 F.2d 1, 14 (1st Cir. 1989)). Each Circuit has since ditched this approach. *See Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011); *Dorsett v. County of Nassau*,

("[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity."). Every other Circuit requires only an objective showing to state a claim. *Id.*; *Barton*, 632 F.3d at 29; *Dorsett*, 732 F.3d at 160; *Mirabella v. Villard*, 853 F.3d 641, 650 (3d Cir. 2017); *Constantine*, 411 F.3d at 500; *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010); *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011); *Scheffler v. Molin*, 743 619, 621 (8th Cir. 2014); *Rhodes v. Robinson*, 408 F.3d 559, 568–69 (9th Cir. 2005); *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007); *Bennett v. Hendrix*, 423 F.3d 1247, 1251 (11th Cir. 2005); *Toolaprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002). Even so, this Court is bound to follow Fifth Circuit precedent—under which Flash fails to state a claim. Luedecke's Motion should therefore be granted as to Flash's First Amendment retaliation claim.

**V. 42 U.S.C. § 1983 Conspiracy**

Luedecke also moves to dismiss Flash's civil rights conspiracy claim. Flash alleges each individual Defendant, including Luedecke, conspired to suppress his journalism through retaliation and prior restraint. (Doc. 1 at 36). The undersigned finds Flash adequately pled the existence of a conspiracy but failed to plead Luedecke's personal involvement.

Conspiracy claims brought through § 1983 for deprivations of constitutional rights "are unique" in that the plaintiff must not only allege facts that (1) establish the

732 F.3d 157, 160 (2d Cir. 2013); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005).

existence of a conspiracy involving state action, but also (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019). They thus "act as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act" that caused the constitutional deprivation. *Bevill v. Fletcher*, 26 F.4th 270, 283 (5th Cir. 2022). A § 1983 conspiracy therefore cannot exist in a vacuum; there must be a surviving constitutional claim for it to be actionable. *Id.*

Here, Flash has pled facts establishing the deprivation of his First Amendment rights by Defendant Curtis Evans, a party to the alleged conspiracy. (Doc. 48). Thus, all that is left to consider is whether Flash sufficiently pled the existence of a conspiracy involving state action. *See Morales v. Carrillo*, 625 F. Supp. 3d 587, 598 (W.D. Tex. 2022) ("The second prong of this analysis [deprivation of civil rights in furtherance of the conspiracy] is resolved by the Court's denial of summary judgment . . . on the Plaintiffs' false charge claim.").

"[A] plaintiff's § 1983 conspiracy claim need not satisfy 'a probability requirement at the pleading stage; plausibility simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *Bevill*, 26 F.4th at 284 (cleaned up) (quoting *Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013)). Agreement is often "shown by circumstantial evidence, because 'conspirators rarely formulate their plans in ways susceptible of proof by direct evidence.'" *Id.* (quoting *Thomas v. New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982)). Even so, a plaintiff's allegations must "raise[] a suggestion of a preceding agreement, not merely

parallel conduct that could just as well be independent action." *Bevill*, 26 F.4th at 284 (quoting *Twombly*, 550 U.S. at 557).

Luedecke argues Flash's claim fails because he failed to plead the specifics of the agreement such as "when and where" it was made and "who was present . . . ." (Doc. 14 at 11–12). Such specificity is unnecessary at this stage. "Conspiracy" often "conjures images of under-the-table handshakes and back-alley meetings under the cover of night[,]" but that is not how parties typically conspire. *Bevill v. City of Quitman*, No. 4:19-CV-406, 2025 WL 2306849, at *22 (E.D. Tex. Aug. 11, 2025). "They do so over time, in text messages, over lunch meetings, and during phone calls." *Id.* Consequently, "there is rarely a smoking gun" or a "room where [the conspiracy] happened." *Id.* "[T]he determination of whether a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the behavior of the alleged conspirators." *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 374 (M.D. La. 2022) (quoting *Mack v. Newton*, 737 F.2d 1343, 1350 (5th Cir. 1984)).

Flash's allegations need only "suggest a commitment to a common end" or that the "conspirators had a unity of purpose or a common design and understanding . . . ." *Imani*, 614 F. Supp. at 374 (quoting *Mack*, 737 F.2d at 1350). There is a demonstrated commitment to a common end here—suppressing Flash's First Amendment rights using state authority. Flash has pled that the individual Defendants conspired to use their state authority to suppress his journalism through retaliation and prior restraint. (Doc. 1 at 36).

He speaks of a "coordinated, multi-agency effort to develop counterstrategies against Flash's journalism . . . ." *Id.* at 37. Seldomly do such sensational claims have support to back them up, but Flash provides facts to push this over the line from speculative to plausible. After Flash began reporting on the individual Defendants, he was the target of seven separate criminal investigations, none of which resulted in any formal charges. *Id.* at 19. To prevent Flash from monetizing his recordings, County officials discussed playing copyright restricted music over public meetings; they also floated the idea of a policy by which journalists could be refused reporting access based on favorability of coverage. *Id.* at 37. Then—in an extrajudicial proceeding—Flash was banned from coming within 300 feet of any County building or employee. *Id.* at 20. After that ban was struck down, Flash was arrested for the same conduct which had led to the ban—attempting to record to cover a County Commissioners Court meeting that was open to the public. *Id.* at 22.

Throughout the conspiracy's duration, many of the alleged coconspirators made statements expressing their animus toward Flash and his journalism. Defendant Evans called him "crazy" and "not suitable for public settings." (Doc. 1 at 25). Defendant Eisen described Flash's Big Bend Times as a "megaphone" and said that Flash "'brought it on himself' . . . through his journalism." *Id.* at 8. And Defendant Dennison called him a "spoiled toddler" and speculated that he could be carrying a concealed weapon. *Id.* at 12.

Flash also pled links between the individual Defendants and their actions against Flash. As the acts described above were taking place, Defendants Evans and Lopez

jointly provided body camera footage to and participated in an interview with the anti-Flash smear website. *Id.* at 25–26; *see Quitman*, 2025 WL 2306849, at *18 (considering joint interviews as evidence of conspiratorial relationship). Critically, Flash points to Defendant Eisen stating that the action taken against Flash was "motivated by our coverage[,]" suggesting a collective response. (Doc. 1 at 35).

Although none of these allegations would be sufficient standing alone, a reasonable fact finder could look at the totality of the facts here and find they demonstrate a "commitment to a common end" rather than purely independent conduct. *Imani*, 614 F. Supp. at 374 (quoting *Mack*, 737 F.2d at 1350). Multiple strategies were deployed with the end goal of silencing Flash's journalism. Whether those strategies were undertaken pursuant to a common scheme or agreement is still an open question, but Flash has at least provided enough to meet the "minimum standard" necessary to survive a motion to dismiss. *Bevill*, 26 F.4th at 284; *Morales*, 625 F. Supp. at 605 ("[T]he Court expresses no opinion on the merits of Plaintiff's conspiracy claim; it simply finds that the inference of conspiracy is not so tenuous that the Court" must dismiss it. (internal citation and quotations omitted)). Expecting Flash to provide even more as to when and where certain meetings took place and who was present would be unreasonable, given that—for over a year—Flash could not even come within 300 feet of any of the alleged conspirators or the buildings in which they worked without facing jail time. (Doc. 1 at 20).

Although Flash sufficiently pled the existence of a conspiracy involving state action to suppress his journalism, he has not demonstrated Luedecke's membership in

it. *See Zorn v. City of Marion*, 774 F. Supp. 1279, 1330 (D. Kan. 2025) (finding plaintiff sufficiently pled conspiracy claim against some defendants but dismissing the claim against other defendants who lacked involvement). Plaintiffs bringing claims through § 1983 must show that each government-official was personally involved in the constitutional deprivation. *Cope v. Cogdill*, 3 F.4th 198, 207 n.6 (5th Cir. 2021). In the context of conspiracy claims, this showing can involve otherwise lawful acts because "lawful actions can be evidence of a conspiracy." *Morales*, 625 F. Supp. at 603–04.

There are simply no factual allegations tying Luedecke to any of the other alleged co-conspirators. Flash argues the fact that multiple County officials, including Luedecke, each targeted the same journalist supports the reasonable inference that they acted in concert. (Doc. 27 at 11). But parallel conduct, without more, is insufficient to support a claim for conspiracy. *Twombly*, 550 U.S. at 557; *Villegas v. City of El Paso*, No. EP-15-CV-00386-DCG, 2025 WL 2502505, at *30 (W.D. Tex. Aug. 22, 2025). And although Eisen's statement that the actions against Flash were "motivated by our coverage" does suggest a collective response tied to Flash's reporting coverage, it does not tie Luedecke specifically to the conspiracy. (Doc. 1 at 35).

Flash also pled that Luedecke reached a "meeting of the minds" with Defendants Evans, Lopez, and Eisen to achieve the unlawful objective of the conspiracy. (Doc. 1 at 36). But this is merely a conclusory legal conclusion that the Court need not accept as true. *Hansel v. Hemby*, No. 4:25-CV-00504-RWS-JBB, 2026 WL 776309, at *25 (E.D. Tex. Mar. 2, 2026) ("Plaintiff's conclusory allegation that [defendants] had a meeting of the minds in early October 2024 is insufficient to plead a § 1983 conspiracy." (internal

citation omitted)), *R. & R. adopted*, 2026 WL 775762 (E.D. Tex. Mar. 18, 2026). Accordingly, Luedecke's Motion should be granted as to Flash's civil rights conspiracy claim.

**VI. State Law Claims**

Luedecke moves to dismiss the state law abuse of process claim against her, pointing to Section 101.106(e) of the Texas Tort Claims Act ("TTCA"). Luedecke argues that Flash would have had to elect to sue either her or the County, but not both. (Doc. 14 at 12–13). Regardless of the validity of this argument, subsection (e) explicitly states government employees "shall immediately be dismissed on the filing of a motion by the governmental unit." § 101.106(e). Therefore, this right is properly raised in the County's Motion to Dismiss, but not Luedecke's. *Ibarra v. Harris County*, 243 F. App'x 830, 837 (5th Cir. 2007) (affirming lower court denying dismissal under subsection (e) because county "never filed a motion to dismiss" and "the defendant officers have no automatic right to dismissal"). Luedecke's Motion should therefore be denied as to Flash's state law claims.

**VII. Official Capacity Claims**

Finally, Luedecke moves to dismiss all of Flash's claims against her in her official-capacity. Official capacity actions against government officials are duplicative when their governmental entity is also a defendant, because official-capacity actions are "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Courts dismiss official-capacity claims on this basis, even when the plaintiff seeks injunctive relief from specific defendants. *San Antonio*

*Firefights' Association, Loc. 624 v. City of San Antonio*, No. SA-18-CV-745-XR, 2018 WL 11148671, at *2 (W.D. Tex. Oct. 4, 2018) ("[T]he underlying claims against the official-capacity defendants and the City are the same, regardless of whether Plaintiff intends to ask for injunctive relief specific to the Mayor or City Attorney."); *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001). Luedecke's Motion should therefore be granted as to Flash's claims against her in her official capacity, as the County is a defendant here.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that Luedecke's Motion to Dismiss be **GRANTED IN PART** and **DENIED IN PART**. (Doc. 14). Luedecke's Motion should be granted as to Flash's malicious prosecution, First Amendment retaliation, and civil rights conspiracy claims. These claims should be **DISMISSED WITHOUT PREJUDICE**. Luedecke's Motion should be denied as to qualified and judicial immunity as well as Flash's abuse of process claim.

SIGNED this 17th day of June, 2026.

DAVID B. FANNIN
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND RIGHT TO APPEAL/OBJECT

In the event that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation **by certified mail, return receipt requested**. Pursuant to 28 U.S.C. § 636(b), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Court need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the Magistrate Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a de novo determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).